**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| In re:<br><br>    GreenTech Automotive, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No. 18-10651 |
| In re:<br><br>    WM Industries Corp.,<br><br>Debtor. | Chapter 11<br><br>Case No. 18-10652 |
| In re:<br><br>    Gulf Coast Funds Management, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 18-10653 |
| In re:<br><br>    American Immigration Center, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 18-10654 |
| In re:<br><br>    GreenTech Automotive Capital A-3 GP, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 18-10655 |

Kristen E. Burgers (VSB No. 67997)
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, Virginia 22102
Telephone:  (703) 584-8900
Facsimile:  (703) 584-8901
Email:  kburgers@hf-law.com

*Proposed co-Counsel to the Debtors*

Mark S. Lichtenstein (pro hac vice pending)
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 223-4000
Facsimile:  (212) 223-4001
Email:  mlichtenstein@crowell.com

*Proposed co-Counsel to the Debtors*

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| GreenTech Automotive Partnership A-3, L.P., | ) ) ) | Case No. 18-10656 |
| Debtor. | ) ) ) ) |  |

### DECLARATION OF NORMAN D. CHIRITE IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Norman D. Chirite declares and says:

1.      I am the internal legal counsel to GreenTech Automotive, Inc. ("**GreenTech**"), a corporation headquartered in Sterling, Virginia.  I am familiar with the day-to-day operations, businesses and financial affairs of the Debtors (as defined below).

2.      I submit this declaration (the "**Declaration**") (i) in support of the petitions (the "**Petitions**") of the Debtors for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) pursuant to 28 U.S.C. § 1746 in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "**First Day Motions**") and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases. I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees, directors and members of the Debtors, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  If called upon to testify,

I would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, the financial information contained herein is unaudited.

## Commencement of Reorganization Proceedings

4.      On February 24, 2018 (the "**Petition Date**"), GreenTech, WM Industries Corp., Gulf Coast Funds Management, LLC, GreenTech Automotive Capital A-3 GP, LLC, GreenTech Automotive Partnership A-3, LP, and American Immigration Center, LLC (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      Part I of this declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these chapter 11 cases, Part III describes the Debtors' prepetition restructuring initiatives and Part IV sets forth the relevant facts in support of the First Day Motions.

## I.      The Debtors' Businesses

6.      GreenTech was organized in Mississippi in 2009 for the purpose of developing, producing, marketing and financing energy efficient automobiles, including electric cars. In 2010, GreenTech acquired assets including intellectual property, relating to an electric vehicle known as the "My Car".  In 2011, GreenTech entered into a Memorandum of Understanding with the State of Mississippi Development Authority and the Board of Supervisors of Tunica County, Mississippi, pursuant to which the State of Mississippi and Tunica County agreed to provide a loan and certain additional financial incentives to GreenTech to support job creation

through GreenTech's manufacturing operations in Tunica County.  GreenTech owns a manufacturing facility and related equipment in Robinsonville, Tunica County, Mississippi.

7.      WM Industries Corp., a Virginia corporation ("**WMIC**"), is a holding company that is the holder of a majority of the outstanding shares of common stock of GreenTech.

8.      Gulf Coast Funds Management, LLC, a Louisiana limited liability company ("**GCFM**"), is a designated regional center in the Immigrant Investor Program under the U.S. Department of Homeland Security's U.S. Citizenship and Immigration Services.

9.      GreenTech Automotive Capital A-3 GP, LLC, a Delaware limited liability company ("**A-3 GP**"), is the general partner of GreenTech Automotive Capital A-3, L.P., a Delaware limited partnership ("**A-3 LP**") organized to receive investment funds from third party investors under the EB-5 Program that were, in turn, loaned to GreenTech.

10.     American Immigration Center, LLC, is a Virginia limited liability company and the sole member of GCFM.

11.     For the period from 2009 until 2013, GreenTech received investments aggregating $141.5 million from a total of approximately 283 individuals in four distinct investment transactions, referred to herein as the "A-1", "A-2". "A-3" and "A-4" investment tranches.

12.     In the A-1 tranche, 57 investors invested an aggregate of $28.5 million in GreenTech's Series A-1 Preferred Stock.

13.     In the A-2 tranche, 35 investors invested an aggregate of $17.5 million in additional shares of GreenTech's Series A-1 Preferred Stock.

14.     In the A-3 tranche, 89 investors invested an aggregate of $44.5 million in limited partnership interests in GreenTech Automotive Capital A-3, L.P., which funds were, in turn, loaned to GreenTech.

15.     In the A-4 tranche, 102 investors invested an aggregate of $51 million in GreenTech's Series A-2 Preferred Stock.

16.     The A-1 through A-4 tranches were intended to qualify for the Employment-Based Immigration Preference program, known as "EB-5", which offered immigrant investors the opportunity to qualify for permanent U.S. residency by investing specified amounts in certain U.S. job creating initiatives in economically challenged localities in the United States.  Each of the investors in the A-1 through A-4 tranches were participants in the EB-5 program.

17.     Prior to making an investment, every potential investor was provided with a solicitation package.  The offering materials for the A-1 through A-4 investment tranches disclosed that the investments were "at risk" within the new enterprise, as was required under applicable EB-5 regulations, and that there was no assurance that the investments would be successful or that the investors would ultimately receive permanent residency in the U.S.

## II.     Events Leading to the Chapter 11 Cases

18.     The Debtors' businesses have reached the point of unsustainability absent utilization of the tools presented by chapter 11.   GreenTech has experienced significant adverse developments that have hindered the successful operations of its automobile business, impaired its access to capital, and resulted in difficulties in the advancement of its investors' permanent residency petitions before the United States government.

19.     In 2013, the conservative-oriented online news organization Franklin Center for Government and Public Integrity, through its watchdog.org web site, published a series of 76

negative articles containing certain false and defamatory statements targeting GreenTech, which was previously affiliated with Terrence McAuliffe (who at that time was running for Governor of the Commonwealth of Virginia).

20.   GreenTech pursued defamation claims against the Franklin Center in Mississippi and Virginia courts that were ultimately resolved.  However, the adverse publicity occasioned by the watchdog.org articles and extensive follow-on coverage in major media had extremely negative impacts on the governmental, investor and public perception of GreenTech and its business.

21.   The Securities Exchange Commission commenced an investigation of GreenTech stemming from the adverse publicity.  While the SEC ultimately declined to pursue any further action against GreenTech, the investigation itself and the burden of the required responses to the SEC's inquiries further damaged GreenTech and its business prospects.

22.   In addition, the Office of the Inspector General of the Department of Homeland Security conducted an investigation of GreenTech and the involvement of Mr. McAuliffe in communications with the DHS's Citizenship and Immigration Services.  The resulting report of the Inspector General in 2015, and the involvement of Republican legislators such as Senator Chuck Grassley in the matter, further impaired GreenTech's reputation and its fundraising capability and, importantly, the orientation of USCIS toward the investor petitions for permanent residency under the EB-5 program.

23.   GreenTech was dealt another severe blow when it was sued in early 2015 by Plastech Holdings Company ("**PHC**"), a Michigan firm that falsely accused GreenTech of tortious interference with PHC's contractual relationship with a Chinese automotive manufacturer, Anhui Jianghuai Automobile Co., Ltd. ("**JAC**"), with whom GreenTech had

Case 18-10651-BFK   Doc 7   Filed 02/26/18   Entered 02/26/18 23:47:47   Desc Main
Document      Page 7 of 16

established a cooperative vehicle development and marketing arrangement.  After protracted litigation and discovery, GreenTech secured the dismissal of that case when it was established conclusively that PHC had forged the Chinese company's signature on a fictitious agreement that was the foundation of its claims against GreenTech. As a result of the PHC litigation, GreenTech incurred significant legal and other expenses and was forced to abruptly terminate its business relationship with the Chinese company, forfeiting a substantial deposit, stranding substantial start-up expenses and resulting in other damages totaling in tens of millions of dollars, which effectively destroyed GreenTech as a viable enterprise.

24.      GreenTech is now pursuing civil claims against PHC and its counsel, Susman Godfrey ("**Susman**"), in a federal action in Detroit, Michigan before the same court that dismissed the fraudulent claims against GreenTech, for  the damages resulting from PHC's and Susman's pursuit of claims which they knew were fraudulent.

25.      The foregoing circumstances, as well as personnel issues and manufacturing and other difficulties experienced in pursuing the establishment of GreenTech's ambitious business plan, ultimately resulted in severe economic hardship for GreenTech and its failure to meet operating plans.

26.      GreenTech exhausted its financial resources battling the USCIS, PHC/Susman and negative perceptions arising due to the public events recounted above.  GreenTech was forced to substantially limit operations in Mississippi, even though it had been successful in establishing the business opportunity with the Chinese firm JAC and had in fact commenced limited production of its MyCar vehicle in Mississippi.

27.      In 2016, GreenTech entered into a relationship with a newly organized automotive enterprise in China, Jiangsu Saleen Automotive Technologies,, Co., Ltd ("**JSAT**"),

under which GreenTech had appraised and then conveyed rights in its MyCar intellectual property and certain engineering assistance to JSAT in exchange for a minority interest in JSAT held on behalf of GreenTech by a subsidiary of WMIC.  The minority interest in JSAT (the "**JSAT Interest**") remains the principal asset of GreenTech apart from its manufacturing facility.

28.     Over the past approximately two years, GreenTech has continued to survive only through advances from its principal stockholder and fees for engineering services from JSAT, while claims of its investors and the State of Mississippi and ensuing litigation have continued to mount and consume dwindling resources.  The State of Mississippi and Tunica County, Mississippi have commenced litigation to recover amounts advanced to and for the benefit of GreenTech, and various groups of EB-5 investors have pursued civil litigation against the Debtors in a number of state and federal courts proceedings.

III.    **Prepetition Restructuring Initiatives**

29.     The Debtors' management team has taken various actions in response to the challenges described above. Facing these liquidity and operational issues, the Debtors explored outside financing and possible sale options for the past two years.  Although the Debtors did have some promising leads, these efforts did not reach the desired results.

30.     In particular, in 2017 GreenTech sought to arrange for the purchase of the JSAT Interest by a Chinese investment fund and obtained support for the transaction from a significant portion of its investors.  However, the condition to that transaction – that there be no major litigation involving GreenTech – has not been fulfilled due to the pendency of litigation against GreenTech and the other Debtors, including claims by a group of investors who sought to force payment to them of more than their original investments as a condition to not frustrating the consummation of that transaction.

31.     The Debtors have determined, in the prudent exercise of their business judgment, that the commencement of these chapter 11 cases at this time is the best alternative in order to stabilize their businesses, provide access potentially to DIP financing and ensure that maximum value can be preserved and realized for the benefit of their estates. While the Debtors are cognizant of the costs associated with chapter 11, the Debtors believe that, by using the tools available to them under the Bankruptcy Code, they can effectuate a value-maximizing transaction through a plan of reorganization or sales. The Debtors have been and continue to be focused on developing a restructuring solution that maximizes value for all stakeholders.

32.     Upon the conclusion of the chapter 11 process, the Debtors expect to restructure their debt obligations and capital structure, and seek to obtain the highest recovery possible for creditor constituencies through a chapter 11 plan of reorganization or a sale or series of sales pursuant to section 363 of the Bankruptcy Code. In the meantime, the Debtors will marshal all of their resources to continue to operate to achieve the goal of value maximization.

## IV.      **First Day Motions**

33.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions. The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to chapter 11.

34.     For a more detailed description of the First Day Motions than set forth below, the Debtors respectfully refer the Court to the respective First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control. Capitalized terms that are used in this Part IV but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

### A.      **Administrative Motions**

i.      *Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")*

35.     The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Bankruptcy Rules**"). Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, GreenTech.   Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors to indicate the joint administration of the estates.

36.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted. Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources. The Debtors' financial affairs and business operations are closely related. Many of the motions, hearings and orders in these chapter 11 cases will affect each Debtor and their respective estates. The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates. Moreover, each creditor can still file its claim against a particular estate. In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these chapter 11 cases. The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files. Finally, supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the Eastern District of Virginia will be simplified.

37.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and

constitutes a critical element in achieving a successful and smooth transition to chapter 11.

Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration

Motion should be granted.

        ii.    *Debtors' Motion for an Order Extending the Time to File Schedules and Statements of Financial Affairs (the "**Extension of Schedules Motion**")*

38.    The Debtors seek entry of an order granting additional time to file their

schedules and statements of financial affairs. Due to the numerous other matters that the

Debtors must attend to in connection with filing these cases, the Debtors will not be able to

complete the schedules of assets and liabilities, schedules of current income and expenditures,

statements of executory contracts and unexpired leases and statements of financial affairs in the

fourteen days provided under Bankruptcy Rule 1007(c).

39.    Given the many critical operational matters that the Debtors' management and

legal personnel must address in the early days of these chapter 11 cases, I believe that with the

extension requested, the Debtors will be able to focus their attention to business operations to

maximize the value of the Debtors' estates during the first critical post-petition months. I believe

this will help the Debtors make a smooth transition into chapter 11 and, therefore, maximize the

value of the Debtors' estates to the benefit of creditors and all parties in interest.

40.    I believe that the relief requested in the Extension of Schedules Motion is in

the best interests of the Debtors' estates, their creditors, and all other parties in interest and

constitutes a critical element in achieving a successful and smooth transition to chapter 11.

Accordingly, on behalf of the Debtors, I respectfully submit that the Extension of Schedules

Motion should be granted.

        iii.    *Debtors' Motion for an Administrative Order (i) Limiting Number of Recipients of Future Notices and (ii) Designating Form and Manner in*

*Which Notices May Be Sent to Certain Interested Parties (the "**Limit of Notice Motion**")*

41.     The Debtors seek entry of an order (i) limiting the number of recipients of future notices and (ii) designating the form and manner in which notices may be sent to certain interested parties. There are multiple creditors in these Chapter 11 Cases, including multiple Chinese investors ("**Chinese Interested Parties**") who may assert creditor claims under certain circumstances (subject to the Debtors' objections). Without the requested relief, the Debtors' will expend considerable resources in serving all motions, notices and other requests for relief pursuant to Bankruptcy Rule 2002.

42.     The Debtors' administrative costs can be significantly reduced by limiting the number of recipients of future notices and allowing the Debtors to give notice to Chinese Interested Parties by posting notice on GreenTech's website, posting notice on the WeChat social media application, and emailing the Chinese Interested Parties. I believe this reduction in administrative costs will help maximize any recovery to general unsecured creditors.

43.     I believe that the relief requested in the Limit of Notice Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Limit of Notice Motion should be granted.

  iv.     *Debtor's Motion for Entry of an Order (a) Authorizing, But Not Directing the Debtor to Pay Certain PrePetition (i) Wages, Salaries, and Other Compensation, (ii) Reimbursable Employee Expenses, and (iii) Employee Medical and Similar Expenses; and (b) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "**Wages and Benefits Motion**")*

44.     GreenTech seeks entry of an order (a) authorizing, but not requiring, it to pay or cause to be paid, in its sole discretion, all or a portion of the amounts owing (and associated

- 12 -

costs) under or related to Employee Wages and Benefits and (b) authorizing applicable banks

and other financial institutions to receive, process and pay any and all checks drawn on the

GreenTech's payroll accounts and automatic payroll and other transfers to the extent that those

checks or transfers relate to any of the foregoing.

45.      If the requested relief is not granted, GreenTech's relationships with their

Employees would be adversely impacted and there could well be irreparable harm to the

Employees' morale, dedication, confidence and cooperation. GreenTech's employees include

personnel critical to ensure maximization of the realizable value of their estates. The

Employees' support for GreenTech's efforts is critical to the success of these chapter 11 cases.

At this early stage, GreenTech simply cannot risk the substantial damage to its business that

would inevitably attend any decline in its Employees' morale attributable to GreenTech's failure

to pay wages, salaries, benefits and other similar items.

46.      I believe that the relief requested in the Wages and Benefits Motion is in the

best interests of GreenTech's estate, its creditors and all other parties in interest and constitutes

a critical element in achieving a successful and smooth transition to chapter 11. Accordingly,

on behalf of GreenTech, I respectfully submit that the Wages and Benefits Motion should be

granted.

> v.      *Debtor's Motion for Entry of an Order (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Future Performance and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "**Utilities Motion**")*

47.      GreenTech seeks entry of an order (a) determining that the GreenTech's proposed

offer of deposits provides Utilities with adequate assurance of payment within the meaning of

section 366 of the Bankruptcy Code, (b) approving procedures for resolving requests by Utilities

for additional or different assurances beyond those set forth in the Motion, and (c) prohibiting the

Utilities from altering, refusing or discontinuing any Utility Services on account of prepetition

amounts outstanding or on account of any perceived inadequacy of GreenTech's proposed

adequate assurance.

48.     Uninterrupted Utility Services are essential to GreenTech's ongoing operations.

Should any Utility refuse or discontinue service, even for a brief period, GreenTech's operations

could be severely disrupted. The impact of this disruption on GreenTech's day-to-day business

operations and revenue would be extremely harmful and could jeopardize the value of

GreenTech's assets.

49.     I believe that the relief requested in the Utilities Motion is in the best interests of

GreenTech's estate, its creditors and all other parties in interest and constitutes a critical element

in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of

GreenTech, I respectfully submit that the Utilities Motion should be granted.

       **B.**      **Substantive Motions**

         i.     *Debtor's Motion for Entry of an Order Approving Key Employee Incentive Program (the "**KEIP Motion**")*

50.     While the KEIP Motion, which also has elements designed to retain key

employees, may not be filed on the first day of these Chapter 11 Cases, the KEIP Motion will be

filed imminently. As will be set forth in the KEIP Motion, two critical employees, myself, as

internal counsel and business advisor, and Peter Huddleston, as Chief Financial Officer (the

"**Key Employees**"), will agree to continue to be employed by GreenTech at the current

compensation through the earlier of the date of a confirmed plan of reorganization or liquidation

or conversion of the Chapter 11 cases to Chapter 7.

51.     Under the KEIP, provided that GreenTech successfully consummates either (a) a Section 363 sale of GreenTech's interest in JSAT or (b) a confirmed plan of reorganization or a plan of liquidation providing for the sale of the JSAT Interest (the "Performance Condition"), then (i) upon the reorganization of GreenTech, each Key Employee will be offered employment by GreenTech with a 25% salary increase, and (ii) if GreenTech does not offer such employment, including in the case of a liquidation of GreenTech, each Key Employee shall be paid a separation payment equal to 100% of base salary.  If a Key Employee voluntarily terminates such person's employment with GreenTech prior to the Performance Condition being satisfied, such person shall no longer be eligible to receive any payment. If GreenTech terminates the employment of a Key Employee or fails to pay salary or benefits to such person in whole or in part, either before or after reorganization, then such person shall be entitled to receive a payment of 100% of current base salary provided the Performance Condition is satisfied either prior to or after such termination.

52.     The Board of GreenTech has extensively debated the elements of the KEIP and, in its business judgment, believes that the benefits provide under the KEIP Motion are in the best interests of the GreenTech estate and relatively *de minimis* in relation to the assets and liabilities of GreenTech.

53.     I also believe that the relief requested in the KEIP Motion is in the best interests of GreenTech's estate, its creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11 and successful transactions in these Chapter 11 cases.  Accordingly, on behalf of GreenTech, I respectfully submit that the KEIP Motion should be granted.

## V.    **Conclusion**

54.    I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

55.    I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: February 26, 2018                    */s/ Norman D. Chirite*
                                            Norman D. Chirite
                                            Internal Counsel