**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| In re:<br><br>GreenTech Automotive, Inc.,<br><br>Debtor. | Chapter 11<br><br>Case No. 18-10651 |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING
THE DEBTORS TO IMPLEMENT A KEY EMPLOYEE INCENTIVE PLAN**

GreenTech Automotive, Inc. ("**GTA**"), the debtor and debtor-in-possession herein, hereby moves (the "**Motion**") for entry of an order authorizing GTA to implement a key employee incentive plan (the "**KEIP**"), and, in support thereof, respectfully states as follows:

**Preliminary Statement**

GTA cannot afford to lose its leadership during this critical time. As of the Petition Date (as defined herein), GTA has only two executive employees in its Sterling, Virginia headquarters: Peter Huddleston, chief financial officer, and Norman Chirite, internal counsel and business advisor (each a "**Key Employee**," and together, "**Key Employees**"). Both Mr. Huddleston and Mr. Chirite have historical knowledge of GTA's business operations, are familiar with and known to its Board of Directors, and have specialized knowledge of the Debtor's assets and potential liabilities. Without the benefit of Mr. Huddleston's and Mr. Chirite's specialized knowledge and leadership, a successful result to this Chapter 11 Case (as defined herein), would be difficult to achieve.

Kristen E. Burgers (VSB No. 67997)
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, Virginia 22102
Telephone: (703) 584-8900
Facsimile: (703) 584-8901
Email: kburgers@hf-law.com

*Proposed co-Counsel to the Debtors*

Mark S. Lichtenstein (pro hac vice pending)
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 223-4000
Facsimile: (212) 223-4001
Email: mlichtenstein@crowell.com

*Proposed co-Counsel to the Debtors*

Neither Mr. Huddleston nor Mr. Chirite have an employment agreement with GTA. In order to induce Mr. Huddleston and Mr. Chirite to continue to work for GTA during the Chapter 11 Case, the Board of Directors of GTA and Mssrs. Huddleston and Chirite have agreed to the terms of a KEIP, whereby each Key Employee will be offered employment by reorganized GTA with a 25% salary increase (a) upon the successful completion of a Section 363 sale of the JSAT Interest or (b) upon confirmation of a plan of reorganization or a plan of liquidation providing for the sale of the JSAT interest (the "**Performance Condition**"). If GTA does not offer such employment, including in the case of a liquidation of GTA, each Key Employee shall be paid a separation payment equal to 100% of base salary.

Implementation of the KEIP is critical to GTA's success in this Chapter 11 Case and thus represents the exercise of the Debtor's sound business judgment. The dollar amount of the KEIP is quite low, relative to the value of GTA's assets and relative to the potential costs to GTA should Mr. Huddleston or Mr. Chirite terminate their employment with GTA. Without Mssrs. Huddleston's and Chirite's expertise, GTA would have difficulty fulfilling its basic requirements as a debtor in bankruptcy, let alone achieving a successful resolution of the Chapter 11 Case. For these reasons, the Motion should be granted.

## Jurisdiction

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The predicates for the relief requested are sections 363 and 503 of title 11 of the United States Code (the "Bankruptcy Code").

## Background

3. On February 26, 2017 (the "**Petition Date**"), GTA filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code, initiating this chapter 11 case (the "**Chapter 11 Case**").  Also on February 26, 2018, GTA's affiliates WM Industries Corp. ("**WMIC**"), Gulf Coast Funds Management, LLC ("**GCFM**"), GreenTech Automotive Capital A-3 GP, LLC ("**A-3 GP**"), GreenTech Automotive Partnership A-3, L.P. ("**A-3 LP**") and American Immigration Center, LLC ("**AIC**") (collectively, the "**Debtors**") each filed a voluntary bankruptcy petition. The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in the Chapter 11 Cases.

4.      GTA, headquartered in Sterling, Virginia, was organized in Mississippi in 2009 for the purpose of developing, producing, marketing and financing energy efficient automobiles, including electric cars.

5.      WMIC, a Virginia corporation, is a holding company that holds a majority of the outstanding shares of common stock of GTA.

6.      GCFM, a Louisiana limited liability company, is a designated regional center in the Immigrant Investor Program under the U.S. Department of Homeland Security's U.S. Citizenship and Immigration Services ("USCIS").

7.      A-3 GP, a Delaware limited liability company, is the general partner of A-3 LP, a Delaware limited partnership organized to receive investment funds from third party investors under the Employment-Based Immigration Preference program, known as "**EB-5**."  The EB-5 program offered immigrant investors the opportunity to qualify for permanent U.S. residency by investing specified amounts in certain U.S. job creating initiatives in economically challenged

localities in the United States.

8. The Debtors have experienced significant adverse developments that have hindered the successful operations of GTA's automobile business, impaired access to capital, and resulted in difficulties in the advancement of GTA's investors' permanent residency petitions before the United States government.

9. In 2013, the Franklin Center for Government and Public Integrity, a conservative-oriented online news organization, published through its watchdog.org website a series of 76 negative articles containing certain false and defamatory statements targeting GTA.

10. The watchdog.org articles resulted in adverse publicity that negatively affected governmental, investor and public perception of GTA and its businesses, even though GTA pursued defamation claims against the Franklin Center that were ultimately resolved.

11. As a result of this adverse publicity, the U.S. Securities and Exchange Commission (the "**SEC**") commenced an investigation of GTA. While the SEC declined to pursue further action, the investigation and required responses to the SEC's inquiries further damaged GTA and its businesses.

12. Additionally, the Office of the Inspector General of the Department of Homeland Security conducted an investigation of GTA and the involvement of Terence McAuliffe, who was previously affiliated with GTA, in communications with the USCIS. The resulting report, issued in 2015, and the involvement of Republican legislators such as Senator Chuck Grassley, further impaired GTA's reputation and fundraising ability and the orientation of USCIS toward the investor petitions for permanent residence under the EB-5 program.

13. The Debtors suffered another severe blow when GTA was sued in early 2015 by Plastech Holdings Company ("**PHC**"), which falsely accused GTA of tortious interference with PHC's contractual relationship with a Chinese automotive manufacturer, Anhui Jianghuai Automobile Co., Ltd. After protracted litigation and discovery, GTA secured the dismissal of that case when it was established conclusively that PHC had forged the Chinese company's signature on a fictitious agreement that was the foundation of its claims against GTA. As a result of the PHC litigation, GTA incurred significant legal and other expenses and was forced to abruptly terminate its business relationship with the Chinese company, forfeiting a substantial deposit, stranding substantial start-up expenses and resulting in other damages totaling in tens of millions of dollars, effectively destroying GTA as a viable business enterprise.

14. Furthermore, the State of Mississippi and Tunica County, Mississippi have commenced litigation to recover amounts advanced to and for the benefit of GTA, and various groups of EB-5 investors have pursued civil litigation against the Debtors in a number of state and federal courts proceedings. These actions have continued to consume Debtors' dwindling resources.

15. As a result of these significant adverse developments, as well as internal factors such as personnel issues and manufacturing and other difficulties in pursuing GTA's ambitious business plan, the Debtors are faced with severe economic hardship. Over the past approximately two years, GTA has continued to survive only through advances from its principal stockholder and fees for engineering services from Jiangsu Saleen Automotive Technologies, Co., Ltd ("**JSAT**").

16. The Debtors have engaged in an ongoing and extensive effort to review their

5

operations and address the challenges described above. They have explored outside financing and possible sale options for the past two years but have been unable to reach a desired result. In particular, in 2017 GTA sought to arrange for the purchase by a Chinese investment fund of its minority interest in JSAT, held on behalf of GTA by a subsidiary of WMIC ("**JSAT Interest**"). GTA acquired the JSAT Interest in 2016 when it entered into a relationship with JSAT, then a newly organized automotive enterprise in China, under which GTA had appraised and then conveyed rights in its MyCar intellectual property and certain engineering assistance to JSAT in exchange for the JSAT Interest. Apart from its manufacturing facility, the JSAT Interest is the principal asset of GTA. GTA obtained support for the sale of the JSAT Interest from a significant portion of its investors. However, the condition to that transaction - that there be no major litigation involving GTA - has not been fulfilled due to the pendency of litigation against GTA and the other Debtors, including claims by a group of investors who sought to force payment to them of more than their original investments as a condition to not frustrating the consummation of that transaction.

17. Despite the Debtors' best efforts, the Debtors have been unable to stabilize their businesses outside the bankruptcy forum. Accordingly, the Debtors filed their chapter 11 petitions to preserve and maximize the value of their assets, as well as to ensure that both secured and unsecured creditors are protected.

**Relief Requested**

18. By this Motion, GTA seeks entry of an order substantially in the form of order attached hereto as Exhibit A, pursuant to sections 363 and 503 of the Bankruptcy Code, (i) approving and authorizing GTA to implement a chapter 11 key employee incentive plan (the

"KEIP"), and (ii) granting certain related relief. In support of this Motion, GTA relies upon and incorporates by reference the declaration of Mr. Tim Tiahua Mao, the President and Chief Executive Officer of GTA, which is attached hereto as Exhibit B (the "**Mao Declaration**").

### The Key Employees and Rationale for KEIP

19. Due to the enormous financial difficulties suffered by the Debtors pre-petition, as of the Petition Date GTA's key executive team is comprised of Norman Chirite, GTA's internal counsel and business advisor, and Peter Huddleston, GTA's Chief Financial Officer (collectively, the "**Key Employees**"). On February 22, 2018, Mr. Charles Xiaolin Wang, GTA's longtime Chief Executive Officer and President, resigned his positions and was replaced by Mr. Tim Mao. Mr. Wang's resignation has made the key employees even more critical. Accordingly, Mr. Mao needs the Key Employees to continue their employment by GTA in order to achieve a successful restructuring or asset sale in Chapter 11.

20. As set forth in the Mao Declaration, Mr. Huddleston and Mr. Chirite have skills, experience, institutional knowledge, and business savvy which are crucial to the potential success of GTA as it pursues various strategic alternatives in the Chapter 11 case. Whether GTA seeks to reorganize or sell its assets pursuant to Section 363 of the Bankruptcy Code or pursuant to Section 1123 of the Bankruptcy Code under a liquidating plan, GTA's chances of realizing value for stakeholders will be severely impaired without the Key Employees to coordinate with GTA's professionals, counter-parties and creditors.

21. Mr. Huddleston is an extremely detail oriented Chief Financial Officer. He has intimate knowledge of all of the claims against GTA, will be able to assist in the diligence to be conducted by potential acquirers in any asset sales, will be able to provide the required financial reporting in the Debtors' cases, and has access to all relevant information necessary for the

success of this Chapter 11 Case.

22. The ongoing services of Mr. Chirite, a former partner in the corporate department of Weil, Gotshal & Manges and a senior private equity executive, is also critical to the success of this Chapter 11 case. Prior to the Petition Date, Mr. Chirite coordinated all the defensive litigation confronting GTA. Mr. Chirite is also integral in the prosecution of a potentially very valuable affirmative lawsuit against Plastech Holding Corp. ("**Plastech**"), an entity that inflicted egregious harm against GTA by filing a fraudulent document in a since-dismissed lawsuit, and its attorneys. As a result of the foregoing misconduct, GTA has commenced a lawsuit against Plastech and its attorneys, Susman Godfrey, for multi-million dollars' worth of damages. Mr. Chirite is integral to this valuable litigation claim.

23. In addition to his irreplaceable knowledge of the various pending litigations against GTA, and by GTA, Mr. Chirite is singularly familiar with the terms of the JSAT Interest, which is a critical asset of the GTA. JSAT is a potential plan funder and/or asset acquirer, and Mr. Chirite's continued involvement in these cases on behalf of GTA is manifestly important to effectuating any transaction in regards to the JSAT Interest or JSAT. Finally, Mr. Chirite is well known to the members of the Board of Directors of GTA (the "**Board**"), the majority of whom are Chinese. Without Mr. Chirite, a sophisticated attorney and businessman, the critical communications and decision-making required across oceans and continents will be severely impaired at a time where clarity and communication have never been more important. Simply put, Mr. Chirite is a critical employee, as is Mr. Huddleston.

24. At present, Mr. Huddleston is paid $240,000.00 per year by the Debtors plus health benefits. Mr. Chirite is paid $200,000 per year by the Debtors plus health benefits.

Neither Mr. Huddleston nor Mr. Chirite has a written employment agreement with the GTA or any of the Debtors.

25. In anticipation of filing the Chapter 11 Case, Mr. Chirite and Mr. Huddelston worked together with the Board of GTA to formulate an appropriate hybrid KEIP program to incentivize Mr. Chirite and Mr. Huddleston to remain employed by GTA throughout the course of the Chapter 11 Case and to help GTA achieve successful results therein by virtue of a reorganization or a sale of assets.  The terms of the KEIP, as agreed upon by the Board and the Key Employees, are as follows:

### Key Employee Incentive Plan

26. The Key Employees agree to continue to be employed by GTA at their current compensation through the earlier of the date of (a) a confirmed plan of reorganization or liquidation or (b) the conversion of the Debtors' cases to Chapter 7.

27. Provided that GTA successfully consummates either (a) a Section 363 sale of the JSAT Interest or (b) a confirmed plan of reorganization or a plan of liquidation providing for the sale of the JSAT interest (the "**Performance Condition**"),   then (i) upon the reorganization of GTA, each Key Employee will be offered employment by reorganized GTA with a 25% salary increase, and (ii) if GTA does not offer such employment, including in the case of a liquidation of GTA, each Key Employee shall be paid a separation payment equal to 100% of base salary.

28. If a Key Employee voluntarily terminates his employment with GTA prior to the Performance Condition being satisfied, he shall no longer be eligible to receive any payment.  If GTA terminates the employment of a Key Employee or fails to pay salary or benefits to such person in whole or in part, either before or after a reorganization, then such person shall be

entitled to receive a payment of 100% of current base salary provided the Performance Condition is satisfied either prior to or after such termination.

29. GTA is obligated to seek Bankruptcy Court approval of the KEIP as a First-Day Motion. If the KEIP is not approved by the Court, the Key Employees may terminate their employment by the Debtors.

**Basis for Relief**

**A.  The KEIP Should Be Approved under Sections 363(b)(1) and 503(c) as Being in the Best Interest of the Debtors and their Estates and Creditors**

30. The KEIP should be approved under Sections 363(b)(1) and 503(c) of the Bankruptcy Code. As detailed herein, the KEIP is essential to GTA's restructuring efforts, and the modest cost is more than offset by the benefits. Thus, the KEIP reflects a sound exercise of GTA's business judgment under Section 363(b)(1) of the Bankruptcy Code, which empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

31. The KEIP may also be evaluated under Section 503(c)(3) of the Bankruptcy Code, which prohibits certain transfers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." The standards for approval under Sections 503(c)(3) and 363(b) are the same – a transfer will be approved if made as a result of a sound exercise of the debtor's business judgment. *See, e.g., In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Global Home Prods.*, 369 B.R. 778, 783 (Bankr.

D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Viking Offshore (USA) Inc.*, Case No. 08-312-H3-11 (LZC), 2008 Bankr. LEXIS 1360, at *4 (Bankr. S.D. Tex. Apr. 30, 2008) (standard under 503(c)(3) is substantially similar to the business judgment test).

32. The business judgment standard requires that a debtor base its decision to sell or lease assets outside the ordinary course of business upon a sound business purpose. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales." (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995))); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason").

33. Here, the KEIP satisfies the business judgment test as it is demonstrably in the best interests of GTA, its estate and its creditors. As described in more detail above, the efforts of the Key Employees during the restructuring will be critical to preserving the value of the GTA estate and maximizing creditor recoveries. It is imperative that those Key Employees, who are in a position to drive the outcome of the restructuring, be properly incentivized during the strategic transaction process. It is equally critical that GTA's business operations continue to run smoothly and that the Key Employees are able to focus on performing their jobs.

34.     GTA carefully designed the KEIP to balance its need to properly motivate the Key Employees through appropriate, market-competitive compensation, with the need to ensure that the GTA estate receive enhanced value in exchange. The enhanced salary proposed under the KEIP is earned only upon definitive successful results in the GTA case. The Key Employees are to receive 25% more than their current base salary *only if* the Performance Condition is satisfied and they are retained by GTA post-confirmation. In this event, creditors will have received consideration under a confirmed plan which will benefit all stakeholders. The modest enhanced compensation is directly linked to a reorganization and/or a sale of substantially all of the Debtors' assets under a confirmed plan which may only be achieved through the efforts of the Key Employees. Further, the Key Employees will only be entitled to a separation payment if the Performance Condition is satisfied and they are not offered employment with a reorganized GTA. The separation payments are appropriate to incentive the Key Employees to remain employed by GTA and to satisfy the performance conditions as the sale of assets or a reorganization will necessarily confer material benefits upon the estate and its creditors. The KEIP will both beget and reward success by motivating the Key Employees to work towards maximizing value, which, in turn, is critical to maximizing stakeholder recovery.

35.     Implementation of the KEIP is a valid exercise of the Debtors' business judgment, as it is specifically designed to prevent attrition of Key Employees during the strategic restructuring process and potential auction process, thereby preserving the value of GTA's assets for the benefit of all stakeholders. If the Key Employees were to resign, the value and benefits of these employees' experiences would be lost, and GTA's operations and their pursuit of a strategic restructuring transaction would be significantly impaired. The KEIP is reasonable in light of the size of GTA's business and the terms of other incentive and retention programs.

36. In *In re Dana Corp.*, the court articulated six factors to consider when evaluating approval of a compensation proposal: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

37. Here, an analysis of the *Dana* factors supports approval of the proposed compensation plans. The KEIP is specifically designed to address particular concerns related to the Key Employees. First, the KEIP will motivate Key Employees to maximize recoveries in the GTA restructuring and will encourage the Key Employees to remain with GTA during the Chapter 11 Case. The costs of the KEIP were deliberately set at or below market norms for organizations comparable to GTA. Second, the Key Employees were specifically selected in order to align employee interests with those of creditors.

38. Courts in this district and elsewhere have routinely approved similar programs under similar circumstances. *See, e.g.*, *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Jan. 18 & 28, 2013); *In re Movie Gallery, Inc.*, Case No. 10-30696 (DOT) (Bankr. E.D. Va. Sept. 21, 2010); *In re Roper Bros. Lumber Co.*, Case No. 09-38215 (KRH) (Bankr. E.D. Va. Feb. 25, 2010).

## Request for Waiver of Stay

39. In addition, by this Motion, GTA seeks a waiver of any stay of the effectiveness of the order approving this Motion pursuant to any applicable Bankruptcy Rule or Local Rule of the

United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules"). Specifically, pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons set forth above, the Debtors require immediate implementation of the KEIP for the benefit of all parties in interest. Accordingly, GTA submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

40. Notice of this Motion has been given to the following parties or to their counsel, if known: (i) the Office of the United States Trustee, (ii) the Securities and Exchange Commission, (iii) all secured creditors of each of the Debtors herein, and (iv) all parties identified on the List of 20 Largest Unsecured Creditors filed by each of the Debtors herein. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Previous Request

41. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*REMAINDER OF PAGE INTENTIONALLY BLANK*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: February 28, 2018            Respectfully submitted,

*/s/ Kristen E. Burgers*
Kristen E. Burgers (VSB No. 67997)
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, Virginia 22102
Telephone: (703) 584-8900
Facsimile: (703) 584-8901
Email: kburgers@hf-law.com

*/s/ Mark S. Lichtenstein*
Mark S. Lichtenstein (pro hac vice pending)
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 223-4000
Facsimile: (212) 223-4001
Email: mlichtenstein@crowell.com

*Proposed co-Counsel to the Debtor*