# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re:<br><br>GreenTech Automotive, Inc.,<br><br>Debtor. | )<br>)<br>) Chapter 11<br>)<br>) Case No. 18-10651<br>) (Jointly Administered)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CHAPTER 11 CASES

The Movants, by counsel, pursuant to the provisions of 11 U.S.C. §1112(b), Federal Rule of Bankruptcy Procedure 9013 and Local Rule 9013-1, submit this memorandum in support of their motion to dismiss the administratively consolidated Chapter 11 cases of the debtors herein ("Debtors").[1]

---

[1] The Movants here are: Xia Bi, Nian Chen, Yuanyuan Chen, Qingli Cheng, Ying Cheng, Dongsheng Hu, Jun Huang, Kui Le, Chunsheng Li, Zhonghui Li, Lin Lin, Lan Liu, Ling Liu, Zheng Qin, Meiming Shen, Yunping Tan, Bixiang Tang, Xiaonan Tang, Chun Wang, Rui Wang, Yahong Wang, Yue Wang, Jian Wu, Lei Yan, Junping Yao, Jin You, Zhen Yu, Houqian Yu, Nianqing Zhang, Xuemei Zhang, Huibin Zhao, and Yan Zhao.

Scott M. Abeles
Jonathan Link (VSB No. 42951)
Gerard P. Fox
GERARD FOX LAW P.C.
3050 K Street, N.W., Suite 210
Washington, DC 2007
Telephone: (202) 664-5585
Fax: (310) 441-4447
jlink@gerardfoxlaw.com

George R. Pitts (VSB No. 24978)
SANDS ANDERSON PC
1497 Chain Bridge Road
Suite 202
McLean, VA 22101
Telephone: (703) 893-3600
Fax: (703) 893-8484
gpitts@sandsanderson.com
Counsel for Movants

## I.    INTRODUCTION

In the words of Mississippi's State Auditor and watchdog, GreenTech Automotive Inc. "was a sham from the very beginning," a firm built on "smoke and mirrors," that "never had any intention to deliver on the promises it made."[2] GreenTech's bankruptcy petition, along with those of its affiliates, continues this unfortunate record. The petitions filed by the GreenTech debtors are not good faith attempts to compensate creditors and reorganize GreenTech into a productive concern. They are intended only to snuff out investigations into GreenTech's corrupt practices and shift any of its remaining value to insiders, debt-free, in a context in which discovering and understanding GreenTech's real value has been made impossible by dubious transactions undertaken in the recent past.[3]

Now nine (9) years old, GreenTech is a car company that has never sold cars. Given its fantastic success at raising money, this is especially remarkable. By its own reckoning, GreenTech has raised well over $1 billion, including $141.5 million from EB-5 investors, like the Movants. *See* Ex. 7 at 3 ("EB5 investors have invested a total of US $129.5 million (141.5 million less the refunded US $12 million)"); Ex. 30 at 22 (EB-5 investment constituted just 7.8% of GreenTech's total investment capital). Based on the financials GreenTech has provided to

---

[2]    http://wreg.com/2017/07/12/mississippi-demanding-millions-back-from-greentech-electric-auto-plant/; http://www.jacksonfreepress.com/news/2017/jul/06/mississippi-demands-64m-back-electric-car-makers-c/.

[3] All internal alterations, quotation marks, footnotes and citations herein are omitted and all emphasis is added unless otherwise noted. All "Ex. __" references are to documents submitted with the concurrently filed Declaration of Mary Catherine Amerine, unless otherwise noted.

investors, nearly all of the funds raised have disappeared and are unaccounted for. *See* Ex. 28, 29.[4]

One thing that is known is that GreenTech did not invest its funds in patented (or even advanced) technology for use in the hybrid electric vehicles it was supposed to build. GreenTech's own General Counsel, Norman Chirite, admitted as much at a recent meeting of creditors. *See* Declaration of Jonathan Link ("Link Decl."), at ¶ 18. This undisputed fact is important on this motion. In 2016, GreenTech swapped the limited IP it did have for a minority share of a separate Chinese company, non-debtor Jiangsu Saleen Automotive Technology Co., LTD ("JSAT"). The Debtors say that "[a]part from its manufacturing facility" the JSAT interest is "the principal asset of GTA." *See* Dkt. No. 7 at ¶ 27. The troubling history of this asset swap, along with indicia that other courts deem consistent with bad faith filings, compels dismissal of GreenTech's petition, and those of its brethren.[5]

Where a debtor's "real motivation is to abuse the reorganization process and to cause hardship or to delay creditors by resort to the Chapter 11 device," such a filing is incompatible with Chapter 11's underlying policies and should be dismissed. *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir 1989). GreenTech cannot reorganize into a going concern as it was never meant to be a going concern. It was formed to raise money from foreign investors blinded by their interest in becoming permanent United States residents and incapable of ferreting out sharp

---

[4] The 7.8% figure dates to 2010. If the ratio of EB-5 investment to total investment held steady throughout GreenTech's lifespan, then GreenTech would have raised about $1.814 billion (141.5 MM x 100 /7.8). Even if the ratio doubled over time, GreenTech would have raised over $900 million (141.5 MM x 100 /15.6 = 907,051,282).

[5] All docket citations are to Case No. 18-10651, unless otherwise noted.

3

practices. The Movants, 32 Chinese investors, are among GreenTech's victims. They invested more than $500,000 each in GreenTech based on false promises of green cards and guaranteed returns. After years of being told that GreenTech was thriving and that contrary reports were false, the Movants sued GreenTech, its affiliates, and their former and current corporate leaders in November of 2017 (hereafter, the "Fraud Action"). *See* Ex. 1.

The Fraud Action, say the Debtors, upset a plan that would have placed much of GreenTech's remaining value into the hands of GreenTech's founder and long-time CEO, Charles Wang. *See* Ex. 2 ("with several lawsuits outstanding, especially the recent malicious lawsuit by the 32 EB5 investors [*i.e.,* the Movants] resulting in the failure of the acquisition, the company cannot carry on"). That value is supposedly bound up in GreenTech's share of non-debtor JSAT. In 2016 Mr. Wang swapped GreenTech's IP, which according to an appraisal commissioned in China was worth over $170 million, for 11.46% of JSAT. *See* Ex. 3. Mr. Wang placed GreenTech's JSAT interest in non-debtor Rugao GTA, a Chinese subsidiary of GreenTech's parent. Notably, Mr. Wang is the controlling shareholder of *all* of these companies – GreenTech, JSAT, and Rugao GTA, and so stood on all sides of this transaction.[6]

Significantly, GreenTech purchased what appears to be the ***very same IP*** in 2010 for just $20 million, *see* Ex. 4 at 2, meaning that this IP increased 850% in value in just six years, all because of a paper transaction orchestrated by those controlling GreenTech. This valuation also inflated the value of Wang's JSAT – if GreenTech swapped IP worth "$170 million" for just 11.46% of JSAT, then Mr. Wang's recently capitalized JSAT was worth well over $1 ***billion***.

---

[6] Movants are in possession of only six pages of the alleged appraisal, which appears to be all any of them were provided. *See* Ex. 3.

4

Dkt. No. 10 at 6 (GreenTech explaining that it "acquired the JSAT Interest in 2016 when it entered into a relationship with JSAT, then a ***newly organized*** automotive enterprise in China.").

Before the Debtors declared bankruptcy, Mr. Wang tried to cause another company, Golden Resources, to buy GreenTech's JSAT share from the investors at a discount. *See* Ex. 5 at §1 (offer to purchase JSAT share for ¥800,000,000 RMB, or about $119 million).[7] Thereafter, Golden Resources and Mr. Wang disclosed their intention to take JSAT public, at a value that would be intrinsically inflated by, at that point, two insider paper deals. *See* Ex. 6 at 3 (disclosure of plan to take JSAT public). That deal fell through, according to GreenTech, because of a lack of shareholder unanimity in its favor and several lawsuits filed against GreenTech. Resurrection of the JSAT transaction is the Debtors' stated first priority in this proceeding, which will eradicate the need for shareholder approval and allow the assets to move free of claims or encumbrances. *See* Dkt. No. 10 (Key Employee Incentive Plan tying all rewards to selling JSAT interest); *id.* at Dkt. No. 11 (seeking expedited hearing to implement KEIP).

As this narrative demonstrates, the financial action in this case is in China, where JSAT, Golden Resources, and Rugao GTA are located and where Mr. Wang resides. These proceedings will not afford a window into that action. There will be, at best, incomplete disclosure regarding what is left of GreenTech, and futile inquiry into JSAT, its suspect $170 million asset swap with GreenTech, and the true nature of the Golden Resources/JSAT arrangement. Meanwhile, the Debtor entities, even if managed by a trustee, will lack the resources to reclaim the only apparent

---

[7] On August 1, 2017, during the period this deal was being discussed, the USD-CNY exchange rate was 6.7189. Thus 800,000,000 / 6.7180 = 119,083,060. *See* www.exchange-rates.org/Rate/USD/CNY/8-1-2017.

assets they have of any value – *i.e.* what went into JSAT. On that note, another foreign company, non-debtor Capital Wealth Holdings Ltd. ("Capital Wealth"), is a British Virgin Island company controlled by Mr. Wang that may be holding much of the capital raised by GreenTech, reinforcing the likelihood that recovery of assets and investments will be futile here.[8]

The petitions, in addition, have been filed as a litigation tactic, a fact the Debtors have not tried to hide. Timing their actions precisely, as soon as GreenTech announced its intention to declare bankruptcy, its CEO, Mr. Wang, also announced that a group of 63 investors in GreenTech had filed suit against the Movants. Ex. 7 at 1, 4 (announcing bankruptcy alongside fact that "*Today*, more than 60 EB5 investors have sued 32 EB5 investors of GTA [the Movants] for malicious litigation in the United States," offering to assist those plaintiffs with their case, and threatening to utilize Movants' immigration information against them unless they dropped the Fraud Action). The 63 investors contend that the Movants' Fraud Action "tortiously interfered" with the JSAT/Golden Resources deal. Aside from this complaint's risible premise, and its assault on the Movants' right of access to the courts, use of the Code's automatic stay provision to stifle litigation that threatens to bring the Debtors' fraud to light, while causing litigation to be initiated against Movants through proxies apparently pursuing the same agenda as GreenTech's insiders, is bad faith.

Aside from facilitating one more suspect transaction and staying actions by the Movants and the state of Mississippi, there appears to be no other purpose to the filings. The misuse of the

---

[8] Efforts to serve Capital Wealth in the Fraud Action, inherently difficult because it is a foreign entity, have been even more difficult due to the devastating impact of Hurricane Irma on the island.

bankruptcy process for the purposes of benefitting insiders and harassing adversaries ("subjective bad faith"), coupled with GreenTech's inability to claim that all it needs is breathing room to thrive ("objective futility") are powerful indicia of a bad faith filing that this Court need not indulge or tolerate. *Carolin*, 886 F.2d at 701-02.

## II.    FACTUAL BACKGROUND

### A.    *The Parties and their Relationship*

**The Movants** are 32 Chinese immigrant investors who purchased limited partnership interests in **Debtor GreenTech Automotive Partnership A-3 ("A-3")** for $500,000 each (plus a $60,000 or $61,000 "administrative fee"). A-3, in turn, loaned these proceeds – $44.5 million in all, from 89 A-3 investors – to **Debtor GreenTech Automotive, Inc. ("GreenTech"). Debtor WM Industries Corp. ("WM Industries")** is GreenTech's parent. **Debtor American Immigration Center, LLC ("AIC")** owns Mr. Wang's various immigration related businesses. **Debtor GreenTech Automotive Capital A-3 GP, LLC ("A-3 GP")** is the General Partner of A-3. **Debtor Gulf Coast Funds Management, LLC** served as the management company for GreenTech and as the vehicle that marketed the investments to GreenTech's investors.

Movants' investments arose under the Employment-Based Immigration Fifth Preference Program, or "EB-5" program, a federal immigration program geared towards economic growth. The EB-5 program provides investors, and their immediate families, the opportunity to permanently live and work in the U.S. after they have invested in a new enterprise. The EB-5 program is administered by the United States Citizenship and Immigration Services (USCIS). Unfortunately, the EB-5 program is not associated with any enforcement program or activity, leaving investors like the Movants, often unsophisticated in complex regulatory frameworks and

7

even the English language, to serve as "Private Attorneys General" and fend for themselves. The EB -5 program is famously plagued with the grossest fraud and abuse. *See, e.g.,* Ex. 8.

On November 22, 2017, the Movants filed the Fraud Action against each Debtor here (except for A-3), plus non-debtor Capital Wealth, and individual defendants Terry McAuliffe, Charles Wang, and Anthony Rodham. *See* Ex. 1. The eleven-count Complaint, later removed to the U.S. District Court for the Eastern District of Virginia, contends that the Debtors and other defendants, individually and collectively, bilked the Movants out of their investments through a dizzying array of deceptive practices and false promises. In particular, the individual defendants, through their alphabet soup of corporate fronts, made GreenTech's investors the following offer: invest $500,000 in our company and we will leverage our political connections to ensure your immigration papers will get to the top of the pile, and then be approved. Better yet, the investors would quickly recover their investments in full. To top things off, the defendants induced the investments with false statements in Mandarin, the Movants' native language, while seeking to exculpate themselves from liability through boilerplate disclaimers written exclusively in English.

### B.    *Assets*

#### 1.    **Real Property**

All of GreenTech's real estate and related assets have been pledged to two creditors – the State of Mississippi and A-3, the limited partnership. Those assets – primarily land and a manufacturing plant in Tunica, Mississippi – were described as worth about $27 million in a recent letter to investors from GreenTech's management. *See* Ex. 9 at 1 ("GTA's intangible assets in China's Jiangsu Saleen Co., Ltd. are valued at approximately RMB 1.106 [about $173

8

million]. Together with land and buildings in Mississippi, the entire GTA is worth US $200 million.").

In exchange for about $5 million in state and local aid, GreenTech pledged 20 acres of land and additional assets to the Mississippi Development Authority. *See* Ex. 10, Art. 3-4 & Ex. 11. The aid took the form of a $3 million loan, and $2 million to buy the site on which GreenTech is located, and in tax exemptions. *See* Ex. 10, Art. 3-4. Mississippi called the loan following a series of missed payments, and filed suit against GreenTech alleging default, on November 7, 2017. At this early stage in the bankruptcy cases, Movants take no position on the validity or perfection of any liens or encumbrances claimed by the state of Mississippi or its related entities.

GreenTech has also pledged "[a]ll assets ... wherever located and whether now owned or hereafter acquired or created" to the limited partnership, A-3, to secure a loan of around $42.5 million. Ex. 12. GreenTech has defaulted on the loan. *See* Ex. 13 Art. 10.1.1.7.

As a result, A-3, the limited partnership and a creditor of GreenTech, should not be grouped with the other Debtors, and there appears to be no legitimate basis for its filing. A-3's assets are estimated at between $10 and $50 million. *See* Case No. 18-10656, Dkt. No. 1, at 2. Its estimated liabilities are listed as falling into the same range, but that is based upon a *mistake.* On its list of its 20 largest unsecured creditors, A-3 lists two: a set of judgment creditors, at around $7.6 million, and then counsel for the Movants here, on their behalf. *See id.* at Dkt. 1-1, at 1. But the Movants have *not* sued A-3. Thus, by A-3's own estimate, its assets vastly outweigh its liabilities. This is particularly important because A-3 has a secured interest in all of GreenTech's assets, which should be distributed to partners in A-3. *See* Ex. 12.

### 2.    Intellectual Property

As its General Counsel admits, GreenTech, supposedly a high-tech company on the leading edge of transportation science, owns no patents relating to hybrid technology. *See* Link Decl. at ¶ 18. At best, a Chinese affiliate of GreenTech (Rugao GTA), also owned by WM Industries, owns a minority share of JSAT, which owns what *used to be* GreenTech's intellectual property. Understanding the strange and troubling path that GreenTech's IP has travelled is essential to understanding why this bankruptcy filing should not go forward.

GreenTech's origins are discussed in a thoughtful opinion by Judge Mills, Chief Judge of the Northern District of Mississippi, in *Hybrid Kinetic Auto. Holdings, Inc. v. Hybrid Kinetic Auto. Corp.,* 629 F. Supp. 2d 618 (N.D. Miss. 2009). GreenTech's predecessor company was started by Charles Wang, who played the role of entrepreneur, and Benjamin Yeung, the financier. The relationship soured, giving rise to runaway litigation that Judge Mills sought to quell with an "advisory opinion." The important takeaway from that opinion, for present purposes, is Judge Mills' statement that as of June 23, 2009, when the opinion was signed, "all parties agree that ***neither Yeung nor Wang owns the actual hybrid car technology*** which will be used in any project." *Id.* at 629.

GreenTech would first acquire IP of its own in May of 2010. It did so by purchasing EUAutos, a Hong Kong company, for $20 million. Critically, and in contrast to transactions to come, the EUAuto deal appears to have been an arm's length transaction.[9]

---

[9] *See* Ex. 4 ("On May 17, 2010, the company announced the successful acquisition of EuAuto Technology Ltd., a Hong Kong based company, whose flagship electric car Mycar was also incorporated into GTA's product line.").

GreenTech disclosed the IP it acquired from EUAutos in Appendix A to a Private Placement Memorandum distributed to potential investors. *See* Ex. 14. As it explained, "GTA has obtained a sole, royalty-free and transferrable license on: 1) a MyCar design patent in the European Union and U.S.; and 2) a trademark on MyCar in the European Union." *Id.* at 20. However, as of March 18, 2011, "*we do not have any technical patents* on any new and existing processing, machinery, manufacturing or composition inventions." *Id*. at 21.

In the years to follow, neither GreenTech nor its affiliates registered a single patent with the USPTO, save for one design patent. As set forth in his declaration, Movants' counsel Jonathan Link, a former patent examiner at the USPTO, devoted hours to scanning the agency's records for GreenTech and all known affiliates – and came up empty. *See* Link Decl., at ¶ 9-16.[10]

At some point in 2016, GTA transferred its IP to Mr. Wang's JSAT in exchange for 11.46% of the shares in JSAT. *See* Ex. 15; *see also* Dkt. No. 10 (KEIP Motion) at 6 ("GTA acquired the JSAT Interest in 2016 when it entered into a relationship with JSAT, then a *newly organized* automotive enterprise in China, under which GTA had appraised and then conveyed rights in its MyCar intellectual property and certain engineering assistance to JSAT in exchange for the JSAT Interest."). Though the MyCar line, and any associated IP, was acquired six years earlier for $20 million, GreenTech contended that the IP had ballooned in value a whopping *850 percent* and was now worth over $170 million. *See* Ex. 3. The investors were told that 11.46% of

---

[10] This search did reveal two *abandoned* utility patent applications filed by WM GreenTech Automotive Corp. WM GreenTech has not been identified as an affiliate of any of the Debtors.

JSAT was worth the same "$170 million" they were giving up.[11]

In their filings, the Debtors describe this share of JSAT as, "[a]part from its manufacturing facility, … the principal asset of GTA." Dkt. No. 7 at ¶ 27. They have continued to suggest that these IP rights are worth over $170 million. *See* Ex. 9 at 1 (referencing GTA's intangible assets, which "are valued at approximately RMB 1.106 billion [about $173 million]").[12]

Public records confirm that JSAT's shareholders are the local government of Rugai and four corporations controlled by Mr. Wang, as follows:

---

[11] Jiangsu Saleen was founded on July 10, 2009 under the name of Rugao Technology Innovation Services Co., Ltd. ("Rugao Innovation") by two corporations owned by the local Chinese government, with registered capital of Renmini ("RMB") (Chinese currency) 0.5 million. *See* Ex. 16 at 2. Over the next seven years, the company made little profit. *See id.* at 168-70, 179-81, 190, 192, 202, 204. The primary business of Rugao Innovation included assisting with the development of local high-technology programs, and providing consulting services to local infrastructure industries and local investment promotions. *See id.* at 2. Things started to change in 2016. On February 5, 2016, the two corporations sold their shares in Rugao Innovation to Nantong Golden Harvest Technology Investment and Development Co., Ltd. ("Nantong Golden Harvest"), which is also owned by the local government. *See id.* at 115. In addition, the legal representative of Rugao Innovation changed from a government officer to Chao Cong, Charles Wang's wife. *See id.* at 115. On March 14, 2016, the corporation was renamed Jiangsu Saleen Investment Co., Ltd. *See id.* at 95. Its registered capital increased from RMB 0.5 million to more than RMB 9.6 billion. *See id.* at 99. Four more corporations owned by Mr. Wang became Jiangsu Saleen's new shareholders and made their "contributions" by non-patent technology (or technologies), or "know-how." *Id.* at 101.

[12] The USD CNY exchange rate on February 18, 2018 was 6.33951. Thus, 1.1 B / 6.33951 = 173,514,987. *See* www.exchange-rates.org/Rate/USD/CNY/2-18-2018.



*See* Ex. 17 (Corporate profiles of Nantong Golden Harvest, Rugao GTA, Nantong Lion Mai,

Rugao Saleen, Nantong Wei Meng and Jiangsu Saleen in the Chinese Government's "National

Enterprise Credit Information Public System."). Capital Wealth is a British Virgin Island

Company, also owned by Mr. Wang. Rugao Qitai Electric Vehicle Technology Co., also known

as "Rugal Qitai" or "Rugao GTA," is the entity that holds GTA's 11.46% share, and is owned by

WM Industries, GreenTech's parent.

Shares in, and contributions to, JSAT are reported as follows:

13

| | Name of shareholder | Type of capital contribution | Amount of capital contribution | Share % |
|---|---|---|---|---|
| 1 | Nantong Golden Harvest Technology Investment and Development Co., Ltd. ("Nantong Golden Harvest") | Cash | RMB 3,000,500,000 | 32% |
| 2 | Rugao Qitai Electric Vehicle Technology Co., Ltd. ("Rugal Qitai" or "Rugao GTA") | "Know-how" | RMB 1,106,920,000 | 11% |
| 3 | Nantong Lion Mai Automobile Technology Co., Ltd. (Nantong Lion Mai) | "Know-how" | RMB 1,880,420,000 | 19% |
| 4 | Rugao Saleen Hybrid Electric Vehicle Technology Co., Ltd. ("Rugal Saleen") | "Know-how" | RMB 1,894,520,000 | 20% |
| 5 | Nantong Wei Meng Automotive Technology Co., Ltd. ("Nantong WM") | "Know-how" | RMB 1,776,270,000 | 18% |

*Source: Ex. 16 at 101.*

GTA's share in JSAT was the subject of a proposal sent to investors in 2017. A firm called Shenzhen Jin Hon Yuan Investment Management Co., Ltd, or "Golden Resources," offered to purchase all of Rugao GTA for ¥800 million RMB (about $119 million).[13] *See* Ex. 5 at §1. The transaction required *all* GreenTech investors to agree. *See id.* In offering materials, the proposal indicated that ¥800 million RMB represented a discount to 72% of Rugao GTA's true value, in light of unexplained "liquidity" issues. Ex. 5 at §1 (offering ¥.8 billion for Rugao GTA's interest in JSAT); Ex. 6 at 2 (buyout proposal noting discount to 72% based on lack of liquidity).

---

[13] On August 1, 2017, during the period this transaction was being discussed, the USD-CNY exchange rate was 6.7189. Thus 800,000,000/6.7180 = 119,083,060. *See* www.exchange-rates.org/Rate/USD/CNY/8-1-2017.

The $800 million RMB offer for 11.46% of JSAT, discounted to 72% of its supposed

true value, would suggest that JSAT itself is worth ¥9.7 *billion* RMB, or $1.44 *billion* dollars.[14]

Of course that value is *entirely* grounded in the valuation given to GTA's 11.46% share of JSAT,

at $170 million or so. That figure, however, appears drawn from little more than thin air.[15]

> In the Golden Resources proposal, the following assertion is made:

>> All Corporate Parties and A3 Investors hereby expressly acknowledge,
>> understand, and agree that …. Golden Resources has made full disclosure
>> regarding its current work with other Chinese financial institutions *on the
>> possible future public listing of JSAT, and that as a significant shareholder of
>> JSAT, the transferred equity interest in Rugao GTA may increase in value after
>> the transfer.*

Ex. 6 at 3. Prior to the bankruptcy, the Golden Resources/JSAT plan fell through due to

conditions regarding ongoing litigation and the need for unanimous investor consent.[16]

---

[14] 800,000,000 x 100 / 72 = 1,111,111,111; 1,111,111,111 x 100 / 11.46 = 9,695,559,433; 9,695,559,433 / 6.7180 = 1,443,221,112.

[15] Movants have recently uncovered information that the company that performed the appraisal, Shanghai Wanlong Asset Evaluation Co., Ltd. ("Shanghai Wanlong"), has been warned repeatedly by the China Securities Regulatory Commission ("CSRC") for issuing flawed appraisals – including as recently as February 12, 2018. *See, e.g.,* http://www.cninfo.com.cn/finalpage/2017-04-27/1203406753.PDF (apologizing, in Chinese, for its lapses). Movants are obtaining certified translations of the relevant documents and will provide them with their reply brief.

[16] Though Golden Resources and Mr. Wang plan to partner on this IPO, making the Golden Resources transaction still another insider transaction, it is not clear at this point whether Mr. Wang also holds an equity interest in Golden Resources. Research thus far shows only that Mr. Wang was formerly the CEO and a member of the Board of Directors of a company called Far East Golden Resources, a somewhat different name at least than the Golden Resources in question here. *See* http://www.hkexnews.hk/listedco/listconews/sehk/2008/0711/LTN20080711372.pdf ("the Board [of Far East Golden Resources Group Limited] comprises five executive Directors, namely Mr Yeung Yung (Chairman), Mr Liu Quan (Deputy Chairman), *Mr Wang Xiaolin (Chief Executive Officer),* Mr Hui Wing Sang, Wilson, Mr Zhu Shengliang and three independent non-executive Directors…").

15

In its initial filings in this Court, GreenTech made clear that its top priority is putting the Company's interest in JSAT back into JSAT's hands, all in preparation for JSAT's planned initial public offering. *See* Dkt. No. 10 (KEIP Motion) at ¶23 (noting that ***"JSAT is a potential plan funder and/or asset acquirer"***). Indeed, the foundation of the Debtors' KEIP proposal is the sale of the JSAT interest. *See id.* at 2 ("each Key Employee will be offered employment by reorganized GTA with a 25% salary increase (a) upon the successful completion of a Section 363 sale of the JSAT Interest or (b) upon confirmation of a plan of reorganization or a plan of liquidation providing for the sale of the JSAT interest").

JSAT's prospects for a successful IPO appear strong. Though what appears to be the only relevant IP in the company sold for just $20 million eight years ago in an arm's length transaction, thanks to one completed insider transaction (between Wang's GreenTech and Wang's JSAT) and one proposed transaction between future IPO partners (the Golden Resources/JSAT transaction), JSAT's apparent valuation has dramatically increased. By filing for bankruptcy, the Debtors seek to eliminate the JSAT transaction's two obstacles – a lack of shareholder unanimity, and ongoing litigation. Because JSAT, Golden Resources, and Rugao GTA are all non-debtor foreign companies, there will be no way to truly test a new Golden Resources proposal or retrace the 2016 asset swap for fairness and potential clawback before any new deal is consummated,

### C.    *Ongoing Litigation*

#### 1.    **Mississippi Litigation**

GreenTech entered into a Memorandum of Understanding ("MOU") with the State of Mississippi and Tunica County, Mississippi, on July 25, 2011. That MOU provided that

GreenTech would construct an automotive assembly facility on property in Tunica County, Mississippi (the "project site"), invest at least sixty million dollars in Tunica County, and create at least 350 new full-time jobs by December 31, 2014. *See* Ex. 10 at Art. 2. In this MOU, Mississippi agreed to loan Tunica County two million dollars to purchase the project site, which the county then leased or transferred to GreenTech. *See* Ex. 10 at Art. 3.2(i). Tunica County holds a Deed of Trust on the project site, securing GreenTech's obligations to Tunica County. *See* Ex. 18. GreenTech states in its Private Placement Memorandum that the land under Deed of Trust to Tunica County is 20 acres. *See* Ex. 19 at 22.

Mississippi also loaned $3,000,000 to GreenTech. *See* Ex. 10 at Art. 3.2(ii). The repayment of the loan was governed by a Loan Agreement, entered into on September 6th, 2011, providing that all unpaid loan payments would become due and payable immediately upon default. *See* Ex. 20 at Art. VII. GreenTech and the Mississippi Development Authority also entered into a Promissory Note on September 6th, 2011, providing for GreenTech's repayment of the $3,000,000 and other amounts payable under the Loan Agreement. *See* Ex. 21. The State also filed a UCC Financing Statement, referencing various items of personal property. *See* Ex. 11.

On July 5, 2017, the Auditor of the State of Mississippi demanded full payment of GreenTech's loans. *See* Ex. 22. When GreenTech failed to pay, Mississippi and Tunica County sued GreenTech in the Chancery Court of Hinds County, Mississippi. *See* Complaint, *Hood v. GreenTech Automotive, Inc.*, No. 25CH1:17-cv-001580 (Nov. 7, 2017). Their complaint was amended on February 12, 2018. *See* First Amended Complaint, *Hood v. GreenTech Automotive, Inc.*, Case No. 25CH1:17-cv-001580. That complaint claims that Tunica County is entitled to a

judicial foreclosure and sale of the property transferred to GreenTech, among other relief. *See id.* at 11, 14-16. GreenTech filed a Suggestion of Bankruptcy on March 1, 2018.

### 2. *Bi, et. al. v. McAuliffe, et. al.* and Retaliatory Litigation

On November 22, 2017, the Movants filed the Fraud Action against all the Debtors here (except A-3), and Messrs. McAuliffe, Wang, and Rodham, in Fairfax County Circuit Court. *See* Ex. 1. Defendants removed the case to the Eastern District of Virginia on December 22, 2017. On January 12, 2018, the Defendants filed motions to dismiss. The Movants opposed those motions on February 9, 2017. The Debtors filed for bankruptcy protection on February 26, 2018, and, as a result, only the individual Defendants filed reply briefs in further support of the motions to dismiss on February 27, 2018.

In conjunction with the bankruptcy petitions, 63 GreenTech investors simultaneously filed suit against the Movants in Fairfax County Circuit Court, claiming the Movants "tortiously interfered" with the Golden Resources transaction and "conspired" to snuff that transaction out -- merely by filing the Fraud Action. *See* Ex. 23 at ¶¶ 97-116. The 63 plaintiffs want $36 million for this so-called "tort." The undersigned counsel has agreed to accept service on behalf of all 32 Movants – whether they reside in the U.S. or China – so that they can move forward immediately with dismissal and sanctions motions.[17]

Indeed, the "Investors" behind this suit have made clear that its primary purpose is to

---

[17] Virginia's common law litigation privilege, statutory litigation privilege, the Virginia Constitution, and the U.S. Constitution all provide sufficient defenses to the claims, separate and apart from the fact that both claims require a "wrongful" act to be actionable, and there is nothing "wrongful" about filing a lawsuit. Moreover, as shareholders in GreenTech, the 63 plaintiffs lack standing to complain about the failure of a deal between GreenTech and Golden Resources.

encourage Movants to drop the Fraud Action – an action the 63 investor plaintiffs *are not even party to*. *See* Ex. 24 (stating that "[i]f you choose to withdraw from the lawsuit [Movants' filed] before the court starts [its] investigation, we will not pursue the effects and losses that you caused earlier," and that "this is the last chance to save yourselves"). The letters also share the same false premise – that it was the Fraud Action that caused the failure of the Golden Resources transaction. As noted, that deal was contingent on unanimity and a lack of *any* material litigation. The Movants were not the only investors to decline to accept the Golden Resources deal, and GreenTech was already been ensnared in material litigation with the state of Mississippi.

Upon closer examination, the "63 Investors" lawsuit appears to be an attempt by Mr. Wang to obtain a litigation advantage in the Fraud Action. In a recent letter to investors, he declared that he "*will work with these investors to bring lawsuits* against those who damage the value of GTA," and appears to be doing so while the case against his companies in the Fraud Action is stayed. *See* Ex. 7 at 6. Mr. Wang ominously notes that he has "obtained a large amount of conclusive evidence about" the Movants, including supposedly "divorce records… false marriage records … some falsified their work experience, some fabricated funding sources" among other accusations, and threatens to rat them out to the authorities. *Id.* Unsurprisingly, a couple weeks later his proxies, the 63 plaintiffs, wrote to the Movants and threatened to use the same supposedly negative immigration information against them to try to force the Movants to drop the Fraud Action, which, again, is an action the 63 plaintiffs are not involved with in any way. *See* Ex. 25.[18]

---

[18] Movants were required to provide a large amount of personal and financial information to Mr. Wang and his companies as part of the EB-5 process, on a strictly confidential and limited

### 3.    *Jing Shen, et. al. v. GreenTech, et. al.*

On April 13, 2017, 12 A-3 and A-4 investors sued GreenTech, Gulf Coast, A-3, and A-3 GP (and an affiliated non-Debtor) in the Circuit Court of Fairfax County alleging fraud and breach of contract. *See* Ex. 26, 2017 WL 1423656 (Cir. Ct. Va. April 14, 2017). Plaintiffs obtained a default judgment of $6.7 million in the case, and later Mr. Wang, on defendants' behalf, signed a "confession of judgment" for $6.7 million. *See* Ex. 27.

### D.    *GreenTech's Performance and Prospects*

As a legitimate business, GreenTech has been an utter failure. Though it raised $128 million from EB-5 investors, says it raised hundreds of millions more, received millions in financing and tax breaks from the State of Mississippi, and employed savvy political insiders to push its plans through EB-5's regulatory process, it appears to have sold no – or at most extraordinarily few – hybrid vehicles. It has no IP of its own, and, even when flush with cash, neither developed, nor acquired, patented technology.

There is no reason to believe that new management and funding for GreenTech will make any difference. The market for GreenTech's offerings can never support an enterprise designed to result in the creation of over 2,500 jobs – the approximate number needed for all of GreenTech's EB-5 investors to obtain their green cards.

GreenTech's financials reflect this. In its Income Statements, GreenTech reported that its revenues in 2016 totaled $260,958 – all gained through "Intercompany Sales." Ex. 28 at 1. This represented a drop in revenues from 2015 of more than $100,000. *See id.* Its 2016 costs of goods

---

purpose basis. Though unclear in his letter, the easiest way for Mr. Wang to obtain this information and provide it to his litigation compatriots is to open his filing cabinet labelled "Gulf Coast."

sold were $197,921, generating a profit of $63,037. Meanwhile, GreenTech spent more than **eleven million dollars** on its sales and administrative costs, including over $6.5 million on payroll. *See id.* Overall it lost more than $13.6 million in 2016, and more than $28.5 million in 2015.

Other aspects of its financials are troubling, and do not give confidence that GreenTech can be a viable business. Between 2015 and 2016, for example, GreenTech's:

- Cash declined from over $4 million to under $1 million;
- Current assets declined from over $10 million to under $5 million;
- Total assets declined by nearly $11 million;
- Long-term liabilities rose by over $11 million;
- Stockholder's equity declined from over $23 million to under $2 million.

*See id.* at 2.

A review of 2013 and 2014 financials, in light of the above, suggests a company that has been raided. At the end of 2014 GreenTech had $33 million in cash, yet had less than $1 million at the end of 2016. *See* Ex. 29 at 1. Total assets have plummeted from over $102 million to around $67 million. There is an entry for an $18,600,000 "Investment in Subsidiaries" in the 2016 "Other Assets" section that does not appear in the 2013/2014 financials. Given the web of corporations here – some bankrupt, some not – but all traceable back to the same individual, it is unclear who has reaped, or will reap, the benefits of these "investments."

GreenTech raised $129.5 million from EB-5 investors alone. It claims to have raised much more. Its financials, labyrinthine corporate structure (known and unknown), and disturbing history give rise to at least three questions going to the heart of the bad faith inquiry:

1.    How much money has simply disappeared from GreenTech?

21

2.      Where is the real value of the Debtors?

3.      Can such money or value realistically be recovered in these proceedings?

The absence of ready answers to those questions shows that these cases will end up wasting the Court's and the parties' time.

## III.   ARGUMENT

Under Section 1112(b) of the Bankruptcy Code, on request of a party in interest, the Court may dismiss a case filed under Chapter 11 for cause if filed in bad faith. *See* 11 U.S.C. § 1112(b) (West 2018); *accord In re Finney*, 992 F.2d 43, 45 (4th Cir. 1993); *see also Carolin*, 886 F.2d at 699 ("good faith filing" requirement is "implicit in [Section] 1112(b)"). As the Fourth Circuit has explained, "the right to file a Chapter 11 bankruptcy petition is conditioned upon the debtor's good faith – the absence of which is cause for summary dismissal." *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 279 (4th Cir. 2007). Indeed, "the ability of a bankruptcy court to conduct a threshold inquiry into the good faith of a petitioner is ***indispensable*** to proper accomplishment of the basic purposes of Chapter 11 protection." *Id.*; *see also Carolin*, 886 F.2d at 698 ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons ... available only to those debtors and creditors with 'clean hands.'").

To determine whether a bankruptcy case has been filed in bad faith, the Court must examine the "objective futility" of a petition and then determine whether it was filed in "subjective bad faith." *Carolin*, 886 F.2d at 701-702. The objective futility inquiry "is designed to ensure that there is embodied in the Petition some relation to the statutory objective of resuscitating a financially troubled debtor." *Id.* at 701. The subjective inquiry tests whether "the

petitioner actually *intends* to use the provisions of Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values," or "whether the petitioner's real motivation is to abuse the reorganization process and to cause hardship or to delay creditors." *Id.* at 702.

The Debtors' filing fails under both factors.

### A.    *The Debtors' Petitions are Objectively Futile*

The purpose of Chapter 11 is to provide an opportunity for a troubled company to reorganize its business in hopes of achieving a fresh start. Chapter 11 comprises "the two recognized policies underlying Chapter 11, of preserving going concerns and maximizing property available to satisfy creditors." *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999). The good faith requirement, in turn, "provides a means for inquiring at the outset into the critical question of whether there is indeed a 'going concern to preserve,' by requiring that the petitioner establish to the court's satisfaction that there exists the 'realistic possibility of an effective reorganization.' It is of course obvious that 'if there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre*....*" Carolin*, 886 F.2d at 698 & 701-02.

Here, it is inconceivable that GTA could propose, let alone confirm, a plan of reorganization. GreenTech had nine (9) years to establish and operate a legitimate business and never came close. There appears to be no market for GreenTech's signature vehicle, the MyCar, which is essentially a glorified golf cart. This is a tech company without technology. As the *Crown Financial* court reasoned, a finding of objective futility follows when:

> This debtor has no ongoing business to protect and no plans to initiate an ongoing
> business. There being no ongoing business in existence and none on the horizon,

23

there is no going concern value to preserve. Further, there is no realistic
possibility of an effective reorganization because there is nothing to reorganize or
resuscitate and no plans for anything to reorganize. There are no jobs to save ...
and no business concept or enterprise for the production of income to be
preserved.

183 B.R. at 722. Indeed, a debtor lacks a reasonable likelihood of rehabilitation under Section

1112(b) as a matter of law where, as here, it lacks income, *see AMA Corp.*, 175 B.R. at 897-98,

lacks operating funds, *see id.*, or lacks continuing revenue generating activity, *see In re Double

W Enterprises, Inc.*, 240 B.R. 450, 454 (Bankr. M.D. Fla. 1999). Because GTA has "no going

concern to preserve" and "no hope of rehabilitation," its bankruptcy filing is objectively futile.

*Carolin*, 886 F.2d at 698 & 701-02.[19]

### B.     *The Debtors Have Filed Their Bankruptcy Cases in Bad Faith*

"The subjective test asks whether a Chapter 11 petition is motivated by an honest intent

to effectuate reorganization or is instead motivated by some improper purpose." *Premier Auto.*,

492 F.3d at 280; *accord Carolin*, 886 F.2d at 702. This inquiry therefore addresses a debtor's

intentions. The plainest case for finding bad faith arises when the bankruptcy filing is part of an

ongoing fraud. The Seventh Circuit defines "fraud" in the bankruptcy context as follows:

Fraud is a generic term, which embraces all the multifarious means which human
ingenuity can devise and which are resorted to by one individual to gain an
advantage over another by false suggestion or by the suppression of truth. No
definite and invariable rule can be laid down as a general proposition defining

---

[19]   Notably, a debtor's prospects can in certain circumstances be deemed so futile that an
inference of *subjective* bad faith follows. *Carolin*, 886 F.2d at 701 & n.3 ("in a given case proof
of the objective futility of a proposed reorganization might be so overwhelming that it would
support a parallel finding of subjective bad faith despite the lack of any other evidence more
directly probative of ... motive. In some situations futility may be so obvious that the only
rational inference to be drawn is that petitioner had to be aware of it, hence not to have intended
to reorganize but only to delay or harass."). Such a finding should follow here.

fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way
by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). Fraud is not limited to

misrepresentation, but may encompass "any deceit, artifice, trick or design involving direct and

active operation of the mind, used to circumvent and cheat another." *Id.*

GreenTech's filing is being used to achieve a transfer of GreenTech's most valuable

intangible asset from one of Mr. Wang's pockets (the one marked "GreenTech") into his other

pocket (the one marked "JSAT") at a discount and debt-free. These bankruptcy filings occurred

because the transaction that could have achieved that goal, with Golden Resources, could not be

completed because many investors (in addition to the Movants) declined to accept its terms, and

because the Movants (and others) began suing GreenTech for its fraudulent practices.

As their filings indicate, the Debtors seek to resurrect their favored deal, which involves

interrelated companies (JSAT, Rugao GTA, and Golden Resources) that are uniformly outside

this Court's jurisdiction. Moreover, the 2016 IP asset swap – when GreenTech's IP was allegedly

appraised at an eye-popping $170 million, and traded for just a sliver of a new, seemingly

unremarkable company, JSAT – cannot be meaningfully examined in a U.S. bankruptcy case

because its participants are in China. Chapter 11 was not enacted to paper over and foster shady

deals. *See, e.g., In re Lam*, 2016 WL 125618, at *3 (Bankr. S.D. Tex. 2016) (dismissing case

based on a finding that the debtor "used the bankruptcy system to further a fraudulent loan

modification scheme"); *In re Wilke*, 429 B.R. 916, 924 (Bankr. N.D. Ill. 2010) (relieving

creditors from automatic stay where "bankruptcy petition was part of a scheme to delay, hinder

and defraud the [creditor]"). On similar facts, the Tenth Circuit affirmed a finding of actual fraud

where the petition was part of a scheme to convince creditors to invest $900,000 for a promised

50% share in a company in which debtors had an interest, and then to convert that investment

into interests in promissory notes, on threats that company was about to file for bankruptcy, and

finally into equity interests in the note's maker, thereby bilking creditors of their money. *See In

re Sun*, 535 B.R. 358 (10th Cir. BAP (Colo.) 2015).

Other indicia counsel in favor of finding subjective bad faith in these cases. *See Janvey v.

Romero*, 883 F.3d 406, 412 (4th Cir. 2018) ("Courts must consider the totality of the

circumstances underlying each case to determine whether a debtor has acted in bad faith. To aid

in this effort, bankruptcy courts have developed a number of multifactor tests."). For example,

the court in *AMA Corp.*, citing to *Matter of Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986),

and *In re Thirtieth Place, Inc.*, 30 B.R. 503 (B.A.P. 9th Cir. 1983) – both heavily discussed by

the Fourth Circuit in *Carolin* – singled out the following factors: (i) "Single asset case;" (ii)

"History of past business conduct," or lack thereof; (iii) "Existence of business activity at the

time of filing" or lack thereof; (iv) "Reasonable prospect for future business conduct" or lack

thereof; (v) "No cash flow" and "[n]o available sources of income to sustain a plan of

reorganization or adequate protection payments;" (vi) "Secured creditor has proceeded to

foreclosure because of arrearages and debtor has been unable to stop the sale in state court;" and

(vii) "Chapter 11 is the only way debtor can avoid the sale...." 175 B.R. at 897-98.[20]

GreenTech's filing satisfies these criteria. It is essentially a one-asset company, as its holdings consist of its impossible-to-value JSAT interest and real property subject to imminent foreclosure. It has no past, present, or future prospects for business activity, virtually no income, and no cash flow. GreenTech is availing itself of the automatic stay provision, while apparently coordinating a lawsuit against the Movants through proxies. *See* Ex. 7 at 5 (using the occasion of Charles Wang's resignation letter as GreenTech CEO to announce: "Today, more than 60 EB5 investors have sued 32 EB5 investors of GTA for malicious litigation in the United States and demanded that these people with malicious lawsuits compensate more than $36 million in losses."); *id.* at 6 (Mr. Wang threatening to use private and protected information against Movants); Ex. 25 at 1 (plaintiffs in new suit threatening to act on Mr. Wang's threat). The combined effect of these factors warrants dismissal. *See Furness v. Lilienfield*, 35 B.R. 1006, 1008 (D. Md. 1983) (finding subjective bad faith where debtor simply wanted to use Chapter 11 to manipulate another litigation); *accord SGL Carbon,* 200 F.3d at 165 (observing that Chapter

---

[20] The Fourth Circuit's most recent bad faith case, *Janvey,* arises under Bankruptcy Code Section 707 and is distinguishable. There, the Court found no reason to depart from findings that the debtor had reasons beyond avoiding a judgment to file his petition; that the debtor's effort to settle litigation under the threat of bankruptcy is not bad faith; and that the size of the debtor's personal assets did not suggest bad faith. *Id.* at 441-17. The futility of the petition was not analyzed, and the unique issues presented here, centering on the inability for the Court or interested parties to find and value the Debtors' assets; the Debtors' use of bankruptcy to foster a lopsided, insider transaction of dubious provenance; use of bankruptcy to shift assets debt-free from one insider's pocket to another; or the use of bankruptcy to tilt the playing field by staying litigation in which the Debtors are defendants, while supporting litigation against the Debtors' adversaries.

11 petition filed to obtain tactical litigation advantages is not within the legitimate scope of the

bankruptcy laws and that courts have typically dismissed such petitions).[21]

Moreover, where, as here, these improper litigation tactics are combined with the

petition's objective futility, courts do not hesitate to dismiss such petitions as violating the good

faith requirement. As the *Crown Financial* court reasoned,

> In this case, as observed above, the debtor has no going concern value and no
> ongoing, viable business enterprise to rehabilitate. Therefore, the court concludes
> that this case was not filed with any actual intent to use the provisions of Chapter
> 11 to reorganize or rehabilitate any ongoing or planned business enterprise nor to
> preserve going concern value which is nonexistent. Instead, this case was filed in
> order to stall and delay the [creditors]' efforts to collect on their judgment in the
> pending state court case.

183 B.R. at 722.

## IV.    CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court dismiss the instant

Chapter 11 cases and award such other and further relief as is just and proper.

| /s/ Scott M. Abeles | /s/ George R. Pitts |
|---|---|
| Scott M. Abeles | George R. Pitts (VSB No. 24978) |
| Jonathan Link (VSB No. 42951) | SANDS ANDERSON PC |
| Gerard P. Fox | 1497 Chain Bridge Road |
| GERARD FOX LAW P.C. | Suite 202 |
| 3050 K Street, N.W., Suite 210 | McLean, VA 22101 |
| Washington, DC 2007 | (703) 893-3600 telephone |
| Telephone: (202) 664-5585 | (703) 893-8484 facsimile |
| jlink@gerardfoxlaw.com | gpitts@sandsanderson.com |
| *Counsel for Movants* | *Counsel for Movants* |

---

[21] The Movants will not further address the other Debtors' filings, as they are all paper
companies and, as such, their bankruptcy filings rise and fall with that of GTA. As discussed
above, it appears that A-3's filing was a mistake, since its stated assets exceed its liabilities (and
it is not a named defendant in the Fraud Action, as are all the other Debtors).

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2018, a true copy of the foregoing *Memorandum in Support of Motion to Dismiss Chapter 11 Cases* was filed with the Clerk of the Court using the CM/ECF system, which will send a notification of electronic filing (NEF) to all creditors and parties in interest, including the following:

John P. Fitzgerald, III
*Trustee*


Kristen E. Burgers
*Attorney for Debtor*

/s/George R. Pitts
George R. Pitts, VSB #24978
SANDS ANDERSON PC
1497 Chain Bridge Road, Suite 202
McLean, VA 22101
(703) 893-3636 telephone
(703) 893-8484 facsimile
gpitts@sandsanderson.com

*Counsel for Xia Bi, Nian Chen, Yuanyuan Chen, Qingli Cheng, Ying Cheng, Dongsheng Hu, Jun Huang, Kui Le, Chunsheng Li, Zhonghui Li, Lin Lin, Lan Liu, Ling Liu, Zheng Qin, Meiming Shen, Yunping Tan, Bixiang Tang, Xiaonan Tang, Chun Wang, Rui Wang, Yahong Wang, Yue Wang, Jian Wu, Lei Yan, Junping Yao, Jin You, Zhen Yu, Houqian Yu, Nianqing Zhang, Xuemei Zhang, Huibin Zhao, and Yan Zhao*