**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | |
| GreenTech Automotive, Inc., et al.[1] | ) ) ) | Chapter 11<br>Case No. 18-10651<br>Jointly Administered |
| Debtor. | ) ) ) | |

**DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THEIR ASSETS; (II) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
(III) APPROVING CERTAIN DEADLINES AND THE FORM, MANNER AND
SUFFICIENCY OF NOTICE; AND (IV) GRANTING OTHER RELATED RELIEF**

GreenTech Automotive, Inc. ("**GreenTech**") and WM Industries Corp. ("**WMIC**"), the

debtors and debtors-in-possession herein (together, the "**Debtors**"), by counsel, file this motion

(the "**Sale Motion**"), pursuant to sections 105, 363 and 365 of Title 11 of the United States

Code (the "**Bankruptcy Code**") and Rules 2002, 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order, the proposed form of

which is submitted herewith (the "**Sale Order**"): (a) authorizing the sale of substantially all of

the Debtors' assets (the "**Assets**"); (b) authorizing the assumption and assignment of certain

executory contracts and unexpired leases in connection with such sale;[2] (c) approving certain

deadlines and the form, manner and sufficiency of notice of the foregoing; and (d) granting

---

[1]  The Debtors in these jointly administered chapter 11 cases are GreenTech Automotive, Inc. (Case No. 18-10651), WM Industries Corp. (Case No. 18-10652), Gulf Coast Funds Management, LLC (Case No. 18-10653), American Immigration Center, LLC (Case No. 18-10654), GreenTech Automotive Capital A-3 GP, LLC (Case No. 18-10655), and GreenTech Automotive Partnership A-3, L.P. (Case No. 18-10656).

[2]  By this Sale Motion, the Debtors' reserve their right to reject any agreement not to be assumed or assigned and will seek rejection of such agreements pursuant to this Sale Motion once such agreements are identified.

Kristen E. Burgers (VSB No. 67997)
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, Virginia 22102
Telephone:  (703) 584-8900
Facsimile:  (703) 584-8901
Email:  kburgers@hf-law.com

*Co-Counsel to the Debtors*

Mark S. Lichtenstein (Admitted pro hac vice)
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 223-4000
Facsimile:  (212) 223-4001
Email:  mlichtenstein@crowell.com

*Co-Counsel to the Debtors*

other related relief.  In further support of this Sale Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1d409.

2.      The statutory and other predicates for the relief sought herein include sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and Rule 6004-1  of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Local Rules**").

## Background

3.      On February 26, 2018 (the "**Petition Date**"), GreenTech and WMIC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating their respective chapter 11 cases (the "**Bankruptcy Cases**").  The Bankruptcy Cases are being jointly administered under the lead case of GreenTech.

4.      The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      No trustee or examiner has been appointed in these Bankruptcy Cases and no committee has been appointed or designated to date.

## The Debtors' Business

6.      GTA was organized in Mississippi in 2009 for the purpose of developing, producing, marketing and financing energy efficient automobiles, including electric cars. In 2010, GTA acquired assets including intellectual property, relating to an electric vehicle known

as the "My Car".  WMIC is a holding company that is the holder of a majority of the outstanding shares of common stock of GTA.

7.      For the period from 2009 until 2013, GTA received investments aggregating $141.5 million from a total of approximately 283 individuals in four distinct investment transactions, referred to herein as the "A-1", "A-2", "A-3" and "A-4" investment tranches.

8.      The Debtors' primary assets are (a) a minority interest in Jiangsu Saleen Automotive Technologies, Co., Ltd. (the "**JSAT Interest**"); (b) assets including intellectual property relating to an electric vehicle known as the "My Car" (the "**MyCar Assets**"); (c) real property consisting of approximately 99 acres located in Robinsonville, Tunica County, Mississippi, improved by a manufacturing facility and related equipment located thereon (collectively, the "**Mississippi Parcel**").

## The Debtors' Efforts to Market its Assets for Sale

9.      The Debtors have explored outside financing and possible sale options for the past two years. Although the Debtors had some promising leads, these leads did not materialize in a definitive transaction.

10.     In 2017 GTA sought to arrange for the purchase of the JSAT Interest by a Chinese investment fund and obtained support for the transaction from a significant portion of its Investors. However, that transaction was conditioned upon there being no pending major litigation involving GTA. Unfortunately, GTA was unable to satisfy this condition due to the pendency of litigation against GTA, WMIC and their affiliated entities, including claims asserted by the Xia Bi Group in a civil action pending before the United States District Court for the Eastern District of Virginia.

11.     Given these circumstances, the Debtors determined, in the prudent exercise of their business judgment, that filing bankruptcy petitions under chapter 11 of the Bankruptcy Code represented the best alternative to stabilize their businesses, provide access potentially to financing for business operations and to ensure the preservation and realization of maximum value for the benefit of their estates.

12.     On July 3, 2018, the Debtors filed their Joint Chapter 11 Plan of Liquidation [Docket No. 210] and a proposed disclosure statement in connection therewith [Docket No. 211]. On July 24, 2018, the Debtors filed their Amended Joint Chapter 11 Plan of Liquidation [Docket No. 232] and a proposed disclosure statement in connection therewith [Docket No. 233]. On August 20, 2018, the Debtors filed their Second Amended Joint Chapter 11 Plan of Liquidation [Docket No. 279] and a proposed disclosure statement in connection therewith [Docket No. 280]. On October 30, 2018, the Debtors filed their Third Amended Plan and proposed disclosure statement therewith.  On November 19, 2018, the Debtors filed their Modified Third Amended Joint Chapter 11 Plan of Liquidation [Docket No. 375] (as may be further amended, the "**Plan**") and a proposed disclosure statement in connection therewith [Docket No. 376] (as may be further amended, the "**Disclosure Statement**").

13.     In furtherance of the Plan confirmation process, on August 14, 2018, the Debtors filed an Motion to Approve Disclosure Statement [Docket No. 234] (the "**Initial Motion to Approve Disclosure Statement**") and an Auction Procedures Motion [Docket No. 265] (the "**Initial Auction Procedures Motion**"), which included as an exhibit the form of Asset Purchase Agreement (the "**Initial APA**") the Debtors had negotiated with Shenzen Jin Hong Investment Management Co., Ltd., commonly known in China as Golden Resources ("**GR**").

4

14.    The original hearing on the Initial Motion to Approve Disclosure Statement and Initial Auction Procedures Motion was scheduled for August 21, 2018. Within a few hours of the commencement of the hearing, GR advised Debtors' counsel that it was not prepared to move forward with the acquisition of the Assets pursuant to the Initial APA due to (a) an economic downturn in China that affected the value of proposed equity trade and (b) the absence of third-party releases from the Chinese investors holding debt claims against GTA.

15.    Subsequent to August 21, 2018, the Debtors and GR entered into a binding term sheet, the key elements of which were incorporated into an Asset Purchase Agreement (the "**Second APA**"), which was included as an exhibit to the Amended Motion for an Order (A) Approving Bidding Procedures for the Sale of the Debtor's Assets; (B) Authorizing an Auction (C) Approving Certain Deadlines and the Form, Manner and Sufficiency of Notice; and (D) Granting Other Related Relief [Docket No. 328] (the "**Auction Procedures Motion**") filed on October 17, 2018.

16.    The hearing on confirmation of the Plan was originally scheduled for December 21, 2019.  The center piece of the Plan was the Second APA pursuant to which substantially all of the Debtors' assets were to be transferred to GR.  The Debtors requested and were granted a continuance of the confirmation hearing to January 16, 2019, to allow additional time for the Debtors to receive a deposit from GR as the stalking horse bidder.  Notwithstanding the additional three week period, GR never posted the deposit.

17.    Shortly before the January 16, 2019 hearing, the Debtors were advised that a group of A-3 and A-4 investors (the "**Investor Group**") was preparing a bid for the purchase of substantially all the Debtors' assets, including the real property, plant and equipment comprising the Debtors' manufacturing facility, as well as the JSAT Interest.  Because, in the Debtors'

estimation, this bid could potentially generate a much better return for creditors than a transfer of the assets to a liquidating trust (which was contemplated under Scenario 2 in the Plan), the Debtors, after consulting with certain of their major stakeholders, requested a further continuance of the Plan confirmation hearing, which was scheduled for February 12, 2019.

18.    At the February 12, 2019 hearing on the confirmation of the Plan, Debtors' counsel advised the Court of the status of the potential deal with the Investor Group.  Counsel advised the Court that the Debtors and the Investor Group had negotiated a draft Asset Purchase Agreement and had prepared and circulated proposed auction procedures but needed a little more time to file a motion to approve the auction procedures and the ultimate sale pursuant thereto. The Court indicated that it would likely approve a motion brought on short notice to schedule the bid procedures motion for a hearing on March 12, 2019 if the Debtors filed and served such papers by no later than March 4, 2019.

19.    After exhaustive negotiations, the Debtors and the Investor Group have prepared and, as soon as it is possible, will execute the Asset Purchase Agreement (the "**APA**"), substantially in the form of the draft attached hereto as Exhibit 1 hereto.[3]  In addition, the Debtors and the Investor Group have agreed to proposed auction procedures which are submitted herewith as Exhibit 2.

### The Asset Purchase Agreement Between Debtors and the Investor Group

20.    Under the APA, the assets to be purchased are: (i) all real and personal property owned by GTA, including the Mississippi Parcel,  (ii) the JSAT Interest, (iii) litigation claims, if any, that exist, and have not been settled or released, as of the Closing Date (as defined in the APA), excluding avoidance actions pursuant to Chapter 5 of the Bankruptcy Code, (the

---

[3] The APA is not yet complete due to the need for the purchasing entity, Encore Wealth Management, to undergo certain corporate formality and complete specific governance procedures.  The APA will be executed by the purchasing entity on or before April 8, 2019, which is in advance of the anticipated auction.

"**Litigation Claims**"), (iv) all assets of Gulf Coast Funds Management, LLC, a Louisiana limited

liability company (the "**GCFM Assets**"), which is a wholly owned subsidiary of WMIC, and (v)

all Accounts Receivable, Intellectual Property, Intellectual Property Licenses (all as defined in

the APA) and all other tangible or intangible assets of the Debtors (the "**Other Assets**").  The

Mississippi Parcel, JSAT Interest, Litigation Claims, and GCFM Assets, and the Other Assets

are collectively referred to as the "**Assets**".

      21.     The consideration for the Assets is Eight Million Dollars ($8,000,000.00) plus a

waiver by each member of the Investor Group to any right to distribution from any plan of

liquidation or reorganization proposed by any of the Debtors and confirmed by the Bankruptcy

Court arising from or related to their respective investments in GreenTech Automotive

Partnership A-3, LP or GTA, as applicable, exclusive of their respective interest in the DIP

Financing (as defined in the APA).

      22.     As set forth in greater detail in the APA, the proposed transaction generally

provides for the following:

| | | |
|---|---|---|
| (a) | **Assets to be Purchased** | The Assets, consisting of the Mississippi Parcel, JSAT Interest, the Litigation Claims, the GCFM Assets, and the Other Assets. |
| (b) | **Purchase Price** | $8,000,000, with a $800,000 deposit to be paid by no later than April 7, 2019 (the "**Stalking Horse Bid**"). |
| (c) | **Earnest Money Deposit** | $800,000 (the "**Deposit**"). [4] |
| (d) | **"As is, Where is"** | Except as otherwise stated in the APA, the Assets are being sold "as is, where is." |
| (e) | **Assumed Leases/Contracts** | Purchaser will have the right to designate contracts and leases for assumption and |

---

[4] As set forth in the Final Order Authorizing Debtor to Obtain Unsecured Postpetition Financing [Docket NO. 497] (the "**Final DIP Order**"), the amount of the Deposit may be reduced by the amount of the Investor Funding.  *See* Final DIP Order ¶ 3.  The Deposit will be remitted to the Debtors on or before April 8, 2019, which is in advance of any anticipated auction.

|        |                                        | assignment pursuant to the procedures approved by the Court. Unless otherwise stated in the APA, cure claim obligations will be the responsibility of the Purchaser. |
|--------|----------------------------------------|----------------------------------------|
| (f)    | **Subject to Higher/Better**           | The proposed sale will be subject to higher/better offers submitted in connection with a sale process and bid procedures approved by the Court. |
| (g)    | **Conditions Precedent to Closing**    | Among other things, the Bankruptcy Court shall have entered the (i) Bidding Procedures Order, including approval of the Stalking Horse Bid Protections, has become a Final Order, and (ii) Sale Order and the Sale Order has become a Final Order. |
| (h)    | **Break-Up Fee/Expense Reimbursement** | The Break-up Fee is 3% of the purchase price and the expense reimbursement is up to 2% of the reasonable expenses incurred by the stalking horse bidder. |
| (i)    | **Closing Date**                       | Three (3) Business Days after the satisfaction or waiver of the conditions precedent to Closing (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).[5] |

## <u>Relief Requested</u>

23.     The Debtors respectfully request, pursuant to sections 105, 363 and 365 of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, entry of the Sale Order approving

(i) the sale of the Assets free and clear of liens, claims and encumbrances to the Purchaser, or a

qualified bidder submitting a higher or otherwise better offer, (ii) the assumption and assignment

of certain executory contracts and unexpired leases in connection with the sale of the Assets, and

(iii) the exemption of the sale of the Assets from stamp or similar taxes.

---

[5]  All capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the APA.

24.     The Debtors expressly reserve the right to modify the relief requested in the Sale

Motion prior to or at the applicable hearings.

## PART I

## THE AUCTION PROCEDURES

24.     The Debtors request that the Court approve the bid procedures (the "**Bid**

**Procedures**"), attached as <u>Exhibit 2</u> hereto, to facilitate the sale of the Assets. The Debtors

submit that the Bid Procedures are fair and reasonable and should be approved.  The purchase

price offered by the Purchaser pursuant to the APA establishes a floor price above which,

competing bidders will need to overbid.  The Bid Procedures describe, among other things, the

procedures for interested parties to access due diligence, the manner in which bidders and bids

become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the

selection and approval of any ultimately successful bidders, and the deadlines with respect to the

foregoing.  All interested persons and entities will be afforded a full, fair and reasonable

opportunity to purchase the Assets.  Engaging in such a competitive process to effectuate a sale

of substantially all the Assets while preserving enterprise value will maximize the value of the

Debtors' estates for the benefit of all creditors and stakeholders.

25.     The principal elements of the Bid Procedures are as follows:[6]

a.  **Due Diligence**

Prior to the Auction, the Debtors shall afford any potential bidder the opportunity to
conduct reasonable due diligence review.  The Debtors shall provide all potential bidders
certain information in connection with the proposed sale, including, but not limited to,
these proposed Bid Procedures and a copy of the APA.  Promptly after approval of the
Bid Procedures, the Debtors shall establish a virtual data room containing, among other

---

[6]  The following summary is for informational purposes only. All interested parties should carefully review the Bid
Procedures attached to the Order approved by the Court.  In the event there is any discrepancy, the Order shall
govern.  Capitalized terms used in this section not otherwise defined herein shall have the meanings ascribed to them
in the Bid Procedures.

things, all due diligence material made available to, or generated by, Purchaser prior to execution of the APA.  Should any potential bidder wish to access information in addition to the Bid Procedures and the APA, such potential bidder will (if it has not previously done so) be required to enter into a confidentiality agreement reasonably satisfactory to the Debtors.  Upon execution of the confidentiality agreement, the potential bidder shall be given access to the virtual data room containing various financial data and other relevant and confidential information.  The Debtors shall provide all additional due diligence that is reasonably requested and, to the extent the Debtors furnish any such potential bidder with any due diligence materials that are not already available in the virtual data room, the Debtors shall promptly add such information to the virtual data room for the benefit of all such potential bidders and Purchaser.  The Debtors will afford to each such potential bidder and Purchaser access to the Mississippi Parcel for inspection purposes.

The Debtors and their professionals do not represent or warrant the accuracy or veracity of any information that they provide to potential bidders in connection with due diligence; *provided*, *however*, that the Debtors and their professionals represent and warrant that they have made good faith efforts to ensure that information provided to potential bidders is accurate and complete.

### b.   **Determinations by Debtors**

The Debtors are authorized (i) to determine whether any potential bidder is a Qualified Bidder; (ii) to coordinate the efforts of potential bidders in conducting their respective due diligence investigations; and (iii) to receive bids from Qualified Bidders (collectively, the "**Bidding Process**").

### c.   **Requirements Of "Qualified Bidder" Status**

Any potential bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder" by the Debtors.  To be deemed a Qualified Bidder, on or before April 7, 2019[7], such bidder must deliver to the Debtors and their professionals:

(i)      written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (*provided*, *however*, that the closing of the sale shall not be contingent in any way on the Successful Bidder's financing);

(ii)      a representation that the potential bidder has the financial wherewithal to consummate the transactions contemplated or otherwise provide such information that will allow the Debtors to make a reasonable determination as to the potential bidder's ability to perform;

(iii)      a stipulation or evidence that submission of the bid, execution, delivery and closing on the purchase of the Assets is duly authorized and the prospective

---

[7] The Investor Group requires an extension of time through and including April 7, 2019, to lodge its Good Faith Deposit due to certain corporate organizational issues.

bidder has all requisite approvals from its board of directors or comparable governing body; and

(iv)    a certified check or other good and verifiable funds in the amount of (i) Eight Hundred Thousand Dollars ($800,000.00), if bidding on all the Assets, or (ii) ten percent (10%) of the proposed purchase price, if bidding on less than all of the Assets (the "**Good Faith Deposit**").

For the avoidance of doubt, Purchaser shall be deemed a Qualified Bidder, and the APA shall be deemed a Qualified Bid as hereinafter defined, notwithstanding the provisions of paragraph 15(d) of the Bid Procedures, and the Purchaser shall not be required to submit an additional Qualified Bid or any additional information or make an additional deposit. The Good Faith Deposits shall be held by an escrow agent to be designated by the Debtors.  All Good Faith Deposits shall be returned within seventy-two (72) hours of the selection of the Successful Bidder as set forth herein, except for the Good Faith Deposit submitted by the Successful Bidder and the Back-Up Bidder.  The Good Faith Deposits of the Successful Bidder and Back-Up Bidder shall be held in separate accounts established by the Debtors.   If the Successful Bidder (or the Back-Up Bidder) fails to consummate an approved sale of the Assets because of a breach or failure to perform on the part of such Successful Bidder (or Back-Up Bidder), such Successful Bidder's (or Back-Up Bidder's) Good Faith Deposit will be held by the Debtors subject to the terms and conditions in paragraph 24 of the Bidding Procedures.

A Qualified Bidder that desires to make a bid for the Assets shall deliver written and electronic copies of such bid to the Debtors and their professionals so as to be received by no later than April 8, 2019 at 2:00 p.m. (Eastern Time) (the "**Opening Bid Deadline**").

### d.    <u>Requirements for a Qualified Bid</u>

A "Qualified Bid" is an offer to purchase the Assets that conforms, to the Debtors' satisfaction (in consultation with their professionals), to the following requirements:

i.    <u>Identity of Offeror</u>.  Discloses the identity of the offeror, including without limitation the identity of the equity holders and sponsors of the offeror; *provided*, *however*, that, if the offeror is a publicly traded company, the equity holders of such offeror need not be disclosed.

ii.    <u>Form</u>.  Includes a clean, duly executed and binding purchase agreement (an "**Agreement**"), together with all exhibits, schedules, and any ancillary agreements described therein and a redline of its proposed purchase agreement compared against the APA.

iii.    <u>Purchase Price</u>.  Identifies the purchase price and how the purchase price will be paid (*i.e.*, the <u>dollar</u> amount of each of the following:  cash, credit bid and/or assumption of liabilities) at closing;

iv.    <u>Minimum Cash</u>.

a.  a potential bidder is bidding on all of the Assets, the purchase price must include a minimum cash amount payable at closing in the amount of at least Eight Million, Five Hundred Thousand Dollars ($8,500,000.00), which is equal to Cash Consideration of the bid submitted by the Purchaser of $50,000,000.00, plus (i) the Break-Up Fee, (ii) Expense Reimbursement, and (iii) the an initial minimum overbid increment of $100,000.00; or

b.  If a potential bidder is bidding on less than all of the Assets, the purchase price must include a minimum cash amount payment at closing in the amount greater than the aggregate sum of (i) the Break-Up Fee, (ii) Expense Reimbursement, and (iii) an initial minimum overbid increment of $100,000.

v.    <u>Assets and Liabilities</u>.   Identifies the acquired assets, excluded assets, assumed liabilities and retained liabilities, as applicable.

vi.    <u>Financing</u>.   Includes evidence to the satisfaction of the Debtors, in consultation with the Debtors' professionals, of the offeror's financial ability to consummate the transactions contemplated in the Agreement.

vii.    <u>Corporate Authority</u>.   Includes written evidence to the Debtors' satisfaction, in consultation with the Debtors' professionals, of the authorization and approval from the offeror's board of directors (or comparable governing body) with respect to the submission, execution, delivery and consummation of the Agreement.

viii.    <u>Closing</u>.   Confirms that, if selected as the Successful Bidder, the offeror will consummate and fund the Agreement in accordance with its terms by a date certain.

ix.    <u>Due Diligence</u>.   Acknowledges and represents that the offeror:  (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its offer; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction other than as provided in the Agreement; and (iii) with the exception of the Purchaser, is not entitled to any breakup fee or similar type of payment, and by submitting an Agreement, waives, and shall be deemed to waive, the right to pursue a substantial contribution claim under Section 503 of the Bankruptcy Code related in any way to the submission of its bid or the Bid Procedures.

x.    <u>Earnest Money Deposit</u>.  Includes the Good Faith Deposit.

xi.    <u>No Collusion</u>.  By submitting a Qualified Bid, each such bidder shall be deemed to have confirmed that it has not engage in any collusive behavior with

respect to the bidding or the Auction.  The Debtors reserve the right to have each Qualified Bidder re-confirm that it has not engaged in any collusive behavior with respect to the bidding or the Auction.

The Debtors, in their discretion, in consultation with their professionals, may allow a Potential Bidder whose offer has failed to meet the requirements of a Qualified Bid additional time to cure any deficiencies.  Between the Opening Bid Deadline and the Auction, the Debtors may negotiate with or seek clarification from Qualified Bidders. Each Qualified Bidder shall promptly provide to the Debtors any information reasonably required in connection with the evaluation of a Qualified Bid.  Without the consent of the Debtors, in consultation with their professionals, a Qualified Bidder may not amend, modify, or withdraw its Qualified Bid, except to increase the purchase price or otherwise improve the terms of the Qualified Bid to make them more favorable to the bankruptcy estate during the period that such Qualified Bid is required to remain irrevocable and binding.

e.  **Auction**

In the event that at least two (2) Qualified Bids (including the APA) are received by the Debtors by the Opening Bid Deadline, the Debtors will conduct an Auction.  The Auction, if any, shall be held at the law offices of Hirschler, 8270 Greensboro Drive, Suite 700, Tysons, VA 22101 at a date and time to be determined by the Debtors and to be provided by the Debtors in a subsequent notice to all Qualified Bidders and to be provided by the Debtors in a subsequent notice to all Qualified Bidders, creditors, 2002 parties, and parties in interest.  The bidding shall start at the amount offered in the highest Qualified Bid as determined by the Debtors.

In the event that there are no Qualified Bids submitted by the Bid Deadline other than the APA, the Debtors will not hold the Auction and instead shall request at the Sale Hearing that the Bankruptcy Court approve the APA.

Except as otherwise determined by the Debtors in consultation with their professionals, only the (i) Debtors, (ii) the Debtors' professionals, (iii) the Office of the United States Trustee for the Fourth Circuit, (iv) Qualified Bidders, (v) any creditor of the Debtors that, at least five (5) business days prior to the Auction, delivers to Debtors' counsel (by mail or e-mail at the address or e-mail address identified hereinabove) a written request to attend the Auction, and (vi) the respective professionals of the foregoing, shall be entitled to attend the Auction; provided that (*x*) the Debtors reserve the right to object to any request to attend the Auction made by a creditor pursuant to clause (v) immediately above, and (*y*) if the Debtors and such creditor are unable to consensually resolve such objection promptly, the Debtors shall seek a teleconference with the Bankruptcy Court prior to the Auction to adjudicate such objection.  Only Qualified Bidders are eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

i.    Qualified Bidders shall appear at the Auction in person, or through a duly authorized representative who has all requisite authority to legally bind such Qualified Bidder.

ii.     The Debtors, in consultation with their professionals, may conduct the Auction in the manner that the Debtors determine, in their reasonable business judgment, will result in the Successful Bid that will maximize the overall value of the Assets to creditors and the Debtors' estates, and may adopt and modify rules for the Auction at the Auction that, in the Debtors' reasonable business judgment, in consultation with their professionals, will better promote the goals of the Auction and that are not materially inconsistent with any of the provisions of the Bid Procedures Order, the Bankruptcy Code, or any order of the Bankruptcy Court.  All such rules will provide that:  (i) the Auction procedures must be fairly and evenly administered, and not intended to cause any participating Qualified Bidder to be disadvantaged in any material way with respect to the process as compared to any other participating Qualified Bidder; and (ii) all participating Qualified Bidders (or their authorized representatives) shall be entitled to be present for all bidding and that the terms of each Qualified Bid shall be fully disclosed or available to all other Qualified Bidders throughout the entire Auction. Each bid by a Qualified Bidder at the Auction, if not inconsistent with the provisions of these Bid Procedures, shall be deemed to constitute a Qualified Bid.

iii.    The Debtors will arrange for the actual bidding at the Auction to be recorded by stenographic or video means.

iv.     No later than one (1) hour prior to the commencement of the Auction, the Debtors, in consultation with their professionals, shall determine (i) the then-current highest or otherwise best bid (the "**Opening Bid**"); and (ii) the initial minimum overbid above the Opening Bid, which shall be in an amount not less than One Hundred Thousand Dollars ($100,000).

v.      The Auction will begin with the Opening Bid.  Subsequent to the initial round of bidding, the Auction may continue, in the discretion of the Debtors in consultation with their professionals, with one or more subsequent rounds of bidding.  The minimum overbid for any such subsequent rounds shall be One Hundred Thousand Dollars ($100,000).

vi.     All Qualified Bidders shall have the right, at any time, to request that the Debtors announce, subject to any potential new bids, the then-current highest or otherwise best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then current highest or otherwise best bid.

vii.    In the discretion of the Debtors, in consultation with their professionals, each Qualified Bidder shall have the right to propose modifications to its Agreement at the Auction; *provided*, *however*, that any such modifications to an Agreement on an aggregate basis and viewed in whole, shall not be less favorable to the bankruptcy estate as determined by the Debtors, in consultation with their professionals.

viii.   Immediately prior to the conclusion of the Auction, the Debtors, in consultation with their professionals (i) will review each bid made at the Auction; (ii) determine the highest or best bid for the Assets (the "**Successful Bid**" and the entity or entities submitting such Successful Bid, the "**Successful Bidder**"); and (iii) notify all Qualified Bidders at the Auction, prior to its conclusion, of the identity of the Successful Bidder.  In making this determination, the factors that the Debtors may consider include, without limitation, the amount of the purchase

14

price, the form of consideration offered, and the Qualified Bidder's ability to close a transaction and the timing thereof.

ix.      In addition, the Debtors shall determine, in consultation with their professionals, which Qualified Bid, if any, is the next highest or otherwise best Qualified Bid and designate such Qualified Bid as the "**Backup Bid**" which shall proceed to closing in the event the Successful Bidder fails to consummate the Successful Bid.  A Qualified Bidder that submits the Qualified Bid that is designated as the Backup Bid is the "**Backup Bidder**."

x.      At the conclusion of the Auction, any and all key terms of the Successful Bid and the Backup Bid shall be recited on the record to ensure the accuracy thereof and to aid in the final documentation of the sa

xi.      All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Successful Bid, as applicable.

f.   **Sale Hearing**

A hearing to consider of the sale to the Purchaser or Successful Bidder will be held on April 16, 2019 (the "**Sale Hearing**").  At the Sale Hearing, the Debtors will seek authorization to consummate the transaction proposed by the Purchaser or the Successful Bidder.  The Auction and/or the Sale Hearing may be adjourned in open court from time to time, without further notice.  The Sale Hearing will be held before the Honorable Brian F. Kenney, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of Virginia, 200 South Washington Street, Alexandria, Virginia 22314.
Any objections to any of the relief to be requested at the Sale Hearing must be in writing, state the basis of such objections with specificity and be filed with the Bankruptcy Court before the objection deadline to be set by the Bankruptcy Court.  All such objections shall be served in accordance with the Sale and Bid Procedures Notice so as to actually be received by such date and time.
In the event that a Successful Bidder fails to consummate a purchase in accordance with the Successful Bid, the Backup Bidder shall be designated the Successful Bidder and the Debtors shall be directed to and authorized to effect such transaction without further order of the Bankruptcy Court.  The Successful Bidder and Backup Bidder, if any, should be represented by counsel at the Confirmation Hearing.

g.   **Consummation of the Purchase**

The purchase of the Assets shall be consummated as set forth below.

A.   Application of Earnest Money Deposit

(a)      If the Successful Bidder consummates the proposed sale on the terms and conditions of the Successful Bid, the Earnest Money Deposit of such Successful Bidder will be applied to the purchase price at closing.

(b)     If the Successful Bidder fails to consummate the proposed sale on the terms and conditions of the Successful Bid, breaches the terms and conditions of the Successful Bid, or otherwise fails to perform its obligations hereunder or thereunder, the Debtors may, and without further order of the Bankruptcy Court, deem the Successful Bidder to be a "**Defaulting Buyer**," at which time the Successful Bid shall be deemed rejected.

(c)     A Defaulting Buyer automatically forfeits its Earnest Money Deposit.

B.     <u>Backup Purchase</u>

(a)     Upon a determination by the Debtors, in consultation with their professionals, that the Successful Bidder is a Defaulting Buyer, the Debtors will be authorized, but not required, to consummate a sale with a Backup Bidder on the terms and conditions of the Backup Bid without further order of the Bankruptcy Court, provided that the Bankruptcy Court approved such Backup Bid at the Sale Hearing.

(b)     If a Backup Bidder consummates a sale on the terms and conditions of the Backup Bid, the Earnest Money Deposit of such Backup Bidder will be applied to the purchase price at closing.  In the event that the Debtors seek to consummate a sale on the terms and conditions of a Backup Bid with a Backup Bidder and such Backup Bidder fails to consummate such sale on or before the alternative closing date, breaches its Backup Bid, or otherwise fails to perform, the Debtors may, in its business judgment and in consultation with their professionals, and without further order of the Bankruptcy Court, deem such Backup Bidder to be a Defaulting Buyer and pursue the same remedies set forth hereinabove with respect thereto (including, but not limited to, retaining and applying the Backup Bidder's Earnest Money Deposit as part of the Debtors' damages resulting from the breach or failure to perform by the Backup Bidder).

26.     The Bid Procedures provide an organized process to market the Assets, for the receipt and review of bids from potential purchasers with an ability to close on the sale of the Assets and to maximize value to the Debtors' estates.

27.     The Bid Procedures require evidence of financial wherewithal, designed to confirm that participants are *bona fide* bidders with the ability to consummate any proposed transaction.

28.     The Bid Procedures also ensure that the Auction (to be held only in the event the Debtors receive multiple Qualified Bids) is conducted in a fair, timely and orderly manner.  In

the Debtors' business judgment, the requested timing strikes the appropriate balance between

affording potential bidders sufficient opportunity to bid, on the one hand, and promoting an

efficient and expeditious sale process, on the other.

29.     Section 363 of the Bankruptcy Code authorizes a trustee, and in this case the

Debtors, to sell, after notice and a hearing, estate assets outside the ordinary course of business.

Generally, Court approval of a proposed sale of assets requires demonstrating that the "proffered

purchase price is the highest and best offer" under the circumstances of the case. *See, e.g., Four*

*B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir.

1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the

value of the estate at hand"); *In re Integrated Res.,* 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a

well-established principle of bankruptcy law that the ... duty with respect to such sales is to

obtain the highest price or greatest overall benefit possible for the estate.") *(quoting Cello Bay*

*Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.),* 99 B.R. 124, 131 (Bankr.

N.D. Ga. 1988)).

30.     The implementation of competitive bidding procedures to facilitate the sale of a

debtor's assets outside of the ordinary course of a debtor's business ensures that such sale will

generate the highest and best return for the estate.  Adoption of the Bid Procedures in this case

will subject the Assets to competitive bidding thereby promoting a maximum sale price.  The Bid

Procedures, in the Debtors' opinion, will ensure the estates receives the highest or otherwise best

offer and will maximize value for all stakeholders.

## NOTICE OF BIDDING PROCEDURES AND AUCTION

31.     The Debtors seek Court approval of the manner and form of notice of the Bid

Procedures and the Auction, substantially in the form attached as Exhibit 3 hereto (the "Sale and

Bid Procedures Notice"), which the Debtors will serve on the following parties: (a) the U.S.

Trustee; (b) all known secured and unsecured creditors of the Debtors; (c) the Purchaser; (d) all

entities known to have expressed an interest in bidding on the Assets; and (e) all other parties

requesting notice in this Chapter 11 case pursuant to Bankruptcy Rule 2002.

32.     The Debtors propose to serve the Sale and Bid Procedures Notice within three (3)

business days after entry of the Bid Procedures Order, by electronic mail, to the extent available,

or by first-class mail, postage prepaid otherwise, on the parties described above. The Sale and

Bid Procedures Notice shall provide that any party may obtain a copy of this Motion or the Bid

Procedures Order by contacting the Debtors' counsel.

33.     Assuming the Court approves the schedule proposed in this Motion, the Debtors

submit no other or further notice should be required, as such notice is sufficient and satisfies the

requirements of the Bankruptcy Rules.

34.     The prompt entry of an order approving the sale of the Assets is critical for two

primary reasons.  First, an order is necessary before the Purchaser can commence the process of

posting the Deposit and, second, the Debtors seek to embark on the marketing of the Assets to

potential purchasers as soon as possible.

## BREAK-UP FEE AND OVERBID PROTECTION

36.     The Debtors request approval of the payment to Purchaser of a break-up fee of

3% of the Purchase Price (the "**Break-Up Fee**") and reimbursement in an amount up to 2% of

the Purchase Price for actual, reasonable and documented out-of-pocket costs, fees and expenses

related to the Transactions contemplated by the APA (the "**Expense Reimbursement**" and

together with the Break-Up Fee, the "**Stalking Horse Bid Protections**") in the event the

Purchaser is not the Winning Bidder for the Assets because a Competing Overbid is approved by

the Bankruptcy Court as the Winning Bidder and the Debtors close on an Alternative

Transaction, to be paid out at the Closing of the Alternative Transaction from the proceeds of the

Competing Overbid as an allowed administrative expense claim against Debtors' bankruptcy

estates.

37.     The inclusion of the Stalking Horse Bid Protections was an express condition

precedent to Purchaser's execution of the APA and are meant to compensate Purchaser for the

value it adds as a stalking horse bidder and to reimburse Purchaser for its costs and expenses

incurred in the event Purchaser is not approved as the purchaser of the Assets.  Approval of

break-up fees and other forms of bidding protections in connection with the sale of significant

assets pursuant to section 363 of the Bankruptcy Code has become an established practice in

chapter 11 cases.  Under the circumstances of this case, the proposed Stalking Horse Bid

Protections are necessary to enable the Debtors to enter into the APA and thereby (i) induce one

or more potential purchasers to submit a higher or otherwise better bid that might not otherwise

be forthcoming and (ii) increase the likelihood that the Debtors will receive the highest or

otherwise best offer for the Assets to the benefit of the Debtors, its estate and creditors.

38.     Ample support exists for the Debtors' request for approval of the Stalking Horse

Bid Protections.  *See, e.g., In re Tropea*, 352 B.R. 766, 768 (Bankr. N.D. W. Va. 2006) (citation

omitted) ("Break-up fees serve to 'compensate the buyer for the risk of being outbid.'"); *In re

Lamb*, No. 96-1-1099-DK, 2002 WL 31508913, at *2 (Bankr. D. Md. Oct. 11, 2002) (finding

that a break-up fee may be justified if the fee is necessary to obtain the prospective purchasers

bid).  The proposed amount of the break-up fee is well within the spectrum of fees approved by

bankruptcy courts in chapter 11 cases.  *See, e.g.,* In *re Global Motorsport Group, Inc., et al.*,

Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (Court approved a break-up fee of

approximately 4%, or $500,000 in connection with sale); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved break-up fee of 7.47% in connection with sale of substantially all of Debtor's assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%).  The United States Court of Appeals for the Third Circuit has held that the standards governing the general allowance of administrative claims pursuant to section 503(b) of the Bankruptcy Code should govern the authorization of break-up fees and related expenses for the initial bidder in an auction process.  *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999).  Under the *O'Brien* analysis, to be approved, bidding incentives must provide some benefit to a debtor's estate.  *Id.*

39.    Here, the Stalking Horse Bid Protections satisfy "administrative expense" standard.  The Stalking Horse Bid Protections are reasonable because they (i) are not excessive compared to fees and reimbursements approved in other chapter 11 cases of a similar size and complexity and (ii) will not diminish the Debtors' estates.  Break-up fees, such as that proposed herein, enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity of obtaining even greater benefits for the estate through an auction process.  The Stalking Horse Bid Protections are reasonable, will promote competitive bidding, will not "chill" the bidding process, and their availability will increase the likelihood that the price at which the Assets are sold will reflect their true worth.  Further, absent the approval of the Stalking Horse Bid Protections, the Purchaser would not enter into the APA.  Therefore, the Debtors respectfully submit that the Stalking Horse Bid Protections should be approved.

**PART II**

40.     In Part II of this Motion, the Debtors seek approval of (i) the sale of the Assets free and clear of liens, claims and encumbrances, (ii) the assumption and assignment of certain executory contracts and unexpired leases (or, alternatively, the rejection of any such contracts and leases that are not being assumed by the successful purchaser), and (iii) the exemption of the sale of the Assets from stamp or similar taxes.

## THE SALE OF THE DEBTORS' ASSETS SHOULD BE APPROVED

41.     The Debtors submit that ample authority exists for the approval of the proposed sale of the Assets.  Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

> (b)(1)   The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.
>
> (f)      The trustee may sell property of the estate under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which the property is sold is greater than the aggregate value of all liens on such property;
>
> (4)      such interest is in bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(b)(1), (f); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

42.     Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor.  *See In re Abbots Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 87 (Bankr. D. Md. 1988); In *re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith); *see also Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Daily Gazette Co.*, 584 B.R. 540, 547 (Bankr. S.D. W. Va. 2018); *In re Cloverleaf Enters., Inc.*, No. 09-20056, 2010 WL 1445487, at * 2-3 (Bankr. D. Md. Apr. 2, 2010) (citations omitted) ("Among the matters the court must consider [when approving sales pursuant to section 363(b)(1)] are . . . whether the proposed sale is in the debtor's sound business judgment . . . ."); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Indus. Valley Refrig. & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

43.    The "sound business purpose" test requires that a debtor establish four elements to sell property outside the ordinary course of business, namely (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith.  *See Abbots Dairies*, *infra*; *Titusville*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel*, 82 B.R. at 335-36; *Industry Valley*, 77 B.R. at 21.  Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive, but, rather, a debtor is "simply required to justify the proposed disposition with sound business reason."  *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

44.    Consideration of the above factors in this case unequivocally establishes that the proposed sale should be approved.  Prior to and since the Petition Date, the Debtors worked diligently with their professionals to explore alternatives to a sale of substantially all of the Assets, including alternative financing arrangements.  Additionally, since prior to the Petition Date, the Debtors, have actively marketed the Assets to maximize the recovery for the estates. The Debtors' decision to sell the Assets is based upon their sound business judgment in consideration of its inability to maintain their financing other than in the context of a section 363 sale, and their duty to maximize the value of the Assets as a going concern for the benefit of its estate and creditors.

45.    The APA represents the best offer received to date for the proposed acquisition of the Assets.  To ensure that the value of the Assets is maximized, however, the APA is expressly subject to higher or otherwise better offers.  The Debtors believe there is no better evidence of value than what the market will ultimately bear.  The Auction procedures described in the

Auction Procedures Motion and Auction Procedures Order will ensure that the Debtors receive the maximum value for the Assets and that the purchase price ultimately realized by the estate will be fair and reasonable.  Accordingly, the Debtors submit that consideration of the business reasons articulated herein leads to the inescapable conclusion that the Debtors should be authorized to sell the Assets.

### SALE FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES

46.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f); *In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met).  For purposes of section 363(f)(4), courts must determine "whether there is an objective basis for either a factual or legal dispute as to the validity of the [interest]."  *In re Collins*, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995) (citation omitted).  "[T]his standard does not require the [c]ourt to resolve the underlying dispute, just determine its existence."  *Id.* (citation omitted).

24

The Debtors expect that they can satisfy the Court that the fourth of these requirements has been met.

47.    In order to facilitate the sale of the Assets, the Debtors require authorization to sell them free and clear of any and all liens or interests that may be asserted, with such liens to attach to the sale proceeds.

48.    There are three parties allegedly holding security interests or having any lien or other encumbrance on the Assets being sold: the State of Mississippi (the "**State**"), the Disputed Judgment Creditors (as defined below), and GreenTech Automotive Partnership A-3, L.P. ("**A-3 LP**").

49.    On June 28, 2018, the State filed a Proof of Claim asserting (i) a secured claim in the amount of $3,494,653.02 based on security agreement dated September 6, 2011 and that UCC-1 financing statement filed on March 2, 2012 with the Secretary of State for the State of Mississippi and (ii) an unsecured claim in the amount of $6,000,000.00 based on a pending state court action in Mississippi seeking damages for the breach of the duty of good faith and fair dealing (the "**State of Mississippi Claim**").

50.    The Debtors' vigorously dispute the State of Mississippi Claim because the State failed to file an exhibit listing the equipment with its UCC-1 financing statement. Thus, based on the strong-arm provision of Section 544 of the Bankruptcy Code, the State is an unsecured creditor (although its treatment is different based on the allegations of secured status in its proof of claim). Additionally, the Debtors believe to be without merit the asserted $6 million unsecured claim against GTA based on an alleged breach of the duty of good faith and fair dealing as set forth in the Amended Complaint filed in the Chancery Court of Hinds County, Mississippi, First Judicial District. Additionally, based on recent paystubs to the State, the principal amount due is

$2,850,000.00, plus interest in the amount of approximately $400,000.00.  If the Debtors and the

State are unable to agree regarding consensual plan treatment for the State, including the secured

or unsecured status of the claim and the amount of the claim, the Debtors may seek to object to

the claim and estimate it at as an unsecured claim in a far lower number than asserted.

51.     On August 2, 2017, the Circuit Court for Fairfax County, Virginia entered a

judgment against Gulf Coast Funds Management, LLC, A-3 LP, GreenTech Automotive Capital

A-3 GP, LLC and GTA in the amount of $6,720,000.00, plus interest, costs, and fees, in favor of

certain investors (the "**Disputed Judgment Creditors**"). Although the Disputed Judgment

Creditors did not attempt to levy or attach any assets of GTA, the Disputed Judgment Creditors

assert a secured lien on all of GTA's intangible personal property, including the JSAT Interest,

based on the delivery of the Writs of Fieri Facias to a private process server prior to the

preference period (the "**Disputed Judgment Creditors Claim**").

52.     The Debtors dispute the Disputed Judgment Creditors Claim based on a variety of

legal and factual issues, including, without limitation, that the JSAT Interest and the economic

rights flowing therefrom are located in China and that the value of the assets, at the time of the

attachment of the alleged lien, was immaterial and subject to a substantial contingency prior to

any value accruing to the JSAT Interest.

53.     On August 14, 2018, A-3 LP, by counsel, filed a proof of claim asserting a

secured claim in the amount of $50,000,000 secured by the Mississippi Parcel.  Upon

information and belief, A-3 LP has consented to the sale of the Assets free and clear of the lien

of A-3 LP.

54.     Accordingly, the alleged interests of both the State and the Disputed Judgment

Creditors are in *bona fide* dispute, and the Debtors submit that the sale of the Assets free and

clear of liens, claims and encumbrances satisfies the statutory prerequisites of section 363(f)(4)

of the Bankruptcy Code.  The Debtors further submit that the sale of the Assets free and clear of

the lien of A-3 LP satisfies the statutory prerequisites of section 363(f)(2) of the Bankruptcy

Code.

## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

55.     In order to facilitate and effect the sale of the Assets, the Debtors may also seek to

assume and assign certain executory contracts and unexpired leases to the purchaser of the

Assets to the extent required.  Section 365 of the Bankruptcy Code authorizes a debtor to assume

and/or assign its executory contracts and unexpired leases subject to the approval of the

bankruptcy court:

(a)     Except as provided in . . . subsections (b), (c), and (d) of this section, the

trustee, subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor.

(b)(1)   If there has been a default in an executory contract or unexpired lease of

the debt the trustee may not assume such contract or lease unless, at the time of

assumption of such contract or lease, the trustee:

(A)     cures, or provides adequate assurance that the trustee will promptly

cure such default;

(B)     compensates or provides adequate assurance that the trustee will

promptly compensate, a party other than the debtor to such contract or lease, for

any actual pecuniary loss to such party resulting from such default; and

27

(C)      provides adequate assurance of future performance under such

contract or lease. . . .

(f)(2)   The trustee may assign an executory contract or unexpired lease of the

debtor only if –

(A)      the trustee assumes such contract or lease in accordance with the

provisions of this section; and

(B)      adequate assurance of future performance by the assignee of such

contract or lease is provided, whether or not there has been a default in such

contract or lease.

*See* 11 U.S.C. §§ 365(a), (b)(1), (f)(2).  Accordingly, section 365 authorizes the proposed

assumptions and assignments, provided that the defaults under such contracts and leases are

cured and adequate assurance of future performance is provided.

56.      The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction."  *See*

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that the debtor will thrive and

pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required, assurance will fall

considerably short of an absolute guarantee of performance.").

57.      Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance

of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

58.     In connection with the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and/or assignment of the executory contracts and unexpired leases proposed to be assigned to the purchaser of the Assets will be satisfied.  It is an express condition of the Auction Procedures that bidders submit their Adequate Assurance Packages (defined in the Auction Procedures) containing sufficient financial and other information to assess the bidder's compliance with section 365 of the Bankruptcy Code.  The Debtors will provide all parties to executory contracts and unexpired leases to be assumed and assigned pursuant to the Sale Motion with such Adequate Assurance Packages and an opportunity to be heard.  Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts and unexpired leases should be approved.

## REJECTION OF UNSOLD CONTRACTS AND LEASES

59.     The Debtors are hopeful that all of the Assets will be sold on acceptable terms and conditions.  However, in the event that there are any executory contracts or unexpired leases that remain unsold at the conclusion of the Auction, the Debtors reserve the right to request authority at the Sale Hearing to reject any or all such unsold executory contracts and unexpired leases. After concluding the Auction and selling the Assets, the unsold executory contracts and unexpired leases may be valueless to the Debtors and would only create an administrative expense burden on the Debtors' estate.  Therefore, the Debtors request authority to reject, as of

the date of the Sale Hearing, some or all executory contracts and unexpired leases they believe to have no value.

## CURE AMOUNTS

60.     In order to ascertain the net benefit to the estates from the assignment of its executory contracts and unexpired leases, the Debtors need to accurately determine the extent of their cure obligations, if any.  Consequently, as part of the Supplement, the Debtors intend to file with the Court and serve upon the parties to the Debtors' executory contracts and unexpired leases that the Debtors believe may be subject to assumption and assignment (or rejection), a list and description of all of its executory contracts and unexpired leases to be assumed and assigned as part of the winning bid (together, the "**Executory Contracts**"), and the cure amounts (the "**Cure Amounts**"), if any, reflected in the Debtors' books and records as of the date such exhibit (the "**Executory Contract Exhibit**") is filed with the Court.  The Debtors shall filer and serve such list by no later than April 7, 2019.

61.     A separate hearing to consider any objections to the proposed Cure Amounts will be held on a date to be established by the Court.  The Debtors request that any party failing to object to the proposed assumption and assignment of its Executory Contract and the listed cure amount (if any) be deemed to consent to the treatment of its Executory Contract under section 365 of the Bankruptcy Code and this Sale Motion, including, but not limited to, the Cure Amounts.  *See Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the assumption and

assignment of its Executory Contract notwithstanding any anti-alienation provision or other

restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

## EXEMPTION OF SALE FROM STAMP OR
## SIMILAR TAXES AND BULK SALE STATUTES

62.     Pursuant to section 1146(c) of the Bankruptcy Code, the "transfer . . . or the

making or delivery of an instrument under a plan confirmed under section 1129 of this title, may

not be taxed under any law imposing a stamp tax or similar tax."  See 11 U.S.C. § 1146(c).  The

Third Circuit has broadly construed this provision to include sales and transfers that occur

outside of a chapter 11 plan of reorganization and before or after confirmation of that chapter 11

plan.  *See Director of Revenue State of Delaware v. CCA Partnership (In re CCA Partnership)*,

70 B.R. 696 (Bankr. D. Del. 1987), *aff'd* 72 B.R. 765 (D. Del. 1987), *aff'd* 833 F.2d 304 (3d Cir.

1987).  This view is shared by courts in the Second Circuit.  *See In re Jacoby-Bender, Inc.*,

40 B.R. 10 (Bankr. E.D.N.Y. 1984), aff'd 758 F.2d 840 (2d Cir. 1985); *In re 995 Fifth Avenue

Assocs., L.L.P.*, 116 B.R. 384 (Bankr. S.D.N.Y. 1990), *aff'd* 127 B.R. 533 (S.D.N.Y. 1991), *aff'd

in part, rev'd in part (on other grounds)* 963 F.2d 503 (2d Cir. 1992).  In so holding, the courts

have focused on whether the sale and transfer is "necessary to the consummation of the plan."

*Jacoby-Bender*, 758 F.2d at 842.

63.     In this case, the Debtors' sale of the Assets is essential to the consummation of a

plan, which is in draft form and will be promptly filed after the sale is consummated.  Therefore,

the sale of the Assets should be deemed to be "under a plan."  The Debtors proposes to distribute

the net proceeds of the sale of the Assets to creditors in connection with the sale or pursuant to a

confirmed chapter 11 plan.  Consequently, the Debtors submit that the sale of the Assets and

distribution of the net proceeds pursuant to a chapter 11 plan facilitates and is indeed essential to

confirmation of a chapter 11 plan for the Debtors, and thus falls within the scope of the

31

exemption provided for under section 1146(c) of the Bankruptcy Code. *See In re Permar Provisions, Inc.*, 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987) (sale of property one year prior to plan confirmation was exempt under section 1146(c) where sale proceeds were distributed to secured and unsecured creditors).

64.     Certain states and localities in which the Assets of the Debtors are located have or may have statutes or regulations requiring creditor notification before bulk transfers are conducted or other restrictions concerning the sale (or liquidation) of the Assets.  The Debtors have not conducted a comprehensive study of such requirements for every state, city and town in which the Assets are located.  However, certain of the statutes and regulations may provide that if a liquidation or bankruptcy sale is court authorized, then a company need not comply with such statutes or regulations.  Moreover, in the context of bankruptcy cases such as these, where creditors are given notice of the proposed sale in advance, as well as an opportunity to be heard before this Court, the application of such statutes and regulations would be redundant and unnecessary.  Accordingly, the Debtors seek the authorization to consummate the sale of the Assets without the necessity of complying with any state or local bulk transfer law or other requirements.

## WAIVER OF MEMORANDUM OF LAW

65.     This Sale Motion does not raise any novel issues of law and, accordingly, the Debtors respectfully request that the Court waive the requirement contained in Local Bankruptcy Rule 9013-1(G).that a separate memorandum of law be submitted.

## NOTICE

66.     Notice of this Sale Motion and proposed form of order has been served on all parties on the attached Service Lists.

*REMAINDER OF PAGE INTENTIONALLY BLANK*

**WHEREFORE**, the Debtors respectfully request entry of an order substantially in the

form filed concurrently herewith granting the relief requested in this Sale Motion and for such

other and further relief as may be just and proper.

Dated: March 4, 2019                    Respectfully submitted,

                                        */s/ Kristen E. Burgers*
                                        Kristen E. Burgers (VSB No. 67997)
                                        HIRSCHLER FLEISCHER
                                        8270 Greensboro Drive, Suite 700
                                        Tysons, Virginia 22102
                                        Telephone:  (703) 584-8900
                                        Facsimile:   (703) 584-8901
                                        Email:  kburgers@hf-law.com

                                        - and –

                                        Mark S. Lichtenstein (Admitted pro hac vice)
                                        Crowell & Moring LLP
                                        590 Madison Avenue, 20th Floor
                                        New York, New York 10022
                                        Telephone:  (212) 223-4000
                                        Facsimile:  (212) 223-4001
                                        Email:  mlichtenstein@crowell.com

                                        *Co-counsel to the Debtors*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of March, 2019, a copy of the foregoing

Debtors' Motion for an Order (I) Authorizing the Sale of Substantially All of Its Assets; (II)

Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III)

Approving Certain Deadlines and the Form, Manner and Sufficiency Of Notice; and (IV)

Granting Other Related Relief, together with all exhibits and a proposed form of Order, were

served (a) by operation of this Court's CM/ECF electronic case management system on the

parties identified on Exhibit A (ECF Service List) and (b) by facsimile or electronic mail, as

applicable, on the parties identified on Exhibit B (Facsimile/Electronic Mail Service List).


*/s/ Kristen E. Burgers*
Kristen E. Burgers

# EXHIBIT A

## ECF SERVICE LIST

Electronic Mail Notice List - Parties in the case only

| | | |
|---|---|---|
| • | Joseph A. Guzinski: | joseph.a.guzinski@usdoj.gov |
| • | John P. Fitzgerald, III: | ustpregion04.ax.ecf@usdoj.gov |
| • | Timothy G. Moore: | tmoore@spottsfain.com |
| • | Robert H. Chappell, III: | rchappell@spottsfain.com |
| • | John E. Lucian: | lucian@blankrome.com |
| • | George R. Pitts: | gpitts@rubinrudman.com |
| • | Belkys Escobar: | belkys.escobar@loudoun.gov |
| • | John B. Connor: | jack@johnbconnor.com |
| • | James A. Bobo: | jbobo@ago.state.ms.us |
| • | Dennis T. Lewandowski: | dtlewand@kaufcan.com |
| • | Dipesh Patel: | dipesh.patel@saul.com |
| • | Robert M. Marino: | rmmarino@rpb-law.com |
| • | Jeffrey N. Rothleder: | jeffrey.rothleder@sequirepb.com |
| • | Mariam W. Tadros: | mtadros@reesbroome.com |

## EXHIBIT B

### FACSIMILE/E-MAIL SERVICE LIST

Office of the United States Trustee
1725 Duke Street, Suite 650
Alexandria, Virginia  22314
Facsimile:  (703) 557-7279
E-mail:  ustpregion04.ax.ecf@usdoj.gov

US Securities & Exchange Commission
950 E. Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326-1382
Facsimile:  (404) 842-7666
E-mail:  atlanta@sec.gov

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346
E-mail: Valerie.Riley@irs.gov

Virginia Department of Taxation
PO Box 1115
Richmond, VA 23218-1115
Facsimile:  (804) 254-6111

Christopher J. Giaimo
Squire Patton Boggs
2550 M Street, NW
Washington, DC 200037
E-mail:  Christopher.giaimo@squirepb.com

Capital Wealth Holding Limited
c/o Newhaven Trustees (BVI)
PO Box 933 Road Town
Tortola, BVI VG 1110

Tunica County, Mississippi
c/o John Keith Perry Jr.
5699 Getwell Road Building G5
Southaven, MS 38672
Facsimile:  (662) 536-6869
E-mail:  jkp@perrygriffin.com

Jiangsu Saleen Auto. Tech Co.
Building 7&8 No. 299 Wenshui Road
Jingan District
Shanghai PR CHINA

Norma Anderson
Tax Collector, Tunica Co.
PO Box 655
Tunica, MS 38676
E-mail:  Norma.Anderson@tunicagov.com

Virtual Integrated Analytics
Solutions Inc.
1400 Broadfield Boulevard, Suite 325
Houston, TX 77084
E-mail:  bozturk@viascorp.com
          support@viascorp.com

Quality Metalcraft Inc.
33355 Glendale Avenue
Livonia, MI 48150
Facsimile:  (734) 261-5180
E-mail:  sales@qualitymetalcraft.com

Swoosh Technologies & Solution
1422 Elbridge Payne Road, Suite 230
Chesterfield, MO 63017
Facsimile:  (314) 228-1854

Futuris Auto Interiors
Unit 3807 38th Floor, BM Business Center
No. 100 Yutong Road, Zhabei District
Shanghai PR CHINA
E-mail:  dyang@futurisgroup.com

Akerman LLP
IOLA Account
666 Fifth Street, 20th Floor
New York, NY 10103
E-mail:  Brian.miller@akerman.com
         Michael.mena@akerman.com

Sheehan & Associates, PLC
1460 Walton Boulevard, Suite 102
Rochester, MI 48309
Facsimile:  (248) 650-5368
E-mail:  sheehanlawyers@aol.com

Honigman Miller Schwartz &Cohn
2290 First National Building
660 Woodard Avenue
Detroit, MI 48226
Facsimile:  (313) 465-7403
E-mail:  jlockhart@honigman.com

P7/Buchanan Pinkard Lakeside
PO Box 780052
Philadelphia, PA 19178
E-mail:  kate.root@cushwake.com

Global Steering Systems, LLC
PO Box 210
Watertown, CT 06795
Facsimile:  (860) 945-5405
E-mail:  sales@globalsteering.com

11012064.1  043227.00001