**DRAFT**

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND BETWEEN**

**WM INDUSTRIES CORP.,**

**GREENTECH AUTOMOTIVE, INC., DEBTORS-IN-POSSESSION**

**AND**

**ENCORE WEALTH INVESTMENTS LIMITED**

**Dated as of [●], 2019**

# TABLE OF CONTENTS

**ARTICLE 1** DEFINITIONS ............................................................................ 2

    1.1          Definitions. ................................................................ 2

    1.2          Other Definitional and Interpretative Provisions. ............... 9

**ARTICLE 2** PURCHASE AND SALE ............................................................ 10

    2.1          Purchase and Sale of Assets. ....................................... 10

    2.2          Excluded Assets. ....................................................... 11

    2.3          Assumption of Liabilities. ........................................... 11

    2.4          Excluded Liabilities. .................................................. 11

    2.5          Assumed Contracts. ................................................... 12

    2.6          Further Conveyances and Assumptions. .......................... 12

    2.7          Purchased Assets sold "As Is, Where Is".

**ARTICLE 3** PURCHASE PRICE ................................................................... 13

    3.1          Purchase Price. ......................................................... 13

    3.2          Deposit. .................................................................. 13

    3.3          Payment of Purchase Price. ......................................... 13

    3.4          Allocation of Purchase Price. ....................................... 14

    3.5          Prorations. .............................................................. 14

**ARTICLE 4** CLOSING AND TERMINATION ................................................ 15

    4.1          Closing Date.

    4.2          Deliveries by Sellers ................................................. 15

    4.3          Deliveries by Purchaser. ............................................. 16

    4.4          **[INTENTIONALLY OMITTED]** ................................ 16

    4.5          Termination of Agreement ........................................... 16

    4.6          Effect of Termination and Remedies. .............................. 17

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 18

    5.1          Organization and Good Standing. ................................... 18

    5.2          Authorization of Agreement. ........................................ 18

    5.3          No Violation; Consents. .............................................. 18

    5.4          Litigation. ............................................................... 19

    5.5          Financing. ............................................................... 19

**DRAFT**

| | | |
|---|---|---|
| 5.6 | Bankruptcy. | 19 |
| 5.7 | Financial Advisors. | 19 |
| **ARTICLE 6** REPRESENTATIONS AND WARRANTIES OF SELLERS | | 19 |
| 6.1 | Organization and Good Standing. | 19 |
| 6.2 | Authorization of Agreement. | 19 |
| 6.3 | No Violation; Consents. | 20 |
| 6.4 | Litigation. | 20 |
| 6.5 | Continued Economic Interest In JSAT. | 20 |
| 6.6 | Financial Advisors. | 20 |
| 6.7 | Preservation of Purchased Assets. | 20 |
| **ARTICLE 7** BANKRUPTCY COURT MATTERS | | 21 |
| 7.1 | Alternative Transaction. | 21 |
| 7.2 | Bankruptcy Court Approval. | 21 |
| 7.3 | Sale Order. | 21 |
| 7.4 | Stalking Horse Bid Protections. | 21 |
| 7.5 | Debtor's Fiduciary Obligations. | 22 |
| **ARTICLE 8** COVENANTS | | 22 |
| 8.1 | Appropriate Action; Filings. | 22 |
| 8.2 | Preservation of JSAT Interest. | 22 |
| 8.3 | Preservation of Records; Cooperation. | 23 |
| 8.4 | Further Assurances. | 23 |
| **ARTICLE 9** TAX MATTERS; OTHER AGREEMENTS | | 23 |
| 9.1 | Tax Matters. | 23 |
| (a) | Transfer Taxes. | 23 |
| (b) | Tax Returns and Payments. | 23 |
| (c) | Cooperation. | 24 |
| **ARTICLE 10** CONDITIONS TO CLOSING | | 24 |
| 10.1 | Conditions Precedent to Obligations of Purchaser. | 24 |
| 10.2 | Conditions Precedent to Obligations of Sellers. | 25 |
| 10.3 | Conditions Precedent to Obligations of Purchaser and Sellers. | 25 |
| 10.4 | Frustration of Closing Conditions. | 25 |
| **ARTICLE 11** LIMITATIONS | | 26 |
| 11.1 | Purchaser's Review. | 26 |

**DRAFT**

**ARTICLE 12** MISCELLANEOUS ............................................................................... 26

    12.1               Survival of Representations, Warranties, Covenants and Agreements. ................................................................... 26

    12.2               Expenses. ............................................................................... 26

    12.3               Submission to Jurisdiction. .................................................... 27

    12.4               Waiver of Jury Trial. ............................................................. 27

    12.5               Time of Essence. ................................................................... 28

    12.6               Entire Agreement; Amendments and Waivers. ...................... 28

    12.7               Governing Law. ..................................................................... 28

    12.8               Notices. ................................................................................. 28

    12.9               Severability. .......................................................................... 29

    12.10             Binding Effect; Assignment. ................................................. 29

    12.11             Headings. ............................................................................... 30

    12.12             Counterparts. ......................................................................... 30

**DRAFT**

## EXHIBITS

Exhibit A          Form of Bidding Procedures Order
Exhibit B          Form of Sale Order
Exhibit C          Investors
Exhibit D          Second Amended and Restated Limited Partnership Agreement of
                   GreenTech Automotive Partnership A-3, LP

## SCHEDULES

Schedule 1.1       Purchaser Assumed Contracts
Schedule 2.1       Purchased Assets
Schedule 2.2       Excluded Assets
Schedule 2.3       Assumed Liabilities
Schedule 3.1       Required Consents
Schedule 3.4       Allocation of Purchase Price

**DRAFT**

## ASSET PURCHASE AND SALE AGREEMENT

**THIS ASSET PURCHASE AND SALE AGREEMENT**, dated as of [●], 2019 (this "Agreement"), is made and entered into by and among **WM INDUSTRIES, CORP.**, a Virginia corporation ("WMIC"), **GREENTECH AUTOMOTIVE, INC.**, a Mississippi corporation ("GTA,"together with WMIC, "Sellers"), and **ENCORE WEALTH INVESTMENTS LIMITED**, a British Virgin Islands Business Company ("Purchaser"). Sellers and Purchaser are sometimes herein referred to collectively as the "Parties" and each individually as a "Party." Capitalized terms shall have the meaning set forth in Article 1 unless otherwise defined herein.

### WITNESSETH:

**WHEREAS**, Sellers in their respective individual capacities: (i) were organized for the purpose of developing, producing, marketing and financing energy efficient automobiles, including electric cars (the "Business"); (ii) acquired, in 2010, assets including intellectual property relating to an electric vehicle known as the "MyCar"; (iii) constructed and currently owns a manufacturing facility in Robinsonville, Mississippi; and (iv) in 2016 transferred, indirectly through a Chinese subsidiary of WMIC (the "WMIC Subsidiary"), certain assets and intellectual property relating to the MyCar to Jiangsu Saleen Automotive Technologies Co., Ltd., a Chinese limited company ("JSAT"), in exchange for an approximately 11.46% minority equity interest in JSAT (the "JSAT Interest");

**WHEREAS**, on February 26, 2018 (the "Petition Date"), Sellers and certain affiliated companies (collectively, the "Debtors") filed voluntary petitions for relief commencing cases under chapter 11 of title 11 of the United States Code, sections 101 et. seq. (as amended from time to time, the "Bankruptcy Code"), which cases are being jointly administered under the lead case *In re GreenTech Automotive, Inc. et al.*, Case No. 18-10651-BFK (the "Bankruptcy Case") and pending before the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court");

**WHEREAS**, Sellers continue to operate their businesses as a debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Sellers have determined that a sale of Sellers' assets pursuant to Sections 363 and 365 of the Bankruptcy Code is necessary to maximize value, is in the best interest of the estate and its creditors and is supported by reasonable business justification;

**WHEREAS**, on the terms and subject to the conditions hereinafter set forth and pursuant to the Sale Order, the Parties desire to enter into this Agreement pursuant to which, Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code as hereinafter set forth; and

1

**DRAFT**

**WHEREAS**, the Purchased Assets will be sold, pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances, judgments and interests pursuant to the Sale Order.

**NOW, THEREFORE**, in consideration of the promises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE 1

**DEFINITIONS**

1.1    <u>Definitions</u>.  For the purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>Accounts Receivable</u>" means the accounts receivable and other rights to payment and the full benefit of all security for such accounts receivable or rights to payment, including, but not limited to, all accounts receivable with respect to goods shipped or products sold or services rendered to customers, any other miscellaneous accounts receivable, and any claim, remedy or other right related to any of the foregoing.

"<u>Action</u>" means any action, suit, arbitration, claim, inquiry, proceeding or investigation of any nature, whether known or unknown, by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, at law or in equity.

"<u>Affiliate</u>" (and, with a correlative meaning "<u>affiliated</u>") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "<u>control</u>" (including with correlative meanings, "<u>controlled by</u>" and "<u>under common control with</u>") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise) of such Person.

"<u>Agreement</u>" has the meaning ascribed thereto in the Preamble.

"<u>AIC</u>" means American Immigration Center, LLC, a debtor-in-possession.

"<u>Alternative Transaction</u>" means one or a series of transactions to sell, transfer or otherwise dispose of any material portion of the Purchased Assets or any equity or beneficial interest in Sellers or relating to any merger, consolidation, reorganization, recapitalization or business combination with Sellers or any beneficial ownership of Sellers with one or more Persons, other than Purchaser, that actually closes, regardless of the structure of the transaction(s).

"<u>Amended LP Agreement</u>" shall have the meaning ascribed thereto in Section 4.2(j) of this Agreement, a copy of which is attached hereto as <u>Exhibit D</u>.

2

**DRAFT**

"Applicable Law" means, with respect to any Person, any U.S. Law applicable to such Person or its business, properties or assets.

"Assignment and Assumption Agreement" shall have the meaning ascribed thereto in Section 4.2(b) of this Agreement.

"Assignments of Intellectual Property" shall have the meaning ascribed thereto in Section 4.2(c) of this Agreement.

"Assumed Liabilities" has the meaning ascribed thereto in Section 2.3 of this Agreement.

"Auction" shall have the meaning specified in the Bidding Procedures Order.

"Bankruptcy Case" has the meaning ascribed thereto in the Recitals.

"Bankruptcy Code" has the meaning ascribed thereto in the Recitals.

"Bankruptcy Court" has the meaning ascribed thereto in the Recitals.

"Bidding Procedures Order" means a Final Order of the Bankruptcy Court setting forth the bidding procedures for the Auction in the form of Exhibit A hereto, which Order shall be, in all respects, acceptable to the Purchaser, in its sole discretion.

"Bill of Sale" shall have the meaning ascribed thereto in Section 4.2(a) of this Agreement.

"Break-Up Fee" shall have the meaning ascribed thereto in Section 7.4 of this Agreement.

"Business" has the meaning ascribed thereto in the Recitals.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Closing" shall have the meaning ascribed thereto in Section 4.1 of this Agreement.

"Closing Date" shall have the meaning ascribed thereto in Section 4.1 of this Agreement.

"Contract" means any contract, indenture, note, bond, loan, instrument, lease, commitment or other agreement (whether written or oral) and any amendment thereto.

"Debtors" has the meaning ascribed thereto in the Recitals.

"Deposit" has the meaning ascribed thereto in Section 3.2 of this Agreement.

"DIP Financing" means the debtor-in-possession financing provided by the Investors, which was approved pursuant to the Interim Order Authorizing Debtor to Obtain Unsecured

3

**DRAFT**

Postpetition Financing [ECF No. 476] and the [Final Order Authorizing Debtor to Obtain Unsecured Postpetition Financing [ECF No. __]].

"<u>Documents</u>" means all files, documents, instruments, papers, books, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, accounts, forecasts, ledgers, journals, title policies, Tax Returns, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Purchased Assets in each case whether or not in electronic form which are in Debtor's possession.

"<u>Employee Benefit Plan</u>" means (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to the a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by the Sellers or any ERISA Affiliate and that covers any current or former employee, director, manager, member, officer or consultant of the Sellers (or their dependents, spouses or beneficiaries).

"<u>Environmental Law</u>" means all Applicable Laws relating to protection of human health, safety, the environment and natural resources, including Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water runoff, waste emissions or wells.  Without limiting the generality of the foregoing, the term will encompass each of the following statutes, and the regulations promulgated thereunder:  Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq*. ("<u>CERCLA</u>"); the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq*.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*.; the Clean Water Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 *et seq*.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq*.; the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq*.; the Safe Drinking Water Act (21 U.S.C. § 349; 42 U.S.C. § 201 and § 300 *et seq*.); the National Environmental Policy Act of 1969, 42 U.S.C. § 4321; the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.,); and Title III of the Superfund Amendment and Reauthorization Act (42 U.S.C. § 11,001 *et seq*.), and all analogous state or local statutes.

"<u>Environmental Liabilities and Obligations</u>" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to:  (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste; (ii) the Release of Hazardous Materials or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or

4

**DRAFT**

marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses (including costs and liabilities for investigation, removal, remediation, restoration, abatement, monitoring, personal injury, property damage, natural resource damages, court costs, and reasonable attorneys' fees) as a result of any of the matters identified in clauses (i)-(v) of this definition.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is treated as a single employer with the Sellers under Section 414(b), (c), (m) or (o) of the IRS Code or Section 4001 of ERISA.

"Excluded Assets" shall have the meaning ascribed thereto in Section 2.2 of this Agreement.

"Excluded Liabilities" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"Expense Reimbursement" shall have the meaning ascribed thereto in Section 7.4 of this Agreement.

"Final Order" means an order entered by the Bankruptcy Court, or any other court exercising jurisdiction over the subject matter and the Parties, that has not been stayed, reversed, modified, or vacated and as to which: (i) there has not been filed and is not pending any appeal or petition for writ of certiorari; (ii) there has not been filed and is not pending any motion for stay, rehearing, reargument, reconsideration, or other motion (collectively, a "Tolling Motion") that tolls the running of the time period within which a notice of appeal, petition for *writ of certiorari*, or Tolling Motion must be filed; and (iii) the time within which a Tolling Motion, notice of appeal, or petition for writ of certiorari must be filed has expired without any Tolling Motion, notice of appeal, or petition for writ of certiorari having been filed; provided, however, that the possibility that a motion pursuant to Fed. R. Civ. P. 59 or 60 or Fed. R. Bankr. P. 9023 or 9024 may be filed with respect to such order does not prevent such order from being a Final Order.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to the United States or to a foreign federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"GTA" has the meaning ascribed thereto in the Recitals.

"Hazardous Materials" means all substances defined, determined or identified as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws or the Release of which is prohibited or regulated under any Environmental Laws.

5

**DRAFT**

"Independent Director" has the meaning ascribed thereto in the Recitals.

"Intellectual Property" means all intellectual property, intangible rights or other proprietary rights, including all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof; (iv) Trade Secrets; and (v) all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Intellectual Property Licenses" means (i) any Contract that contains any grant by any of the Debtors to any third Person of any right to use, publish, perform or exploit any of the Intellectual Property, and (ii) any Contract that contains any grant by any third Person to any of the Debtors of any right to use, publish, perform or exploit any Intellectual Property of such third Person.

"IRS" means the United States Internal Revenue Service.

"IRS Code" means the Internal Revenue Code of 1986, as amended.

"Investors" means the 105 investors in the Purchaser who are set forth on Exhibit C attached hereto.

"JSAT" has the meaning ascribed thereto in the Recitals.

"JSAT Interest" has the meaning ascribed thereto in the Recitals.

"Knowledge" (and derivations thereof) means the actual knowledge without any duty to investigate of Debtors when used with respect to Sellers; and (ii) the actual knowledge, with duty to investigate, when used with respect to Purchaser.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

**DRAFT**

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority or arbitrating authority.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, equitable interest, conditional sale or other title retention device or arrangement, occupancy agreement, license or lease, or security interest in, on or of such asset, and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Material Adverse Effect" means any change, circumstance, fact, condition or event that, individually or in the aggregate with any other change, circumstance, fact, condition or event, prevents or materially delays the consummation of the Transactions, other than an Excluded Matter which shall not be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect. "Excluded Matter" means any adverse change, circumstance, fact, condition or event resulting from one or more of the following: (i) the condition of the economy or the securities markets in general, or any outbreak of hostilities, terrorist activities or war; (ii) any changes in general economic, political or regulatory conditions; (iii) any changes in Applicable Laws or accounting rules; or (iv) any material breach by Purchaser of any covenant or agreement herein or any representation or warranty of Purchaser having been or having become untrue in any material respect.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Permits" means any approvals, authorizations, consents, licenses, franchises, permits or certificates.

"Permitted Liens" means:

(a)     all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all Applicable Laws or under any permit issued by any Governmental Authority; and

(b)     any Lien that pursuant to Section 363(f) or Sections 1123 and 1129 of the Bankruptcy Code, will be released from the Purchased Assets upon entry of the Sale Order.

**DRAFT**

"<u>Person</u>" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"<u>Petition Date</u>" has the meaning ascribed thereto in the Recitals.

"<u>Pre-Closing Tax Period</u>" means any Taxable period ending on or before the Closing Date.

"<u>Purchase Price</u>" shall have the meaning ascribed thereto in Section 3.1 of this Agreement.

"<u>Purchased Intellectual Property</u>" means all Intellectual Property owned by Debtor and included as Purchased Assets on <u>Schedule 2.1</u>.

"<u>Purchased Assets</u>" shall have the meaning ascribed thereto in Section 2.1 of this Agreement.

"<u>Purchaser</u>" has the meaning ascribed thereto in the Preamble.

"<u>Purchaser Closing Failure</u>" means Purchaser's refusal or inability to close the Transactions within five (5) Business Days after the satisfaction or waiver of the conditions in <u>Article 10.</u>

"<u>Release</u>" shall be as defined under CERCLA.

"<u>Representatives</u>" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants, trustees and other agents and representatives.

"<u>Sale Motion</u>" shall have the meaning ascribed thereto in Section 7.2 of this Agreement.

"<u>Sale Order</u>" means a Final Order of the Bankruptcy Court issued pursuant to Sections 105, 363, and/or 365 (as applicable) of the Bankruptcy Code, substantially in the form of <u>Exhibit B</u> and which is acceptable to Purchaser, in its sole discretion, which Final Order will approve this Agreement and all of the terms and conditions hereof, approve of and authorize Sellers to consummate the Transactions and enter into the Transaction Documents with such modifications as are reasonably satisfactory to Debtors and satisfactory Purchaser, and provide that the Purchaser is a good faith purchasers within the meaning of Section 363(m) of the Bankruptcy and further provide that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution under Federal Rule of Civil Procedure 62(a).

"<u>Sellers</u>" has the meaning ascribed thereto in the Preamble.

"<u>Tax</u>" means any (i) federal, state, provincial, territorial, municipal, local or foreign income, profits, gross receipts, environmental (including taxes under Code Section 59A), franchise, custom duties, net worth, ad valorem, sales, use, transfer, value added, excise, natural

8

**DRAFT**

resources, severance, occupation, premium, windfall profit, real property, personal property (tangible and intangible), capital stock, social security (or similar), unemployment, disability, employment, license, unclaimed property or escheatment, stamp, profits, disability, registration, withholding, alternative or add-on minimum, estimated, payroll, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties  or additions to tax, special assessments levied on any Purchased Assets or additional amounts in respect of any of the foregoing, whether disputed or not; (ii) liability for any amounts of the type described in clause (i) above arising as a result of being (or ceasing to be) a member of any Affiliate (or being included (or required to be included) in any Tax Return relating thereto); and (iii) liability for any amounts of the type described in clauses (i) or (ii) above as a result of any express or implied obligation to indemnify or otherwise assume or succeed to the liability of any other Person.  The terms "Taxes" and "Taxable" shall have correlative meanings.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement filed or required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Trade Secrets" means confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, recipes, ingredient specifications, manufacturing or cooking techniques, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists.

"Transaction Documents" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Assignments of Intellectual Property Agreement, and all other Contracts and agreements necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"WMIC" has the meaning ascribed thereto in the Preamble.

"WMIC Subsidiary" has the meaning ascribed thereto in the Recitals.

1.2     Other Definitional and Interpretative Provisions.

(a)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.

9

**DRAFT**

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(d)     Any reference in this Agreement to "$" shall mean United States Dollars.

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(f)     Any agreement, instrument, statute or regulation defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes or regulations) by succession of comparable successor statutes or regulations and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its successors and permitted assigns.

(g)     All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified.

(h)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  If a document or matter is disclosed in any Schedule, it shall be deemed disclosed on any other Schedule to which it reasonably relates (to the extent the relevance of such information to such other Schedule is readily apparent by its description in the Schedule where it is actually disclosed) without necessity of specific repetition or cross reference.  The disclosure of a document or matter on a Schedule is not intended as a representation or warranty as to the material nature of such document or matter, nor does it establish any standard of materiality upon which to judge the inclusion or omission of other documents or matters in any Schedule or constitute an admission of liability, guilt, violation, or delinquency.

(i)     This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2

## PURCHASE AND SALE

2.1     <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, the Bidding Procedures Order and the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser (or its permitted assignee), and Purchaser (or its permitted assignee) shall purchase, acquire and accept from Sellers, free and clear of any and all Liens and free and clear of all Liabilities (other than Assumed Liabilities) to the

**DRAFT**

maximum extent permitted by law, all of Sellers' right, title and interest in, to and under the assets, properties (including Purchased Intellectual Property), rights and claims that are listed on Schedule 2.1, which shall not include, notwithstanding any statement to the contrary on Schedule 2.1 or otherwise, the Excluded Assets expressly identified in Section 2.2 (such assets, properties, rights and claims to be acquired hereunder, collectively, the "Purchased Assets").

2.2    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all rights, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean the assets set forth on Schedule 2.2 hereof.

2.3    Assumption of Liabilities.  Purchaser shall assume no Liability of Sellers except and to the extent of the Liabilities set forth in Schedule 2.3 (collectively, the "Assumed Liabilities").  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume the Assumed Liabilities and shall agree to pay, discharge, perform and otherwise satisfy such Assumed Liabilities in accordance with their respective terms.

2.4    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that other than solely with respect to Purchaser's assumption of the Assumed Liabilities pursuant to Section 2.3, Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of any of the Debtors, including, without limitation the following (collectively, the "Excluded Liabilities"):

(a)    all Liabilities arising from the operation of the Business prior to the Closing Date, including all accrued expenses and accounts payable incurred prior to the Closing Date as well as all Liabilities related to any claims (as defined in Section 101(5) of the Bankruptcy Code) filed by any person or entity in any of the Debtors' Bankruptcy Cases;

(b)    all Liabilities arising out of any of the Excluded Assets, including executory or non-executory contracts unless specifically included as a Purchased Asset;

(c)    all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing prior to the Closing Date;

(d)    all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of or by the Purchased Intellectual Property arising prior to the Closing Date;

(e)    (i) all Liabilities for any Taxes of any of the Sellers and any and all Taxes of any Person that any of the Sellers are liable for as a result of joint and several liability, transferee liability, successor liability, contractual liability, pursuant to any Law, or otherwise, and (ii) all Liabilities for any Taxes allocable to a Pre Closing Tax Period relating to the Purchased Assets;

(f)    all Liabilities related to any Employee Benefit Plan;

11

**DRAFT**

(g)    any and all Liabilities of any of the Sellers to the extent that their existence or magnitude constitutes or results in a breach of a representation, warranty or covenant made by any of the Sellers to Purchaser under this Agreement, or makes the information contained in this Agreement or any Schedule hereto incorrect, incomplete or misleading;

(h)    all Liabilities which Purchaser may or could become liable for as a result of or in connection with any "defacto merger" or "successor-in-interest" theories of liability (other than Assumed Liabilities);

(i)    all Liabilities arising as a result of any Action initiated at any time, to the extent related to the Purchased Assets prior to the Closing Date; and

(j)    all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, US Trustee fees, valuation, investment banking and other third-party advisory or consulting fees and expenses) incurred by or on behalf of any of the Sellers in connection with the Bankruptcy Case or the Transactions.

2.5    <u>Assumed Contracts</u>.

(a)    Purchaser is not assuming any contracts (executory or otherwise), including but not limited to, Purchaser Assumed Contracts or licenses associated with the Purchased Assets unless specifically included as a Purchased Asset on <u>Schedule 2.1</u>.

2.6    <u>Further Conveyances and Assumptions</u>.

(a)    From time to time following the Closing, Sellers and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement, and to otherwise make effective the Transactions.

(b)    Nothing in this Agreement, nor the consummation of the Transactions, shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, Permit, certificate, approval, authorization or other right, which is not capable of being assigned pursuant to Section 365 of the Bankruptcy Code or transferred pursuant to Section 363 of the Bankruptcy Code to Purchaser at the Closing ("<u>Nonassignable Assets</u>") unless and until such assignment or transfer shall be permitted.  Sellers and Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction; <u>provided</u> that no Party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate the assignment or transfer of any Nonassignable Asset.

2.7    <u>Purchased Assets sold "As Is, Where Is"</u>.  PURCHASER ACKNOWLEDGES AND AGREES THAT THE PURCHASED ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND THAT, NOTWITHSTANDING

**DRAFT**

ANYTHING SET FORTH HEREIN TO THE CONTRARY, SELLERS MAKES NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE CONCERNING THE PURCHASED ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE PURCHASED ASSETS INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED.

SELLERS MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR OTHER INFORMATION DELIVERED OR MADE AVAILABLE BY SELLERS TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, THE DUE DILIGENCE MATERIALS).

## ARTICLE 3

## PURCHASE PRICE

3.1    Purchase Price.  The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (i) an amount in cash equal to Eight Million Dollars (USD $8,000,000) plus (ii) a waiver by each of the Investors to any right to distribution from any plan of liquidation or reorganization proposed by any of the Debtors and confirmed by the Bankruptcy Court arising from or related to their respective investments in GreenTech Automotive Partnership A-3, LP or GTA, as applicable, exclusive of their respective interest in the DIP Financing.

3.2    Deposit.

(a)    Within five (5) business days of the entry of the Bidding Procedures Order, Purchaser shall deposit into an escrow account established by the Debtors the sum of Eight Hundred Thousand Dollars (USD $800,000) (the "Deposit"); provided, however, the amount of the Deposit may be reduced, on a dollar for dollar basis, by the amounts advanced by the DIP Financing; provided, further, however, the reduction of the Deposit shall not exceed Four Hundred Thousand Dollars ($400,000) notwithstanding any funds advanced under the DIP Financing in excess of this amount.  The Deposit shall be non-refundable, except as set forth in this Agreement or an Order of the Bankruptcy Court.

(b)    The Parties agree that the Deposit shall (i) be applied as a credit towards the Purchase Price and delivered to Sellers at Closing, (ii) be returned to Purchaser within five (5) business days of termination in the event that this Agreement is properly terminated by Purchaser pursuant to the provisions of Section 4.5, or (iii) be paid to Sellers (exclusive of any interest earned thereon) in the event that this Agreement is properly terminated by Sellers pursuant to Section 4.5(k) due to a Purchaser Closing Failure.

3.3    Payment of Purchase Price.  At the Closing, Purchaser shall deliver, or cause to be delivered, an amount equal to the Purchase Price, adjusted for the items described in Section 3.5,

13

**DRAFT**

*minus* the Deposit (including any interest earned thereon) by wire transfer of immediately available funds.

3.4    <u>Allocation of Purchase Price</u>.  Schedule 3.4 contains an allocation of the Purchase Price for the Purchased Assets for purposes of Section 1060 of the Internal Revenue Code. Any subsequent adjustments to the Purchase Price shall be made consistent with such allocation. Purchaser and Sellers agree to file Federal tax Form 8594 consistent with the agreed allocation. Purchaser and Sellers shall use such allocation for all tax reporting purposes.  If, contrary to the intent of the Parties, any taxing authority makes or proposes an allocation different from that contemplated in this Schedule 3.4, Sellers and Purchaser shall cooperate with each other in good faith to contest such taxing authority's allocation (or proposed allocation); <u>provided</u>, <u>however</u>, that, after consultation with the Party adversely affected by such allocation (or proposed allocation), the other Party may file such protective claims or returns as may reasonably be required to protect its interest.

3.5    <u>Prorations</u>.

(a)    Taxes.  Personal property, ad valorem, or other Tax Liabilities, if any, with respect to the Purchased Assets due and payable prior to the Closing Date and relating to the period of ownership prior to the Closing Date shall be paid by Sellers.  Taxes that have accrued but are not yet due and payable as of the Closing Date shall be prorated between Sellers and Purchaser on the basis of the most recently ascertainable Taxes and calculated based on the parties' respective periods of ownership relative to the period to which such taxes relate.  If current year tax information is not available, the Parties shall calculate such proration using the amount due and payable in the year immediately preceding the year of the Closing.  Any such pro ration shall be final and no subsequent adjustments, refunds or additional payments shall be made.  All tax adjustments shall be based on the fiscal year used by the taxing authority.

(b)    Other Items of Expense or Receipt.  All other customarily prorated items of expense (including, without limitation, any License and Contract fees, if any) or receipt shall be prorated between the Parties hereto as of the Closing Date.  Except with respect to items prorated at Closing and subject to the applicable provisions of the Bankruptcy Code, Sellers shall be responsible for payment of any and all bills or charges incurred on or prior to the Closing Date for work, services, supplies or materials, and Purchaser shall be responsible for payment of any and all bills or charges for work, services, supplies or materials incurred from and after the Closing Date.

(c)    Adjustments.  All revenue from the Purchased Assets, charges and other operating expenses, if any, shall, notwithstanding anything contained herein to the contrary, be prorated at Closing effective as of 11:59 p.m. the day before the Closing Date.  Prorations shall be accomplished by an adjustment in the Purchase Price due Sellers on the Closing Date.  Each Party's respective obligations under this Article 3 to reimburse or pay the other Party shall survive the Closing and shall not merge into any instrument of conveyance delivered at Closing. The Parties shall work together to arrive at final adjustments as soon as practicable and shall remit any amounts owed promptly upon such determination.

**DRAFT**

# ARTICLE 4

## CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>ARTICLE 9</u> (or the waiver thereof by the Party entitled to waive that condition), each Party agrees to consummate the closing of the Transactions (the "<u>Closing</u>") at the offices of Squire Patton Boggs (US) LLP, 2550 M Street, NW, Washington, DC 20037 (or at such other place as the Parties may designate in writing) at 11:00 a.m. local time on the date that is three (3) Business Days following the satisfaction or waiver of the conditions set forth in <u>ARTICLE 10</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the Parties.  The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>."  Unless otherwise agreed by the Parties in writing, and provided the Closing occurs, the Closing shall be deemed effective and all right, title and interest of Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (prevailing Central time) on the Closing Date.

4.2     <u>Deliveries by Sellers</u>.  At the Closing, Sellers shall deliver to Purchaser:

(a)     a duly executed bill of sale (the "<u>Bill of Sale</u>") and deed to any real property owned by any of the Sellers;

(b)     to the extent Purchaser seeks the assumption and assignment of any executory contracts pursuant to Section 365 of the Bankruptcy Code, a duly executed assignment and assumption agreement (the "<u>Assignment and Assumption Agreement</u>");

(c)     duly executed assignments transferring all of Sellers' rights, title and interests in and to the Purchased Intellectual Property, (the "<u>Assignments of Intellectual Property</u>");

(d)     copies of any consents, waivers and approvals as referred to in <u>Section 10.1(c)</u>;

(e)     a certificate of non-foreign status, dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Sections 1445 and 1446 of the Code certifying under penalties of perjury that Sellers is not a foreign person pursuant to Sections 1445(b)(2) and 1446(f)(2) of the IRS Code;

(f)     a certified copy of the Final Sale Order;

(g)     proofs of service of the Sale Motion, the Bidding Procedures Order, the Sale Order and all notices thereof required under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures and the Local Rules of the Bankruptcy Court, on all necessary parties;

(h)     any all documents, including but not limited to, applicable releases of Liens necessary to transfer the Purchased Assets free and clear of Liens, Liabilities and interests as provided by the Sale Order;

**DRAFT**

(i)        such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as required to satisfy any Applicable Law, or as Purchaser may reasonably request to vest in Purchaser all the right, title and interest of Sellers in, to or under any or all the Purchased Assets;

(j)        the Second Amended and Restated Limited Partnership Agreement for GreenTech Automotive Partnership A-3, L.P., which is acceptable in form and substance to the Purchaser (the "Amended LP Agreement"); and

(k)        all other documents required to be entered into by Sellers to convey the Purchased Assets to Purchaser or to otherwise consummate the Transactions.

4.3        Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Sellers:

(a)        the Purchase Price, adjusted for the items described in Section 3.5;

(b)        a duly executed copy of the Assignment and Assumption Agreement, if applicable;

(c)        duly executed Assignments of Intellectual Property, if applicable;

(d)        a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Sellers) certifying as to the matters set forth in Sections 10.2(a) and (b).

4.4        **[INTENTIONALLY OMITTED]**

4.5        Termination of Agreement.  This Agreement may be terminated prior to the Closing Date as follows:

(a)        at any time prior to the Closing Date by the joint written consent of Sellers and Purchaser;

(b)        by Sellers or Purchaser if the Closing has not occurred on or before thirty (30) days after the entry of the Sale Order (as may be extended by written agreement of the Parties, the "Outside Date"); provided, however, that a Party may not terminate this Agreement pursuant to this Section 4.5(b) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date;

(c)        by Purchaser if the Bidding Procedures Order containing the Stalking Horse Bid Protections is not entered on or before February 15, 2019;

(d)        by Purchaser if the terms of the DIP Financing are not acceptable to Purchaser and a Final Order approving the terms of the DIP Financing is not entered on or before February 15, 2019;

16

**DRAFT**

(e)      by Purchaser if the Sale Order is not a Final Order on or before March 15, 2019;

(f)      by Purchaser if the Debtors fail to file a plan of reorganization or liquidation that is reasonably acceptable to the Purchaser solely in regards to the potential impact on immigration matters and not with respect to proposed distributions to creditors, on or before March 15, 2019;

(g)      by Purchaser if Sellers close on an Alternative Transaction;

(h)      by Purchaser, if Purchaser is not the Winning Bidder for the Purchased Assets at the Auction; provided that if Purchaser is the only Back-Up Bidder as provided in the Bidding Procedures Order, then Purchaser shall not be permitted to terminate this Agreement until after the closing of an Alternative Transaction;

(i)      by Purchaser, at any time, (i) upon a material breach of any covenant or agreement of Sellers set forth in this Agreement, including but not limited to Sellers' refusal or inability to close the Transactions within three (3) Business Days after the satisfaction or waiver of the conditions in ARTICLE 10, or (ii) if Sellers breach any of their representations or warranties herein in any material respect; provided, however, that in each such case the breach is not cured within five (5) business days of written notice thereof by Purchaser;

(j)      by Purchaser or Sellers, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining or prohibiting the Transactions or otherwise enjoining either Party from consummating the Transactions, and such Order shall have become a Final Order or shall not have been vacated prior to the Outside Date; or

(k)      by Sellers (i) upon a material breach of any covenant or agreement of Purchaser set forth in this Agreement, including but not limited to Purchaser's refusal or inability to close the Transactions within three (3) Business Days after the satisfaction or waiver of the conditions in ARTICLE 10, or (ii) if Purchaser breaches any of its representations or warranties herein in any material respect; provided, however, that in each such case the breach is not cured within five (5) business days of written notice thereof by Sellers.

No termination of this Agreement pursuant to this Section 4.5 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.

4.6      Effect of Termination and Remedies.  Upon termination of this Agreement as provided in Section 4.5, this Agreement shall become wholly void and of no further force and effect; provided, however, that:

(a)      if Sellers shall have failed to perform any of the covenants or agreements contained in this Agreement to be performed by Sellers, Purchaser may, at its option, as Purchaser's sole and exclusive remedy, either (i) terminate this Agreement by giving notice of termination to Sellers as provided in Section 4.5, whereupon (but subject to the applicable cure period) the Deposit shall be returned to Purchaser within five (5) business days of termination, or

17

**DRAFT**

(ii) seek specific performance of this Agreement subject, however, to the necessary Bankruptcy Court approval.

(b)    if Purchaser shall have failed to perform any of the covenants or agreements contained in this Agreement to be performed by Purchaser, Sellers may, at their option, terminate this Agreement as provided in <u>Section 4.5</u> and, as Sellers' sole and exclusive remedy against Purchaser, shall receive and retain the entire Deposit (exclusive of any interest earned thereon) as full and complete liquidated damages (and not as a penalty or forfeiture), Sellers and Purchaser hereby agreeing that actual damages will be difficult if not impossible to ascertain.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

5.1    <u>Organization and Good Standing</u>.    Purchaser is a corporation, duly organized under the laws of the British Virgin Islands, validly existing, in good standing and duly qualified to transact business and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2    <u>Authorization of Agreement</u>.    Purchaser has all requisite power, authority and legal capacity to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary company action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    <u>No Violation; Consents</u>.    None of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (a) the organizational documents of Purchaser, (b) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (c) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are

18

**DRAFT**

bound or (d) to Purchaser's Knowledge, any Applicable Law, except in the case of clauses (b), (c) and (d) as would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

5.4    <u>Litigation</u>.    There are no Legal Proceedings pending or, to Purchaser's Knowledge, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Purchaser Material Adverse Effect.

5.5    <u>Financing</u>.  Purchaser will have at the Closing sufficient funds available to pay the Purchase Price, including, but not limited to, the waiver of rights to distributions as described in Section 3.1 of this Agreement, and to otherwise perform its obligations hereunder.

5.6    <u>Bankruptcy</u>.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the Knowledge of Purchaser, threatened against, Purchaser.

5.7    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Sellers.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represents and warrants to Purchaser as follows:

6.1    <u>Organization and Good Standing</u>.  Sellers are duly organized under the laws of Virginia and Mississippi, as applicable, validly existing, in good standing and duly qualified to transact business under applicable law and, subject to the provisions of the Bankruptcy Code, have the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2    <u>Authorization of Agreement</u>.  Subject to the provisions of the Bankruptcy Code, Sellers have all requisite power, authority and legal capacity to execute and deliver this Agreement, the other Transaction Documents, including the Amended LP Agreement, and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Sellers in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Sellers Document</u>"), to perform their obligations hereunder and thereunder and to consummate the Transactions contemplated hereby and thereby upon approval by the Bankruptcy Court.  The execution, delivery and performance by Sellers of this Agreement and each of the Sellers Document have been duly authorized by all necessary company action on behalf of Sellers.  This Agreement has been, and each of the Sellers Document will be, upon entry of the Sale Order, duly executed and delivered by Sellers and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each of the Sellers Document when so executed and delivered will constitute, the legal, valid and binding obligations of Sellers, enforceable against Sellers (or any successor

**DRAFT**

thereto, including but not limited to, a trustee appointed under either Chapter 11 or Chapter 7 of the Bankruptcy Code) in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    No Violation; Consents.    None of the execution and delivery by Sellers of this Agreement or the Sellers Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (a) the organizational documents of Sellers (b) any Contract or Permit to which any of the Sellers is a party or by which any of the Sellers or its properties or assets are bound, (c) any Order of any Governmental Authority applicable to Sellers or by which any of the properties or assets of Sellers are bound or (d) to Sellers' Knowledge, any Applicable Law, except in the case of clauses (b), (c) and (d) as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

6.4    Litigation.    Except for the Bankruptcy Case and claims of related secured creditors [OTHER PENDING LITIGATION], Sellers have received no written notice of, and to the Sellers' Actual Knowledge (defined below) there are no investigations, claims, causes of action or other Legal Proceedings pending or, to Sellers' Knowledge, threatened against any of the Sellers, or to which any of the Sellers is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Seller Material Adverse Effect.

6.5    Continued Economic Interest In JSAT.    Seller, WMIC, continues to own, through a subsidiary that will be sold to Purchaser, the JSAT Interest, Sellers continue to receive all material economic benefits of such interests and that Sellers will transfer such ownership and economic benefit of the JSAT Interest to Purchaser and will not hinder or otherwise seek to impede Purchaser receipt of benefits of the JSAT Interest.

6.6    Financial Advisors.    No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated hereunder, other than the those retained by order of the Bankruptcy Court and no Person is entitled to any fee or commission or like payment in respect thereof which would be payable by Purchaser.

6.7    Preservation of Purchased Assets.    Sellers shall use all commercially reasonable efforts to maintain and preserve the value of the Purchased Assets until the Closing, including but not limited to the filing of all documents necessary to preserve the Purchased Intellectual Property.

**DRAFT**

## ARTICLE 7

## BANKRUPTCY COURT MATTERS

7.1    <u>Alternative Transaction</u>.    After entry of the Bidding Procedures Order until the conclusion of the Auction, Sellers are permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers for the Purchased Assets by, any Person (in addition to Purchaser and its Affiliates, agents and Representatives) in compliance with the Bidding Procedures Order.    In addition, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other Applicable Law, including supplying information relating to Debtor's assets to prospective purchasers.

7.2    <u>Bankruptcy Court Approval</u>.    The consummation of the Transactions contemplated by this Agreement will be subject to a competitive bid procedure pursuant to the Bidding Procedures Order.    As promptly as possible after the date hereof, but in no event later than February 1, 2019, Sellers shall file with the Bankruptcy Court motion(s) pursuant to Sections 363 and 365 of the Bankruptcy Code, as applicable (collectively, the "<u>Sale Motion</u>"), or, in the alternative, a plan of liquidation, with notice thereof being provided in compliance with the applicable Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, seeking, <u>inter alia</u>, entry of (a) the Bidding Procedure Order, including payment of the Break-Up Fee and Expense Reimbursement (both as defined below) and (b) the Sale Order.

7.3    <u>Sale Order</u>.    The Sale Order shall be in form and substance acceptable to Purchaser, in its sole discretion.    The Sale Order shall, among other things, (a) approve, pursuant to Sections 363, 365 and 1146 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement in all respects, (ii) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens (other than Permitted Liens), Liabilities and interests to the fullest extent allowable under the Bankruptcy Code and Applicable Law, (iii) the exemption from applicable transfer, stamp and other similar taxes of the Purchased Assets, and (iv) the performance by Sellers of their obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to Purchaser the Purchaser Assumed Contracts, if any; and (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Debtor and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code.    For the avoidance of doubt, the parties hereto contemplate that all Purchaser Assumed Contracts, if any, will be covered by the Sale Order.

7.4    <u>Stalking Horse Bid Protections</u>.    Sellers confirm that its negotiation of this Agreement with Purchaser is critical to its obtaining the highest and best price for the Purchased Assets, and that without Purchaser's commitment of substantial time and expense to the process, Sellers would have to employ a less orderly process for the sale of the Purchased Assets and therefore risk attracting lower prices.    Sellers acknowledges that Purchaser would not have invested the time and incurred the expense of negotiating and documenting the Transactions if Purchaser were not entitled to reimbursement, in cash, for certain costs and expenses incurred by Purchaser arising out of the Transactions contemplated by this Agreement, including,

**DRAFT**

specifically, a fee in an amount of three percent (3%) of the Purchase Price (the "Break-Up Fee") and reimbursement in an amount up to two percent (2%) of the Purchase Price for actual, reasonable and documented out-of-pocket costs, fees and expenses (including actual, reasonable and documented out-of-pocket costs, fees and expenses of legal, financial advisory, accounting and other similar costs, fees and expenses) related to the Transactions contemplated by this Agreement (the "Expense Reimbursement" together with the Break-Up Fee, the "Stalking Horse Bid Protections").  Notwithstanding anything in this Agreement to the contrary, if Purchaser is not the Winning Bidder for the Purchased Assets because a Competing Overbid (hereinafter defined) is approved by the Bankruptcy Court as the Winning Bidder and the Sellers close on an Alternative Transaction, Purchaser shall be entitled to the Break-Up Fee and Expense Reimbursement, provided this Agreement has not been previously terminated by Sellers pursuant to Section 4.5(h) of this Agreement at that time.   The Break-Up Fee and Expense Reimbursement shall be paid at the Closing of the Alternative Transaction from the proceeds of the Competing Overbid as an allowed administrative expense claim against Sellers' bankruptcy estates without further Order of the Bankruptcy Court.  A "Competing Overbid" is defined in the Bidding Procedures Order and includes a proposal or offer from any Person other than Purchaser relating to any Alternative Transaction.

7.5    Debtor's Fiduciary Obligations.  Notwithstanding anything in this Agreement to the contrary, each and every covenant, obligation and standard of conduct of Sellers set forth in this Agreement shall be subject to and limited by Sellers' obligations as a fiduciary and other requirements of the Bankruptcy Code, and this Agreement shall be deemed to be amended to the extent that any such obligations, requirements or limitations conflict with or are inconsistent with the provisions of this Agreement.

## ARTICLE 8

## COVENANTS

8.1    Appropriate Action; Filings.  Through the Closing Date, Sellers and Purchaser shall cooperate with each other and use (and shall cause their respective controlled Affiliates to use) commercially reasonable efforts:  (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, Applicable Law or otherwise to consummate and make effective the Transactions; (b) to obtain promptly from any Governmental Authority any Orders or Permits required to be obtained by Sellers or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions; (c) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under any Applicable Law; and (d) to defend any and all lawsuits and other proceedings by or before any Governmental Authority challenging this Agreement or the consummation of the Transactions; provided, that Sellers shall not be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the Transactions.

8.2    Preservation of JSAT Interest.  Neither Sellers nor any Person or entity affiliated therewith shall undertake any action that hinders or otherwise prevents the transfer of ownership

**DRAFT**

of the JSAT Interests and Sellers shall preserve the economic benefits of the JSAT Interest so as to ensure the transfer of the full and complete economic benefits of the JSAT Interests to Purchaser.

8.3    Preservation of Records; Cooperation.    Sellers and Purchaser shall (and shall cause their controlled Affiliates to) preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of two (2) years or such longer period as may be required by Applicable Law (provided, however, that in no event shall Sellers be required to preserve such records after the Bankruptcy Case is closed), and shall make such records and personnel available to the other Party as may reasonably be required by such Party; provided, that in no event shall either Party be obligated to provide any information the disclosure of which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or which would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound.    After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records, at least sixty (60) days' prior written notice to such effect shall be given by Purchaser to Sellers and Sellers or their successors (or a Person designated by Sellers) shall have the opportunity (but not the obligation), at their sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select.

8.4    Further Assurances.    Sellers and Purchaser shall use their commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transactions and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

## ARTICLE 9

## TAX MATTERS; OTHER AGREEMENTS

9.1    Tax Matters.

(a)    Transfer Taxes.    To the extent not exempt under Section 1146 of the Bankruptcy Code, all sales, transfer, filing, recordation, registration, documentary, stamp, value-added, goods and services and similar Taxes and fees arising from or associated with the Transactions (collectively, "Transfer Taxes") shall be paid and borne by Purchaser.    At least five (5) Business Days prior to the Closing Date, Sellers shall prepare with Purchaser's cooperation to the extent reasonably requested by Sellers, and deliver to Purchaser for its review and approval any necessary Tax Returns and other documentation with respect to any such Transfer Taxes.    The Party required by law to file any Tax Return in respect of Transfer Taxes shall timely do so.    Notwithstanding the foregoing or anything to the contrary in this Agreement, the Sellers and the Purchaser will use their best efforts to seek to have the Transactions contemplated by this Agreement be exempt from such Transfer Taxes, including but not limited to, any and all municipal, state and county transfer taxes, pursuant to Section 1146(a) of the Bankruptcy Code and Applicable Law.

(b)    Tax Returns and Payments.    Except as otherwise provided herein, after the Closing, Purchaser shall prepare and file (or cause to be prepared and filed) all Tax Returns

**DRAFT**

required to be filed with respect to the Purchased Assets, if any, for any Taxable period that begins after Closing Date.

(c)     _Cooperation_.  Sellers, on the one hand, and Purchaser, on the other, will provide each other with such cooperation and information and documentation as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities.  Any information obtained under this Section 9.1 shall be kept confidential except to the extent disclosure of such information may be necessary or appropriate in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

## ARTICLE 10

## CONDITIONS TO CLOSING

10.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser, in its reasonable discretion, in whole or in part to the extent permitted by Applicable Law):

(a)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date;

(b)     Sellers shall have delivered, or caused to be delivered, to Purchaser all the items set forth in Section 4.2;

(c)     all material consents (or, in lieu thereof, waivers) described on Schedule 3.1 (i) to the extent that same are required and can be obtained, shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) shall be in full force and effect;

(d)     the Bidding Procedures Order containing the Stalking Horse Bid Protections shall have been entered and is a Final Order;

(e)     Purchaser has been selected as the Winning Bidder at the Auction;

(f)     the Sale Order approving Purchaser as the Winning Bidder and approving this Agreement has become a Final Order on or before March 15, 2019;

(g)    the Debtors have filed a plan of reorganization or liquidation acceptable to the Purchaser, solely in matters related to immigration, and not with respect to proposed distributions to creditors, on or before March 15, 2019; and

(h)    the Amended LP Agreement is effective and provides for, *inter alia*, (i) the removal of GreenTech Automotive Capital A-3 GP, LLC as the general partner of GreenTech Automotive Partnership A-3, LP, (ii) the appointment of Purchaser as the general partner of GreenTech Automotive Partnership A-3, LP, and (iii) includes such other amendments and modifications that are necessary to attempt to preserve the immigration benefits afforded to the limited partners of GreenTech Automotive Partnership A-3, LP, as such benefits existed on or prior to the Effective Date.

10.2    <u>Conditions Precedent to Obligations of Sellers</u>.    The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers, in writing, in their reasonable discretion, in whole or in part to the extent permitted by Applicable Law):

(a)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date;

(b)    Purchaser shall have delivered, or caused to be delivered, to Sellers all the items set forth in <u>Section 4.3;</u>

(c)    Purchaser has been selected as the Winning Bidder at the Auction; and

(d)    the Sale Order approving Purchaser as the Winning Bidder and approving this Agreement has become a Final Order.

10.3    <u>Conditions Precedent to Obligations of Purchaser and Sellers</u>.    The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchaser and Sellers in whole or in part to the extent permitted by Applicable Law):

(a)    there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    the Bankruptcy Court shall have entered the (i) Bidding Procedures Order including approval of the Stalking Horse Bid Protections and has become a Final Order, and (ii) Sale Order and the Sale Order has become a Final Order.

10.4    <u>Frustration of Closing Conditions</u>.    Neither Sellers nor Purchaser may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>Section 10.2</u> or <u>Section 10.3</u>, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

**DRAFT**

## ARTICLE 11

## LIMITATIONS

11.1    <u>Purchaser's Review</u>.

(a)    <u>No Reliance</u>.    Purchaser has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement and to consummate the Transactions.  In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon, and Purchaser expressly waives and releases Sellers from any Liability for any claims relating to or arising from, any representation, warranty, statement, advice, document, projection, or other information of any type provided by Sellers or its Affiliates or any of their respective Representatives.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon its own knowledge, investigation, judgment and analysis and not on any disclosure or representation made by, or any duty to disclose on the part of, Sellers or their Affiliates or any of their respective Representatives.

(b)    <u>Limited Duties</u>.    Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

## ARTICLE 12

## MISCELLANEOUS

12.1    <u>Survival of Representations, Warranties, Covenants and Agreements</u>.    The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or upon termination of this Agreement pursuant to <u>Section 4.5</u>, and, following the Closing or the termination of this Agreement, as the case may be, and notwithstanding anything to the contrary contained herein or pursuant to Applicable Law, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives. Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; <u>provided</u>, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.  Notwithstanding the foregoing, to the extent that Closing does not occur as provided for in this Agreement, the claims of the Investors against any of the Debtors shall not be waived and are otherwise preserved.

12.2    <u>Expenses</u>.    Except as otherwise set forth in this Agreement and the DIP Financing, including but not limited to the Break-Up Fee and Expense Reimbursement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the Transactions contemplated hereby and

26

**DRAFT**

thereby; provided, however, except as provided in the Sale Order, Purchaser shall bear sole responsibility for any governmental charges relating to any UCC-3 filing fees or other necessary filing fees and other amounts payable in respect of transfer filings in connection with the Transactions contemplated by this Agreement.

12.3     Submission to Jurisdiction.

(a)     Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Agreement and the Transaction Documents, and to decide any claims or disputes among the Parties that may arise or result from, or be connected with, this Agreement and the Transaction Documents, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all Actions related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 12.8; provided, however, that if the Bankruptcy Case has been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Virginia.

(b)     The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each of the Parties hereby consents to process being served by any Party in any suit, Action or proceeding by serving of a copy thereof in accordance with the provisions of Section 12.8; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

12.4     Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).   EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.4.

27

**DRAFT**

12.5    <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

12.6    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.7    <u>Governing Law</u>.  THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

12.8    <u>Notices</u>.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section):

    If to Sellers:    GreenTech Automotive, Inc.

**DRAFT**

> 21355 Ridgetop Circle
> Suite 250
> Sterling, VA 20166
> Attn:  Chief Financial Officer
> E-mail: peter.huddleston@wmgta.com

with a copy to (which alone shall not constitute notice):

> Crowell & Moring LLP
> 590 Madison Ave., 20th Floor
> New York, NY  10022
> Attn:  Mark S. Lichtenstein
> E-mail: mlichtenstein@crowell.com

If to Purchaser:    [INSERT]

with a copy to (which alone shall not constitute notice):

> SQUIRE PATTON BOGGS (US) LLP
> 2550 M Street, NW
> Washington, DC 20037
> Attn:  Jeffrey N. Rothleder and Christopher J. Giaimo
> Email:   jeffrey.rothleder@squirepb.com
>              christopher.giaimo@squirepb.com

12.9    <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

12.10    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a Party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; <u>provided</u>, <u>however</u>, that (a) prior to the Closing, Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's right to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser and (b) after or in connection with the Closing, Purchaser (or its permitted assignee) shall have the right to assign its rights and/or delegate its obligations hereunder (i) to any Affiliates, (ii) to

29

**DRAFT**

any financing sources for collateral purposes or (iii) to any subsequent purchaser of all or any portion of the stock or assets of Purchaser.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.11    <u>Headings</u>.    The Article and Section headings in the Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    <u>Counterparts</u>.    This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[The Remainder of This Page Is Intentionally Left Blank]

**DRAFT**

     **IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**SELLERS:**

**WM INDUSTRIES CORP., DEBTOR-IN-POSSESSION**

By:_____

Name: _____

Title:_____

**GREENTECH AUTOMOTIVE, INC., DEBTOR-IN-POSSESSION**

By:_____

Name: _____

Title:_____

**PURCHASER:**

**ENCORE WEALTH INVESTMENTS LIMITED**

By:_____

Name: _____

Title: _____

**DRAFT**

**EXHIBIT A**

**BIDDING PROCEDURES ORDER**

**[Attached]**

**DRAFT**

## EXHIBIT B

## SALE ORDER

**[Attached]**

**DRAFT**

## EXHIBIT C

## INVESTORS

| <u>Name</u> | <u>Tranche</u> | <u>Name</u> | <u>Tranche</u> |
|---|---|---|---|
| DAI YUQING | A3 | KONG GEZI | A4 |
| TAO LEI | A3 | FANG WEIMING | A4 |
| LIANG HUI | A3 | HAO LIJUN | A4 |
| LI YING | A3 | HE YIMIN | A4 |
| WANG NING | A3 | ZHANG JINYING | A4 |
| CHEN RAN | A3 | CHEN JUAN | A4 |
| ZHANG SHENGBO | A3 | CHAI XUDONG | A4 |
| LI XINMIN | A3 | LI JING | A4 |
| LIU XIANHAI | A3 | TIAN YUE | A4 |
| DONG YUE | A3 | LI YAN | A4 |
| LIU JINHUA | A3 | ZHANG JIANYU | A4 |
| XU JING | A3 | SHI JIN | A4 |
| ZHANG ZHENJUN | A3 | JIN NING | A4 |
| LUO YINGSHU | A3 | MA YUN | A4 |
| YANG XIN | A3 | MA JING | A4 |
| WAN LING | A3 | SUN PIN | A4 |
| WANG ZHIWEI | A3 | WEI MING | A4 |
| LONG GAN | A3 | LIANG TAO | A4 |
| WANG RUI | A3 | ZOU LIANGGUANG | A4 |
| LU XIAOSHUANG | A3 | LIN JIE | A4 |
| GENG TIANYANG | A3 | DONG GANG | A4 |
| CAI ZHIQIANG | A3 | LI LIXIA | A4 |
| ZHAO HUIBIN | A3 | SUN TINGYE | A4 |
| HUANG JUN | A3 | PENG LINYAN | A4 |
| ZHONG FUMIN | A3 | CUI WEIYING | A4 |
| ZHANG YUNHAI | A3 | GAO TIANQUN | A4 |

**DRAFT**

| Name | Tranche | Name | Tranche |
|---|---|---|---|
| GAO CHUN | A3 | WANG YANDONG | A4 |
| LI LI | A3 | JIANG JIABO | A4 |
| | | LU CHENGWEI | A4 |
| | | FENG QIUHONG | A4 |
| | | JIANG LIYA | A4 |
| | | WU XIAOYAN | A4 |
| | | ZHAO XUEJUN | A4 |
| | | WANG ZONGANG | A4 |
| | | WANG JING | A4 |
| | | HU GONGDE | A4 |
| | | DONGHONG LI | A4 |
| | | WANG XIANZHE | A4 |
| | | JIANG XIAOXIAO | A4 |
| | | YANG MAN | A4 |
| | | LI JUN | A4 |
| | | ZHONG MEI | A4 |
| | | SU YINGYING | A4 |
| | | AI YUNQIAN | A4 |
| | | ZHANG LE | A4 |
| | | QI XUEMEI | A4 |
| | | YU ZHITAO | A4 |
| | | MU XIN | A4 |
| | | YING HONGBO | A4 |
| | | XU HUI | A4 |
| | | ZHANG YING | A4 |
| | | WANG ZIJUN | A4 |
| | | ZHANG DEHONG | A4 |
| | | ZHANG HAO | A4 |

**DRAFT**

| Name | Tranche | Name | Tranche |
|------|---------|------|---------|
| | | WANG XIN | A4 |
| | | LI HENG | A4 |
| | | SHI LIZHENG | A4 |
| | | BIAN XINMIN | A4 |
| | | ZHANG YANG | A4 |
| | | LI NA | A4 |
| | | MA CHAOSONG | A4 |
| | | CHEN WEN | A4 |
| | | LI JUN | A4 |
| | | GUO CHUNLEI | A4 |
| | | ZHAO XIAONING | A4 |
| | | LI XIAOLU | A4 |
| | | HE XIAOHUA | A4 |
| | | XU SHITONG | A4 |
| | | SHENG LIJUN | A4 |
| | | YANG WEN | A4 |
| | | WANG WENJIE | A4 |
| | | LIN YING | A4 |
| | | ZHANG ZIYIN | A4 |
| | | JIANG HUIFEN | A4 |
| | | SHEN JING | A4 |
| | | WANG FANG | A4 |
| | | MA LIN | A4 |

**DRAFT**

**EXHIBIT C**

**SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP
AGREEMENT OF GREENTECH AUTOMOTIVE PARTNERSHIP A-3, LP**

**[Attached]**

**DRAFT**

### SCHEDULE 1.1

### PURCHASER ASSUMED CONTRACTS

### NONE

**DRAFT**

## SCHEDULE 2.1

## PURCHASED ASSETS

1.      All real and personal property owned by GTA including that certain real estate located in Robinsonville, Tunica County Mississippi, consisting of 99.5 acres, more or less, owned by GTA and on which GTA constructed and fitted out a manufacturing facility for automobiles;

2.      The JSAT Interest which is held indirectly by WMIC and which was received by GTA in exchange for the conveyance of its rights in the MyCar intellectual property and certain engineering assistance to JSAT;

3.      Litigation claims, if any, that exist, and have not been settled or released, as of the Closing Date, excluding avoidance actions pursuant to Chapter 5 of the Bankruptcy Code;

4.      [All assets of Gulf Coast Funds Management, LLC, a Louisiana limited liability company, which is a wholly owned subsidiary of WMIC];

5.      All Accounts Receivable, Intellectual Property, Intellectual Property Licenses, and all other tangible or intangible assets of any of the Sellers.

**DRAFT**

## SCHEDULE 2.2

## EXCLUDED ASSETS

**DRAFT**

## SCHEDULE 2.3

## ASSUMED LIABILITIES

## NONE

**DRAFT**

## SCHEDULE 3.1

## REQUIRED CONSENTS

**[NONE]**

**DRAFT**

## SCHEDULE 3.4

## ALLOCATION OF PURCHASE PRICE