## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| GreenTech Automotive, Inc., et al.[1] | ) | Case No. 18-10651 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### DISCLOSURE STATEMENT FOR THE FOURTH AMENDED
### JOINT CHAPTER 11 PLAN OF LIQUIDATION PROPOSED BY
### GREENTECH AUTOMOTIVE, INC. AND WM INDUSTRIES CORP.

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE FOURTH AMENDED JOINT PLAN OF LIQUIDATION (THE "PLAN") PROPOSED BY GREENTECH AUTOMOTIVE, INC. AND WM INDUSTRIES CORP. (TOGETHER, THE "DEBTORS"). THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTORS URGE VOTERS TO ACCEPT THE PLAN.**

Kristen E. Burgers (VSB No. 67997)
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, Virginia 22102
Telephone:      (703) 584-8900
Facsimile: (703) 584-8901
Email:  kburgers@hirschlerlaw.com

*Co-Counsel to the Debtors*

Mark S. Lichtenstein (Admitted  *pro hac vice*)
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:  (212) 223-4000
Facsimile: (212) 223-4001
Email:  mlichtenstein@crowell.com

*Co-Counsel to the Debtors*

April 24, 2019

---

[1]  The Debtors in these jointly administered chapter 11 cases are GreenTech Automotive, Inc. (Case No. 18-10651), WM Industries Corp. (Case No. 18-10652), Gulf Coast Funds Management, LLC (Case No. 18-10653), American Immigration Center, LLC (Case No. 18-10654), GreenTech Automotive Capital A-3 GP, LLC (Case No. 18-10655), and GreenTech Automotive Partnership A-3, L.P. (Case No. 18-10656).

**PREFACE**

**PLEASE NOTE THAT THIS DOCUMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT**

**PLEASE REVIEW THIS DOCUMENT FOR IMPORTANT INFORMATION REGARDING:**

> **\* Description of the Debtors**
>
> **\* Classification and Treatment of Claims and Interests**
>
> **\* Distribution to Holders of Allowed General Unsecured Claims**
>
> **\* Implementation and Execution of the Plan**
>
> **\* Treatment of Contracts and Leases and Procedures to Assert and Resolve Rejection Claims**

**AND IMPORTANT DATES:**

> **\* Date to Determine Record Holders of Claims and Interests – _____**
>
> **\* Deadline to Submit Ballots and Investor Consents– _____, 2019 at 5:00 p.m. (ET)**
>
> **\* Deadline to Object to Plan Confirmation – _____, 2019 at 5:00 p.m. (ET)**
>
> **\* Deadline to Submit Rejection Claims – _____, 2019 at 5:00 p.m. (ET)**
>
> **\* Hearing on Plan Confirmation – _____, 2019 at 11:00 a.m. (ET) before the Honorable United States Bankruptcy Judge Brian F. Kenney, in Court Room I at the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division, 200 South Washington Street, 2nd Floor, Alexandria, Virginia 22314.**

**IF YOU HOLD A CLAIM IN A CLASS ENTITLED TO VOTE, YOUR BALLOT IS ATTACHED TO THE END OF THIS DOCUMENT.  IF YOU ARE AN A-3 OR A-4 INVESTOR YOU ARE BEING ASKED TO OPT-IN TO A RELEASE IN FAVOR OF ENCORE AND AN INVESTOR CONSENT TO THIRD-PARTY RELEASES IS ATTACHED TO THE END OF THIS DOCUMENT.  PLEASE REVIEW THIS**

**DOCUMENT AND COMPLETE AND PER THE INSTRUCTIONS CONTAINED HEREIN TO THE FOLLOWING ADDRESS BY U.S. MAIL, E-MAIL, OR FACSIMILE:**

> **CROWELL & MORING LLP**
> **590 MADISON AVENUE, 20TH FLOOR**
> **NEW YORK, NEW YORK  10022**
> **ATTN: MARK LICHTENSTEIN**
> **FACSIMILE: 212-223-4134**
> **E-MAIL: MLICHTENSTEIN@CROWELL.COM**

**A COPY OF THIS DISCLOSURE STATEMENT AND THE DEBTORS' JOINT PLAN OF LIQUIDATION CAN BE OBTAINED UPON WRITTEN REQUEST TO COUNSEL FOR THE DEBTORS AT THE FOLLOWING ADDRESSES:**

> **CROWELL & MORING LLP**
> **590 MADISON AVENUE, 20TH FLOOR**
> **NEW YORK, NEW YORK  10022**
> **ATTN: MARK LICHTENSTEIN**
>
> **HIRSCHLER FLEISCHER**
> **8270 GREENSBORO DRIVE, SUITE 700**
> **TYSONS, VIRGINIA 22102**
> **ATTN: KRISTEN E. BURGERS**

1.   **INTRODUCTION.**

1.1.   **Purpose of the Disclosure Statement.**   Notice of this disclosure statement (as amended, modified or supplemented, the "**Disclosure Statement**") is being provided by GreenTech Automotive, Inc. ("**GTA**") and WM Industries, Corp. ("**WMIC**" and, together with GTA, the "**Debtors**," or the "**Companies**") to the Office of the United States Trustee, the Securities and Exchange Commission and to all of the Debtors' known Creditors and Interest Holders pursuant to Section 1125(b) of Title 11 of the United States Code (the "**Bankruptcy Code**") for the purpose of soliciting acceptances of the Debtors' Modified Third Amended Joint Plan of Liquidation (the "**Plan**").  The Plan has been filed with the United States Bankruptcy Court for the Eastern District of Virginia, Alexandria Division (the "**Bankruptcy Court**"), and the summaries of the Plan contained herein shall not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  <u>All capitalized terms used within this Disclosure Statement which are not defined herein have the meanings set forth in the attached Plan</u>.  **Bankruptcy Court approved the Disclosure Statement and certain Plan solicitation and confirmation procedures and deadlines (the "Solicitation Scheduling Order").  A hearing on confirmation of the Plan shall be held on _____ __, 2019 at 11:00 a.m. (ET).  The deadline to object to Plan Confirmation is _____ __, 2019 at 5:00 p.m. (ET).  The Debtors may make non-material amendments, modifications and/or additions to the Disclosure Statement and Plan prior to the Effective Date without further Order of the Bankruptcy Court.**

PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTORS' BOOKS AND RECORDS AND PLEADINGS FILED BY THE DEBTORS.   STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.   THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON ITS ACCURACY.

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT

OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER
DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.  THE
DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR
INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR
INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL,
LEGAL AND TAX ADVISORS TO UNDERSTAND FULLY THE PLAN AND
DISCLOSURE STATEMENT.  THE FINANCIAL INFORMATION CONTAINED IN THIS
DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS
OTHERWISE SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES
NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE
IN THE FACTS SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE
STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN
AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS, IF
ANY.  IF ANY CONFLICTS EXIST BETWEEN THE PLAN AND DISCLOSURE
STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

IF A HOLDER OF A CLAIM WISHES TO CHALLENGE THE ALLOWANCE
OR DISALLOWANCE OF A CLAIM FOR VOTING PURPOSES UNDER THE
TABULATION RULES SET FORTH IN THE SOLICITATION SCHEDULING ORDER,
SUCH ENTITY MUST FILE A MOTION, PURSUANT TO BANKRUPTCY RULE 3018(A),
FOR AN ORDER TEMPORARILY ALLOWING SUCH CLAIM IN A DIFFERENT
AMOUNT OR CLASSIFICATION FOR PURPOSES OF VOTING TO ACCEPT OR REJECT
THE PLAN AND SERVE SUCH MOTION ON THE UNDERSIGNED COUNSEL TO THE
DEBTORS SO THAT IT IS RECEIVED NO LATER THAN **5:00 P.M., PREVAILING
EASTERN TIME, ON** _____.  THE DEBTORS SHALL HAVE UNTIL _____ P.M.
ON _____ __, 2019 TO FILE AND SERVE ANY RESPONSES TO SUCH MOTIONS.
UNLESS THE COURT ORDERS OTHERWISE, SUCH CLAIM WILL NOT BE COUNTED
FOR VOTING PURPOSES IN EXCESS OF THE AMOUNT DETERMINED IN
ACCORDANCE WITH THE TABULATION RULES.

   1.2.   **<u>Definitions of Terms Utilized in the Plan</u>.**

Unless the context otherwise requires or a term is defined within the Plan itself, the
following terms shall have the respective meanings set forth below, except as expressly provided
otherwise.

**A-3 GP**:  A Delaware limited liability company named GreenTech Automotive Capital
A-3 GP, LLC, the general partner of GreenTech Automotive Capital A-3, L.P.

**A-3 LP**:  A Delaware limited partnership named GreenTech Automotive Partnership A-3,
L.P., the general partner of which is A-3 GP, and the limited partners of which are comprised of
all tranche A-3 Investors and which advanced in the aggregate the sum of $44.5 million to GTA
pursuant to a loan and security agreement and that certain Deed of Trust, Security Agreement,
Assignment of Leases and Rents, Financing Statement and Fixture Filing dated March 12, 2012,
and recorded in the land records of Tunica County, Mississippi on May 24, 2012.  A-3 LP shall
have Allowed Class 3 and Class 6 Claims in the aggregate amount of approximately $44.5

million, subject to the waiver of certain A-3 Investors of any distribution under the Plan on account of the pro rata share of distributions for the Class 3 and Class 6 Claims.

**A-3 LP Deed of Trust**:  Described in the definition of "Mississippi Parcel," below.

**A-3 LP Secured Note**:  Described in the definition of "Mississippi Parcel," below.

**A-1 Investors**:  Certain investors who invested the sum of $500,000.00 each in GTA and which investment was converted, or pursuant to the terms of such investment, was convertible into common stock of GTA prior to the Petition Date.  Each A-1 Investor shall be deemed to have an Allowed Class 10 Claim in the amount of $500,000.00.

**A-2 Investors**:  Certain investors who invested the sum of $500,000.00 each in GTA and which investment was converted, or pursuant to the terms of such investment, was convertible into common stock of GTA prior to the Petition Date.  Each A-2 Investor shall be deemed to have an Allowed Class 10 Claim in the amount of $500,000.00.

**A-3 Investors**:  Holders of limited partnership interests in A-3 LP each such interest having been purchased for a purchase price of $500,000.00.

**A-4 Investors**:  Holders of preferred shares in GTA purchased for $500,000.00 each and which are subject to a redemption right.  Each A-4 Investor shall be deemed to have an Allowed Class 7 Claim in the amount of $500,000.00.

**Administrative Expense Claim Bar Date**:  The date by which any Administrative Expense Claim must be filed, which is the Effective Date.

**Administrative Expense Claim**:  A request for payment of any cost or expense of administration of the Cases allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

**Administrative Fee**:  The fee in the amount of $60,000.00 each of the A-1 through A-4 Investors paid to Gulf Coast Funds Management, LLC for its assistance in qualifying individual investors for the EB-5 visa program, all in connection with their investment.

**Allowed Claim**:  Any Claim (i)(a) for which a proof of claim has been timely Filed with the Bankruptcy Court by the applicable bar date; or (b) that is listed in the Schedules and not listed as disputed, contingent or unliquidated as to amount; and, in either case, as to which no objection to the allowance thereof has been Filed by thirty (30) days after the Effective Date or (ii) which has otherwise been allowed by a Final Order.  Unless otherwise specified in the Plan, an "Allowed Claim" shall not include: (i) untimely Filed Claims Administrative Expense Claims, or Professional Fee Claims; (ii) interest on the principal amount of an Allowed Claim from and after the Petition Date, (iii) any punitive damages, or (iv) Claims which are Assumed Liabilities. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim has been Filed or is not otherwise Allowed pursuant to the Plan or any other Final Order, is not considered Allowed and shall be expunged without further notice to any party or Order of the Bankruptcy Court.

**Amended and Restated A-3 LPA**:  Second Amended and Restated Limited Partnership Agreement for the A-3 LP, which will govern the post-confirmation business activities of the A-3 LP, will be binding on all Partners of the A-3 LP and which will be approved by the Court pursuant to the Confirmation Order.  A copy of the Amended and Restated A-3 LPA is attached to the Disclosure Statement as Exhibit "B."

**APA**:  Asset Purchase Agreement dated April 8, 2019 pursuant to which the Purchased Assets are to be sold to Encore.

**Assets**:  Any and all right, title and interest of any of the Debtors in and to property of whatever type or nature.

**Avoidance Actions**:  Any and all actions, proceedings, accounts, controversies, agreements, promises, claims, and rights of each Debtor and its estate (collectively, the "**Causes of Action**") to avoid or recover a transfer of property of any of the Debtors' estates or an interest of any of the Debtors in property, including, without limitation, actions arising under Sections 506, 510, 541, 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other applicable federal, state, or common law, including fraudulent transfers, whether or not litigation has been commenced with respect to such Causes of Action as of the Effective Date.

**Bankruptcy Code**:  Title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Cases.

**Bankruptcy Court**:  The United States Bankruptcy Court for the Eastern District of Virginia, or in the event such court ceases to exercise jurisdiction over any Case, such court or adjunct thereof that exercises jurisdiction over such Case in lieu of the United States Bankruptcy Court for the Eastern District of Virginia.

**Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure pursuant to Title 28 of the United States Code, 28 U.S.C. §§ 2075, as they have been or may hereafter be amended.

**Business**:  GTA's activities in seeking to manufacture and distribute electric vehicles.

**Business Day**:  Any day except a Saturday, Sunday or any day on which commercial banks in the Commonwealth of Virginia are authorized or required by applicable law to close.

**Case**:  With respect to each Debtor, the Chapter 11 case initiated by such Debtor's Filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**").  The Cases are being jointly administered in the Bankruptcy Court under the lead Bankruptcy Case 18-10651-BFK pursuant to the Order Pursuant to Federal Rule of Bankruptcy Procedure 1015 Directing Joint Administration [Docket No. 3], entered by the Bankruptcy Court on March 9, 2018.

**Cash**:  Legal tender of the United States of America and equivalents thereof.

**Causes of Action**:  All actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims whatsoever, in each case held by the Debtors, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

**Claim**:  A claim, as defined in section 101(5) of the Bankruptcy Code, against one of the Debtors (or all or some of them) whether or not asserted or Allowed.

**Claims Objection Bar Date**:  A date which is thirty (30) days after the Confirmation Date.

4

**Class**:  A category of Claims or Interests designated pursuant to the Plan.

**Class Claim/Interest**:  The specific Class into which Allowed Claims or Allowed Interests are classified pursuant to the Plan.

**Confirmation**:  Entry by the Bankruptcy Court of the Confirmation Order.

**Confirmation Date**:  The date upon which the Confirmation Order is entered by the Bankruptcy Court.

**Confirmation Order**:  The Order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which shall include, _inter alia_, provisions, pursuant to Sections 105, 363, 365 and 1123 of the Bankruptcy Code (i) authorizing sale of the Purchased Assets of the Debtors free and clear of all liens, claims and encumbrances pursuant to the APA but excepting those liens, claims and encumbrances preserved or created under this Plan, all of which shall attach, and continue to attach, to the Purchased Assets, (ii) approving the APA, (iii) authorizing and directing the assumption and assignment of certain executory contracts, and (iv) waiving the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d).

**Creditor**:  Holder of a Claim.

**Debtor**:  Individually, GTA and WMIC, each of which is a Debtor in its Case (collectively, the "**Debtors**").

**Disallowed**:  A Claim or any portion thereof that is disallowed by a Final Order of the Bankruptcy Court or other court of competent jurisdiction.

**Disclosure Statement**: The Disclosure Statement dated as of April 24, 2019, submitted in connection with Debtors' Fourth Amended Joint Chapter 11 Plan of Liquidation, as it may be amended, modified or supplemented from time to time.

**Disputed Claim**:  Any Claim, (i) proof of which has been Filed to which an objection to the allowance thereof has been Filed prior to the Claims Objection Bar Date and such objection has not been either (a) determined by a Final Order or (b) been settled by the parties under a settlement approved by Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019; or (ii) which has not been otherwise allowed by the Bankruptcy Court.

**Disputed Judgment Creditors**:  Certain Investors who obtained a judgment on August 2, 2017, in the Circuit Court for Fairfax County, Virginia, against Gulf Coast Funds Management, LLC, A-3 LP, GreenTech Automotive Capital A-3 GP, LLC and GTA in the amount of $6,720,000.00, plus interest, costs, and fees.

**Distribution**:  The Debtors' distribution of the Debtors' Cash to the Record Holders of Allowed Claims, as set forth in sections 6.2, 6.3, 7.1, and 7.2 of the Plan.

**Distribution Waiving A-3 Investors**:  Certain A-3 investors, which are shareholders in Encore, who have agreed to waive any distribution on account of their pro rata distribution in Classes 3 and 6 of the Plan.

**Distribution Waiving A-4 Investors**:  Certain A-4 investors, which are shareholders in Encore, who have agreed to waive any distribution on amount of their pro rata distribution as Class 7 Claimants.

5

**Docket**:  The official record of the Cases as contained in *In re Greentech Automotive, Inc., et al.*, Case No. 18-10651, available in the Office of the Clerk for the Bankruptcy Court and at https://ecf.edva.uscourts.gov/.

**EB-5**:  Employment-Based Immigration Preference program, administered through the United States Customs and Immigration Services, which offers immigrant investors the opportunity to qualify for permanent U.S. residency by investing specified amounts in certain U.S. job creating initiatives in economically-challenged localities in the United States.

**Effective Date**:  Defined in Section 6.1 of the Plan.

**Encore**:  Encore Wealth Investments Limited, a private equity firm located in the British Virgin Islands, which, pursuant to the Sale Order and the APA, will acquire substantially all of the Assets of the Debtors.

**Estate**:  Means the bankruptcy estate of either GTA or WMIC, as the context requires, prior to their substantive consolidation pursuant to this Plan, and following their substantive consolidation pursuant to this Plan, the combined bankruptcy estates of the Debtors all as defined by Section 541 of the Bankruptcy Code.

**File, Filed or Filing**:  File, filed or filing with the Bankruptcy Court or its authorized designee in the Cases.

**Final Decree**:  As to each Case, the Order entered pursuant to Section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 5009-1 closing such Case.

**Final Order**:  An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, Local Bankruptcy Rules, or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

**General Unsecured Claim**:  Any Claim against a Debtor which is not a Secured Claim, an Administrative Expense Claim, a Professional Fee Claim, a Priority Claim, a Priority Tax Claim, or an Intercompany Claim and shall not include Claims that are disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

**GTA**:  GreenTech Automotive, Inc., one of the administratively consolidated debtors herein.

**GCFM**:  A Louisiana limited liability company named Gulf Coast Funds Management, LLC, which is a designated regional center in the Immigrant Investor Program under the U.S. Department of Homeland Security's U.S. Citizenship and Immigration Services.

**Holder**:  The Person that is the owner of record of a Claim or Interest, as applicable.

**Impaired**:  With respect to any Class of Claims or Interests, the Claims or Interests in such Class that are impaired within the meaning of Section 1124 of the Bankruptcy Code.

**Intercompany Claim**:  Any Claim by one Debtor against the other Debtor.

**Interest**:  Either (i) the legal, equitable, contractual or other rights of any Person with respect to the preferred or common stock, or any other equity interest in any of the Debtors, including any other interest in or right to convert into such equity interest or (ii) the legal, equitable, contractual or other right of any Person to acquire or receive any of the foregoing.

**Interest Rate**:  The federal post-judgment interest rate in effect on the Petition Date, as set forth in 28 U.S.C. §1961.

**Investment**:  The investment of $500,000.00 by any Investor.

**Investor**:  Any A-1 Investor, A-2 Investor, A-3 Investor or A-4 Investor.

**Investor Claims**:  The Claims held by the A-1 and A-2 Investors.

**Investor Consent**:  The consent form which shall be mailed to all A-3 and A-4 Investors for the purpose of allowing such Investor to opt-in to the third party releases in the Plan.

**JSAT**:  Jiangsu Saleen Automotive Technologies, Co., Ltd., a Chinese limited company.

**JSAT Interest**:  The minority interest in JSAT, received in exchange for the conveyance of GTA's rights in the MyCar intellectual property and certain engineering assistance to JSAT and which is held on behalf of GTA by a subsidiary of WMIC, organized under the laws of the Peoples' Republic of China.

**Liquidating Debtor**:  After confirmation of this Plan, the substantively consolidated Debtors on and after the Effective Date for certain limited purposed described herein, with GTA being the continuing entity.

**Litigation Claims**:  The litigation claims held by the Debtors under Chapter 5 of the Bankruptcy Code.

**Local Bankruptcy Rules**:  Those rules adopted by the United States Bankruptcy Court for the Eastern District of Virginia.

**Mississippi Parcel**:  That certain real estate located in Robinsonville, Tunica County, Mississippi, consisting of 99.5 acres, more or less, owned by GTA and on which GTA constructed and fitted-out a manufacturing facility for automobiles and on which the A-3 LP holds a first priority, properly recorded, deed of trust that encumbers such manufacturing facility and 79.9 acres of such property, more or less (the "**A-3 LP Deed of Trust**") and securing one or more promissory notes made, executed and delivered by GTA and payable to the A-3 LP in the original principal amount of $6,862,000.00 (the "**A-3 LP Secured Note**").

**Order**:  An order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Case or the docket of any other court of competent jurisdiction.

**Person**:  An individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

**Petition Date**:  February 26, 2018, the date on which the Debtors filed their respective petitions for relief in the Bankruptcy Court.

**Plan**:  The Debtors' Fourth Amended Joint Chapter 11 Plan of Liquidation dated as of April 23, 2019, as the same may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**Plan Administrator**.  Peter Huddleston shall serve as the Plan Administrator to initiate, coordinate and oversee the prosecution of Avoidance Actions, the prosecution of objections to claims, the distribution to Claimants, the administration of the post-confirmation estate, and, to the extent necessary, the wind-down and dissolution of all the Debtors and their affiliates.

**Plan Documents:**  The Plan Documents shall include, without limitation, the Amended A-3 LPA.

**Plan Supplement**:  The supplement to the Plan that will be filed by the Debtors no later than ten (10) days before the Confirmation Hearing and, which will include any documents listed in Section 10.1 of the Plan and such other documents the Debtors submit in support of the Plan.

**Priority Claim**:   A Claim that is entitled to priority under Section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim, and a Priority Tax Claim.

**Priority Tax Claim**:  A Claim that is entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

**Professional**:  Any professional employed in the Cases pursuant to Sections 327, 328 or 1103 of the Bankruptcy Code or any Professional or other Person seeking compensation or reimbursement of expenses in connection with the Cases pursuant to Section 503(b)(4) of the Bankruptcy Code.

**Professional Fee Claim**:  A Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred during the period from the Petition Date to the Effective Date.

**Professional Fee Claim Bar Date**:  The date that is thirty (30) days after the Effective Date.

**Pro Rata**:  A proportionate distribution on account of Allowed Claims, so that each holder of an Allowed Claim in a class receives a percentage of the total distribution to all holders of Allowed Claims in that class that is equal to the percentage that Allowed Claim holder's Claim represents of the total amount of Claims held by all Allowed Claim holders in that class.

**Purchaser**:  Encore.

**Purchased Assets**:  The Assets (as defined in the Sale Order) that will be transferred to the Purchaser pursuant to the APA and the Sale Order and which are more specifically defined in Section 1(a) of the APA.

**Record Date**:  The Record Date shall be the date on which all record Holders of Claims or Interests shall be recognized, which shall be [●], 2019.

**Record Holder**:  The Holder of an Interest or Claim as of the Record Date.

**Rejection Claim Bar Date**:  The date by which any Rejection Claim (as defined in Section 10.1 hereof) must be Filed and served in accordance with Section 10.2, which is [●], 2019 at 4:00 p.m. (ET).

**Remaining EB-5 Investor Claims**:  The Claims of A-1 Investors and A-2 Investors, in the approximate aggregate amount of $51 million.

**Returned Administrative Fees**:  Those Administrative Fees which the Debtors are using, with the consent of the Investor who paid such Administrative Fee, to support the Debtors' business operations and these Cases and for which the applicable Investors shall receive payment in addition to distributions, on account of Allowed Cass 6 and Class 7 Claims (if any) plus their other Allowed Claims regardless of classification.

**Returned Distribution**:  Any portion of any Distribution subsequently returned to the Debtor.

**Sale**:  The sale of substantially all of the Debtors' Assets, as further described in Section 3.5 of the Disclosure Statement and Sections 6.2 and 6.3 of the Plan.

**Sale Order**.  The Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets; (II) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; (III) Approving Certain Deadlines and the Form, Manner and Sufficiency of Notice; and (IV) Granting Other Related Relief [Docket No. 557], which was entered by the Bankruptcy Court on April 18, 2019, and pursuant to which, the Debtors are authorized to sell and transfer the Assets to Encore free and clear of all liens, claims, encumbrances and interest.

**Sale Proceeds**:  The proceeds of the Sale of the Purchased Assets to Encore.

**Schedules**:  With respect to any Debtor, the Schedules of Assets and Liabilities Filed by such Debtor, as such Schedules may be amended from time to in accordance with Bankruptcy Rule 1009.

**Secured Claim**:  Either (i) a Claim that is secured by a lien on property in which the Debtors have an interest, which lien is valid, perfected and enforceable under applicable law or pursuant to a Final Order, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to Section 506(a) of the Bankruptcy Code; (ii) a Claim which is Allowed under the Plan as a Secured Claim; or (iii) a Claim secured by a lien on collateral to the extent of the value of such collateral as agreed to by the Holder of such Claim and the Debtors.

**State of Mississippi Claim**:  On June 28, 2018, the State of Mississippi filed a Proof of Claim asserting (i) a secured claim in the amount of $3,494,653.02 based on security agreement dated September 6, 2011 and that UCC-1 financing statement filed on March 2, 2012 with the Secretary of State for the State of Mississippi and (ii) an unsecured claim in the amount of $6,000,000.00 based on a pending state court action in Mississippi seeking damages for the breach of the duty of good faith and fair dealing.

9

**Tunica County Secured Claim**:   The Secured Claim of the County of Tunica in Mississippi which is evidenced by that certain Deed of Trust dated September 23, 2011 and recorded among the land records of Tunica County, Mississippi on September 26, 2011.

**Unclassified Claims**:   Claims which, pursuant to Section 1123(a)(1) of the Bankruptcy Code, shall not be placed into a Class.   Unclassified Claims include Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims.

**Unimpaired**:   With respect to a Class of Claims or Interests, any Class that is unimpaired within the meaning of Section 1124 of the Bankruptcy Code.

**USD**:   United States Dollars.

**United States Trustee**:   The Office of the United States Trustee for Region 4, Eastern District of Virginia (Alexandria Division).

**Voting Classes**:   Classes 1, 2, 3, and 6 which are Impaired and entitled to vote on the Plan.

**WMIC**:   WM Industries, Corp., one of the administratively consolidated Debtors herein.

### 1.3.   **Confirmation of the Plan.**

1.3.1.   **Effect of Confirmation.**   Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation will effect the distribution of the Debtors' remaining assets and the dissolution of the Debtors.   Confirmation serves to make the Plan binding upon the Debtors, all Creditors, Interest Holders and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

1.3.2.   **Effect of Failure to Confirm the Plan.**   If the Plan is not confirmed by the requisite majorities in number and amount required by section 1126 of the Bankruptcy Code (the "**Failure to Accept**") or if any of the other requirements for confirmation under the Bankruptcy Code are not met, or, if the Effective Date of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against the Debtor; (b) prejudice in any manner the rights of the Debtor, any Holders of Claims or Interests, or any other Person; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any Holders of Claims or Interests, or any other Person in any respect. The Debtors may elect, but have no obligation, to convert their Cases to cases under Chapter 7 of the Bankruptcy Code. Section 1112(a) of the Bankruptcy Code governs the voluntary conversion from Chapter 11 to Chapter 7 and provides that a debtor may convert a Chapter 11 case to a Chapter 7 case at any time as of right, except in certain circumstances inapplicable here. 11 U.S.C. § 1112(a).

### 1.4.   **Voting on the Plan.**

1.4.1.   **Impaired Claims or Interests.**   Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a payment or distribution under the Plan may vote on the Plan.   Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class.   The Holders

of Claims not Impaired by the Plan (Class 4 (Allowed Priority Non-Tax Claims), Class 5 (Allowed Convenience Class Claims) and Unclassified Claims) are deemed to accept the Plan and do not have the right to vote on the Plan.  The Debtors, as Holders of Claims in Class 9 (Intercompany Claims) and the proponents of the Plan, shall be deemed to accept the Plan. Holders of Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan (Class 7 (Allowed Claims of Class 4 Investors), Class 8 (Allowed Claims of Capital Wealth Holdings, Ltd. and American Theme Park Fund, LLC), Class 10 (Investor Claims) and Class 11 (WMIC Interests)) are deemed to reject the Plan and do not have the right to vote.

1.4.2.  **Eligibility to Vote on the Plan.**    Unless otherwise ordered by the Bankruptcy Court, only Record Holders of Allowed Classes 1, 2, 3, and 6 may vote on the Plan. A Creditor whose Claim has been Allowed in part as a secured Claim and in part as an unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the unsecured part of the Claim.

1.4.3.  **Voting Procedure and Ballot Deadline.**  To ensure your vote is counted you must (i) complete the Ballot, (ii) complete the Investor Consent as applicable, (ii) indicate your decision either to accept or reject the Plan in the boxes provided in the Ballot or to opt-in to a certain release of Encore as set forth in the Investor Consent, and (iii) sign and return the Ballot and the Investor Consents, if applicable, to the address set forth on the Ballot and/or Investor Consent (please note that envelopes and prepaid postage have not been included with the Ballot and/or Investor Consent). **BALLOTS AND INVESTOR CONSENTS MAY BE SENT BY U.S. MAIL, FACSIMILE TRANSMISSION OR ELECTRONIC MAIL.   ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE EITHER TO ACCEPT OR REJECT THE PLAN.  ANY INVESTOR CONSENT THAT DOES NOT SPECIFICALLY CHECK THE OPT-IN BOX WILL NOT BE EFFECTIVE AS A RELEASE. HOLDERS OF CLAIMS IN VOTING CLASSES MUST SUBMIT A SINGLE BALLOT WITH RESPECT TO A CLAIM OR CLAIMS CLASSIFIED BY THE PLAN IN A SINGLE CLASS. IF MULTIPLE BALLOTS ARE SUBMITTED ON ACCOUNT OF CLAIMS IN A SINGLE CLASS, NO SUCH BALLOTS WILL BE COUNTED.**

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that Ballots for the acceptance or rejection of the Plan and Investor Consents must be received by the Debtors' counsel, as indicated on the Ballot, on or before _____**, at 5:00 p.m. (Eastern Time)**.  Please refer to the Solicitation Scheduling Order for further voting procedures and rules.

1.5.  **Acceptance of the Plan.**  As a Creditor, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to Section 1129(b) of the Bankruptcy Code.  In any case, at least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL, FAX, OR E-MAIL THE BALLOT ATTACHED TO THE NOTICE AS WELL AS THE INVESTOR**

**CONSENT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

2.    **THE DEBTORS.**

2.1.    **Description of Debtors, Debtors' History, and Debtors' Business.**

2.1.1.    **The Debtors' Formation and Purpose**.    GTA was organized in Mississippi in 2009 for the purpose of developing, producing, marketing and financing energy efficient automobiles, including electric cars. In 2010, GTA acquired assets including intellectual property, relating to an electric vehicle known as the "My Car".  In 2011, GTA entered into a Memorandum of Understanding with the State of Mississippi Development Authority and the Board of Supervisors of Tunica County, Mississippi, pursuant to which the State of Mississippi and Tunica County agreed to provide a loan and certain additional financial incentives to GTA to support job creation through GTA's manufacturing operations in Tunica County.  GTA owns a manufacturing facility and related equipment in Robinsonville, Tunica County, Mississippi. WMIC is a holding company that is the holder of a majority of the outstanding shares of common stock of GTA.

For the period from 2009 until 2013, GTA received investments aggregating $141.5 million from a total of approximately 283 individuals in four distinct investment transactions, referred to herein as the "A-1", "A-2", "A-3" and "A-4" investment tranches.  In the A-1 tranche, 57 investors invested an aggregate of $28.5 million in GTA's Series A-1 Preferred Stock.  In the A-2 tranche, 35 investors invested an aggregate of $17.5 million in additional shares of GTA's Series A-1 Preferred Stock. In the A-3 tranche, 89 investors invested an aggregate of $44.5 million in limited partnership interests in GreenTech Automotive Capital A-3, L.P., which funds were, in turn, loaned to GTA.  In the A-4 tranche, 102 investors invested an aggregate of $51 million in GTA's Series A-2 Preferred Stock.  The A-1 through A-4 tranches were intended to qualify for the Employment-Based Immigration Preference program, known as "EB-5", which offers immigrant investors the opportunity to qualify for permanent U.S. residency by investing specified amounts in certain U.S. job creating initiatives in economically-challenged localities in the United States.  Each of the investors in the A-1 through A-4 tranches is a participant in the EB-5 program.

2.1.2.    **Significant Early Events**. From 2013 to 2018, the Companies experienced significant financial, operational and litigation challenges:

- In 2013, the conservative-oriented online news organization Franklin Center for Government and Public Integrity (the "**Franklin Center**"), through its watchdog.org web site, published a series of 76 negative articles containing certain false and defamatory statements targeting GTA, which was previously affiliated with Terrence McAuliffe (who at that time was running for Governor of the Commonwealth of Virginia) and Anthony Rodham (whose sister is Hillary Rodham Clinton).  GTA pursued defamation claims against the Franklin Center in the Mississippi and Virginia courts, and such claims were ultimately resolved.  However, the adverse publicity as a result of the watchdog.org articles and the extensive follow-on coverage in major

12

media outlets had an extremely negative impact on the governmental, investor and public perception of GTA and its business.

• As a result of the negative publicity, the Securities Exchange Commission ("**SEC**") commenced an investigation of GTA and its business activities. While the SEC ultimately declined to pursue enforcement action against GTA, the investigation itself and the burden of the required responses to the SEC's inquiries further damaged GTA and its business prospects.

• The Office of the Inspector General of the Department of Homeland Security ("**DHS**") conducted an investigation of GTA and the involvement of Mr. McAuliffe in communications with the DHS's U.S. Citizenship and Immigration Services ("**USCIS**"). The resulting report of the Inspector General in 2015, and the involvement of high-profile Republican legislators such as Senator Chuck Grassley in the matter, further impaired GTA's reputation and fundraising capability and, importantly, the orientation of USCIS toward the Investor petitions for permanent residency under the EB-5 program.

• In early 2015, Plastech Holdings Company ("**PHC**"), a Michigan firm, filed a complaint against GTA and certain of its affiliates in the United States District Court for the Eastern District of Michigan (Southern Division) (the "**PHC Litigation**"). PHC falsely accused GTA of tortious interference with PHC's alleged contractual relationship with a Chinese automotive manufacturer, Anhui Jianghuai Automobile Co., Ltd. ("**JAC**"), with whom GTA had established a cooperative vehicle development and marketing arrangement. After protracted litigation and discovery, GTA secured the dismissal of the PHC Litigation when GTA established conclusively that PHC had forged JAC's signature on a fabricated agreement that was the foundation of PHC's claims against GTA. PHC appealed the dismissal to the Sixth Circuit Court of Appeals (the "**PHC Appeal**"), which ruled that the appeal was stayed against GTA and its affiliates.

• As a result of the PHC Litigation, GTA incurred significant legal and other expenses. It also was forced to terminate abruptly its business relationship with JAC, forfeiting a substantial deposit, stranding substantial start-up expenses, and resulting in other damages totaling in tens of millions of dollars. The PHC Litigation effectively destroyed GTA as a viable enterprise.

• Pre-petition, GTA filed a civil action (the "**PHC/Susman Litigation**") against PHC and its counsel, Susman Godfrey LLP ("**Susman**"), seeking to recover damages resulting from PHC's and Susman's pursuit of claims which they knew were fraudulent. The Susman Litigation was filed in the United States District Court for the Eastern District of Michigan (Southern Division), the same court that dismissed the fraudulent claims against GTA in the PHC Litigation, which administratively closed the case without prejudice to reopen the case upon the filing of an appropriate motion once the merits of the appeal of the Court's dismissal of the original PHC Litigation.

13

In addition to these events, GTA experienced personnel issues and manufacturing and other difficulties which impeded GTA's ability to meet its ambitious business plan. Notwithstanding its early success in fundraising, the combination of these circumstances ultimately resulted in severe economic hardship for GTA. GTA was forced to substantially limit operations in Mississippi, even though it had been successful in establishing the business opportunity with the Chinese firm JAC and had in fact commenced limited production of its MyCar vehicle in Mississippi.

2.1.3.   **The JSAT Interest**.   In 2016, GTA entered into a relationship with a newly organized automotive enterprise in China, Jiangsu Saleen Automotive Technologies, Co., Ltd ("**JSAT**").   In order to preserve the value of GTA for its Investors, GTA entered into an arrangement with JSAT whereby GTA conveyed rights in its MyCar intellectual property and certain engineering assistance to JSAT in exchange for a minority interest in JSAT (the "**JSAT Interest**").   The percentage interest in JSAT received by GTA was based on a third party appraisal of GTA's assets.   The JSAT Interest is held on behalf of GTA by a subsidiary of WMIC and is the principal asset of GTA apart from its manufacturing facility.

2.1.4.   **Events Leading to the Bankruptcy Filing**.   For more than the past several years, GTA has continued to survive only through advances from its principal stockholder and the receipt of fees for engineering services from JSAT.   During this time period, certain Investor groups have sued the Debtors, as has the State of Mississippi and Tunica County. This new wave of litigation consumed the Debtors' dwindling resources.   To address the looming liquidity crisis, the Debtors explored outside financing and possible sale options for the past two years.   Although the Debtors had some promising leads, these leads did not materialize in a definitive transaction.

In 2017 GTA sought to arrange for the purchase of the JSAT Interest by a Chinese investment fund and obtained support for the transaction from a significant portion of its Investors.   However, that transaction was conditioned upon there being no pending major litigation involving GTA.   Unfortunately, GTA was unable to satisfy this condition due to the pendency of litigation against GTA, WMIC and their affiliated entities, including claims asserted by the Xia Bi Group (as defined in Section 2.3.4 below) in a civil action pending before the United States District Court for the Eastern District of Virginia.

Given these circumstances, the Debtors determined, in the prudent exercise of their business judgment, that filing bankruptcy petitions under chapter 11 of the Bankruptcy Code represented the best alternative to stabilize their businesses, provide access potentially to financing for business operations and to ensure the preservation and realization of maximum value for the benefit of their Estates.

2.2.   **The Bankruptcy Filings, First Day Motions, and Retention of Professionals**.

On February 26, 2018 (the "**Petition Date**"), GTA and WMIC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating their respective Chapter 11 Cases.   Also on February 26, 2018, GTA's affiliates Gulf Coast Funds Management, LLC ("**GCFM**"), GreenTech Automotive Capital A-3 GP, LLC ("**A-3 GP**"), GreenTech Automotive Partnership A-3, L.P. ("**A-3 LP**") and American Immigration Center, LLC ("**AIC**")

14

(collectively, the **Affiliates**") each filed a voluntary bankruptcy petition.  The Cases are being jointly administered under the lead case of GTA, captioned as *In re GreenTech Automotive, Inc., et al.* (Case No. 18-10651-BFK).  Other than the filing of the bankruptcy petitions and certain administrative orders, there has been no activity in the Affiliates' bankruptcy cases.  The Affiliates' bankruptcy cases have now been administratively stayed at the request of the United States Trustee.

In conjunction with the filing of the Cases, the Debtors filed several "First Day" motions, including (a) the Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases [Docket No. 43][1]; (b) the Debtors' Motion for an Order Extending the Time to File Schedules and Statements of Financial Affairs [Docket No. 17]; (c) the Debtors' Motion for an Administrative Order (i) Limiting Number of Recipients of Future Notices and (ii) Designating Form and Manner in Which Notices May Be Sent to Certain Interested Parties [Docket No. 67]; (d) the Debtor's Motion for Entry of an Order (a) Authorizing, But Not Directing the Debtor to Pay Certain Pre-Petition (i) Wages, Salaries, and Other Compensation, (ii) Reimbursable Employee Expenses, and (iii) Employee Medical and Similar Expenses; and (b) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests [Docket No. 42]; and (e) the Debtor's Motion for Entry of an Order (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Future Performance and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance [Docket No. 44]. These Motions were all granted by Court order.

The Bankruptcy Court has approved the employment of the following professionals in these Cases: (i) Crowell & Moring LLP, as lead bankruptcy counsel to the Debtors, approved by Order dated April 19, 2018 [Docket No. 124]; (ii) Hirschler Fleischer, as local bankruptcy counsel to the Debtors, approved by Order dated April 19, 2018 [Docket No. 125]; and (iii) Horne LLP, as tax accountants to the Debtors, approved by Order dated April 19, 2018 [Docket No. 127].

2.3.  **Significant Post-Petition Events**.  The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in the Cases.

2.3.1.  **Cost Saving Measures and Operational Motions**.  During the pendency of the Bankruptcy Cases, the Debtors have been successful in reducing their expenses, leveraging their cash assets, and obtaining a source of funding for the Cases.  First, as of the Petition Date, the Debtors had a corporate credit card with First National Bank of Omaha ("**FNBO**"), which FNBO required to be backed by a $50,000.00 collateral account at Chain Bridge Bank.  Upon the filing of the Cases, however, the Debtors cancelled the FNBO credit card and thereafter secured the return of the funds in the collateral account by Court order [Docket No. 138].  Second, the Debtors were able, with authorization from the Court [Docket

---

[1] Unless otherwise specifically stated, all docket numbers refer to the Docket in the designated lead Case of GTA, Case No. 18-10651-BFK.

15

No. 89], to accept $85,000.00 from JSAT to pay the deposit for certain "ATA Carnet Bonds" for five demonstration cars owned by the Debtor and located in China.  Because JSAT paid the fee for the 2018 bonds, the Debtors  received the $85,000.00 deposit being held as of the Petition Date in connection with the 2017 ATA Carnet Bonds and were able to avoid spending critical estate funds to ship the demonstration cars back from China.  The Debtors successfully negotiated with certain of the Investors to obtain their consent to use such Investors' Returned Administrative Fee, in the amount of $60,000.00 per consenting Investor, to fund the ongoing expenses of GTA's business operations and the Estates.  The Court entered an order authorizing the Debtor to use these Returned Administrative Fees on May 24, 2018 [Docket No. 154], thereby resolving the Debtor's immediate need to obtain DIP financing.  On October 30, 2018, GTA filed a motion to reject its lease for office space in Sterling, Virginia and to approve a Lease Termination Agreement pursuant to which its landlord would apply the security deposit to rejection damages claim and waive any further claims.  On Febtuary 15, 2019, the Court entered a final order permitting the Debtors to utilize the sum of $400,000 to fund estate administration (the "**Investor DIP**" [Docket No. 497], which sum was provided by certain of the investors in Encore.  Under the order approving the Investor DIP, the Investor DIP may be utilized as an offset against the cash price for the acquisition of the Purchased Assets.

       2.3.2.  **Extension of the Exclusive Periods**.  In order to have sufficient time to discuss the components of the Plan with the various Creditor and Investor Groups, the Debtors requested and obtained several extensions of the exclusive periods to file a plan and solicit acceptances thereof.  By order entered on March 19, 2019 [Docket No. 529], the Debtors' period to solicit acceptances of a Plan through and including May 22, 2019.

       2.3.3.  **Contested Matters**.  Approximately one month after the Cases were filed, before the Debtors filed their Schedules or the meeting of creditors was held, a group of A-3 Investors, known as the "Xia Bi Group" filed a Motion to Dismiss the Debtors' Cases.  The Xia Bi Group is the plaintiff in a civil action filed prior to the Petition Date in the United States Bankruptcy Court for the Eastern District of Virginia (Alexandria Division), captioned as *Xia Bi, et al. v. GreenTech Automotive, Inc., et al.* (Case No. 1-17-cv-01459-CMH-IDD) (the "**Xia Bi Litigation**"), which named the Debtors, certain of the Affiliates, Terrence McAuliffe, and Anthony Rodham as Defendants.  The Xia Bi Litigation was stayed as to the Debtors and Affiliates, but is going forward as to Defendants McAuliffe and Rodham, who have both filed Motions to Dismiss the Amended Complaint filed by the Xia Bi Group.  On September 5, 2018, the Court dismissed all Claims in the Xia Bi Litigation against Defendants McAuliffe and Rodham.  That order is currently on appeal to the Fourth Circuit.

       On June 22, 2018, the Debtors filed an Objection (the "**PHC Claim Objection**") [Docket No. 195] to the PHC Claim.  PHC filed the PHC Claim in the amount of $35 million.  For the reasons discussed above with respect to the PHC Litigation, the Debtors have requested that the Court strike the PHC Claim in its entirety or, in the alternative, value the PHC Claim at $0 for Plan distribution and Plan voting purposes.  A hearing on the Objection to the PHC Claim was originally scheduled for July 24, 2018.  On July 17, 2018, PHC filed a Motion for Relief from the Automatic Stay (the "**Relief from Stay Motion**") [Docket No. 217], seeking to lift the automatic stay to allow the Sixth Circuit Court of Appeals to hear and decide the PHC Appeal.  A hearing on the PHC Claim Objection and the Relief from Stay Motion was held on August 2, 2018.  On August 17, 2018, the Bankruptcy Court issued an order (a) lifting the automatic stay

solely to allow the Sixth Circuit Court of Appeals to hear and determine the PHC Appeal, (b) overruling the PHC Claim Objection without prejudice, (c) estimating the PHC Claim in the amount of $7 million for purposes of voting under the Plan, and (d) requiring the Debtors to reserve the full amount of the PHC Claim for purposes of distribution under the Confirmed Plan. On August 17, 2018, the Debtors filed a motion with the Sixth Circuit Court of Appeals requesting an expedited oral argument on the PHC Appeal. The Sixth Circuit Court of Appeals set oral argument for October 2, 2018. Prior to the oral argument, the parties commenced discussions aimed at a global resolution of the disputes and all related claims. The parties reached a proposed settlement whereby, subject to Bankruptcy Court approval (i) PHC will pay $25,000.00 to the Debtors, (ii) Susman Godfrey paid $15,000.00 to the Debtors, and (iii) the parties mutually released all claims. On November 19, 2019, the Court entered an order approving the settlement with PHC and Susman Godfrey [Docket No. 379].

Finally, on July 27, 2018, the Debtors filed an adversary proceeding against Gilbert Villareal and Suzanne Villareal for breach of a Settlement Agreement and Mutual Release dated January 11, 2016, between Mr. Villareal and WMIC (the "**Villareal Settlement Agreement**") and certain documents related thereto, all dated as of January 11, 2016, including but not limited to (i) a Promissory Note in the amount of $1,800,000.00 from Mr. and Mrs. Villareal to GTA, (ii) a Security Agreement from Mr. and Mrs. Villareal, Concorde Marine, Inc., and Concorde Manufacturing, Inc., for the benefit of GTA, (iii) and a Guarantee from Concorde Marine, Inc. and Concorde Manufacturing, Inc. for the benefit of GTA (collectively with the Villareal Settlement Agreement, the "**Villareal Settlement Documents**"). Mr. Villareal is a former employee of GTA who, among other things, defrauded the Debtors and converted the Debtors' property. In lieu of pursuing litigation, Mr. Villareal and the Debtors entered into the Villareal Settlement Documents, whereby Mr. Villareal agreed to make escalating monthly payments in amounts from $20,000.00 per month to $36,000.00 per month through July 1, 2018, at which time a balloon payment in the amount of $950,000.00 would be due. Mr. Villareal has failed to make full monthly payments commencing in December 2017 through the present and the amount of approximately $1.4 million currently is due. The Adversary Proceeding is captioned as *GreenTech Automotive, Inc., et al v. Gilbert Villareal, et al*., Adv. Pro. No. 18-01081-BFK. On the eve of trial, the Debtors settled their disputes with Villareal for the sum of $170,000.00 to be paid over several months. On March 28, 2019, the Court approved the settlement with Villareal in the Adversary Proceeding Docket [Docket No. 23].

2.3.4. **Disputed Claims**. There are at least two disputed claims that, if not resolved by negotiation, may have to be resolved through the claims resolution or confirmation process.

A.      **State of Mississippi**. On June 28, 2018, the State of Mississippi filed a proof of claim asserting a secured claim in the amount of $3,494,653.02 and an unsecured claim in the amount of $6,000,000.00. The Debtors' vigorously dispute the State's secured claim because the State failed to file an exhibit listing the equipment with its UCC-1 financing statement. Thus, based on the strong-arm provision of Section 544 of the Bankruptcy Code, the State is an unsecured creditor (although its treatment is different based on the allegations of secured status in its proof of claim). Additionally, the Debtors believe to be without merit the asserted $6 million unsecured claim against GTA based on an alleged breach of the duty of good faith and fair dealing as set forth in the Amended Complaint filed in the Chancery Court of Hinds County, Mississippi, First

17

Judicial District.  Additionally, based on recent paystubs to the State of Mississippi, the principal amount due is $2,850,000.00, plus interest in the amount of approximately $400,000.00.  The Debtors and the State of Mississippi are continuing to engage in discussions regarding consensual plan treatment for the State and the Debtors are cautiously optimistic that a final resolution can be reached.  In the event that the State and the Debtors cannot reach an agreement as to treatment under the Plan, the secured or unsecured status of the claim and the amount of the Claim, the Debtors may seek to object to the claim and estimate it at a far lower number than asserted.

B.  **Tunica County**.  On June 29, 2018, Tunica County filed a proof of claim asserting a secured claim in the amount of $2,000,000.00, plus interest and expenses. Based on a recent survey of the Mississippi Parcel, Tunica County has a security interest in only 19.6 acres of unimproved land, the value of which is estimated at $394,000.00, based on an aggregate value of $2,000,000.00 for the entire 99.5 acre tract as unimproved.  In the event that the County and the Debtors cannot reach an agreement as treatment under the Plan, the secured or unsecured status of the claim and the amount of the Claim, the Debtors may seek to object to the claim and estimate it at a far lower number than asserted.

C.  **The Disputed Judgment Creditors**.  On August 2, 2017, the Circuit Court for Fairfax County, Virginia entered a judgment against Gulf Coast Funds Management, LLC, A-3 LP, GreenTech Automotive Capital A-3 GP, LLC and GTA in the amount of $6,720,000.00, plus interest, costs, and fees, in favor of the Disputed Judgment Creditors.  Although the Disputed Judgment Creditors did not attempt to levy or attach any assets of GTA, the Disputed Judgment Creditors assert a secured lien on all of GTA's intangible personal property, including the JSAT Interest, based on the delivery of the Writs of *Fieri Facias* to a private process server prior to the preference period. The Debtors dispute the lien claim based on a variety of legal and factual issues, including, without limitation, that the JSAT Interest and the economic rights flowing therefrom are located in China and that the value of the assets, at the time of the attachment of the alleged lien, was immaterial and subject to a substantial contingency prior to any value accruing to the JSAT Interest.  The Debtors and the Disputed Judgment Creditors are engaged in discussions regarding the treatment of the Claims under the Plan, which Claims are classified in Classes 3, 6 and 7.  The Debtors are cautiously optimistic that these discussions will result in a final resolution.  On December 7, 2018, the Debtors filed an objection to the claim filed by the Disputed Judgment Creditors [Docket no. 398].  On December 17, 2019, the Disputed Judgment Creditors filed a motion to estimate their claim for voting purposes on the then applicable proposed plan of liquidation.

2.3.5  **The Asset Purchase Agreements, Auction Procedures Motions and Liquidating Plans.**  On July 3, 2018, the Debtors filed their Joint Chapter 11 Plan of Liquidation [Docket No. 210] and a proposed disclosure statement in connection therewith [Docket No. 211]. On July 24, 2018, the Debtors filed their Amended Joint Chapter 11 Plan of Liquidation [Docket No. 232] and a proposed disclosure statement in connection therewith [Docket No. 233].  On August 20, 2018, the Debtors filed their Second Amended Joint Chapter 11 Plan of Liquidation (may be further amended, the "**Plan**") [Docket No. 279] and a proposed disclosure statement in

connection therewith (as may be further amended, the "**Disclosure Statement**") [Docket No. 280].

In furtherance of the Plan confirmation process, on August 14, 2018, the Debtors filed their Motion to (I) Approve Disclosure Statement, (II) Waiving the Notice Requirements Under Local Bankruptcy Rule 3003-1, (III) Approve Forms of Ballot, (IV) Establish Voting Deadline and Procedures For Vote Tabulation, and (V) Approve Form of Notice and Granting Related Relief [Docket No. 234] (the "**Initial Motion to Approve Disclosure Statement**") and the Debtors' Motion for an Order (A) Approving Bidding Procedures for the Sale of the Debtor's Assets; (B) Authorizing and Scheduling an Auction (C) Approving Certain Deadlines and the Form, Manner and Sufficiency of Notice; and (D) Granting Other Related Relief [Docket No. 265] (the "**Initial Auction Procedures Motion**").   The Initial Auction Procedures Motion included as an exhibit the form of Asset Purchase Agreement (the "**Initial APA**") which the Debtors had negotiated with Shenzen Jin Hong Investment Management Co., Ltd., commonly known in China as Golden Resources ("**GR**" or "**Purchaser**").  The Initial APA involved a cash component and an equity component, which was memorialized in such APA and Plan.

The original hearing on the Motion to Approve Disclosure Statement and Initial Auction Procedures Motion was scheduled for August 21, 2018.   Within a few hours of the commencement of the hearing GR advised Debtors' counsel that it was not prepared to move forward with the acquisition of the Assets (as defined below) pursuant to the Initial APA due to (i) an economic downturn in China which affected the value of proposed equity trade and (ii) the absence of third-party releases from the Chinese investors holding debt claims against GTA. Such releases are critical to GR's ability to consummate a transaction whereby GR would "inject" the JSAT Interest into a Chinese public company, which is the ultimate goal of GR in acquiring the Assets.

Subsequent to August 21, 2018, the Debtors reengaged with GR and their major stakeholders to formulate a revised purchase offer from GR and a further amended plan.  After exhaustive negotiations, the Debtors and GR entered into the binding term sheet, the key elements of which were incorporated into and Asset Purchase Agreement.  Pursuant to the terms such Assets Purchase Agreement, GR was to purchase, for the sum of $50 million, substantially all the Debtors' Assets, including (i) the Mississippi Parcel, (ii) the JSAT Interest, (iii) litigation claims, if any, that exist, and have not been settled or released, as of the Effective Date  of the Plan, excluding avoidance actions pursuant to  the Bankruptcy Code, which would remain with the Liquidating Trustee of the Debtors, and (iv) all of the membership interests in GCFM.

On October 17, 2018, the Debtors filed their Amended Motion for an Order (A) Approving Bidding Procedures for the Sale of the Debtor's Assets; (B) Authorizing an Auction (C) Approving Certain Deadlines and the Form, Manner and Sufficiency of Notice; and (D) Granting Other Related Relief [Docket No. 328] (the "**Second Auction Procedures Motion**"). As noted above, the Second Auction Procedures Motion included as an exhibit an asset purchase agreement.  The Auction Procedures Motion was approved by Order entered on October 31, 2018 [Docket No. 350], as corrected by Order entered on November 1, 2018 [Docket No. 355].

On October 30, 2018, the Debtors also filed their Amended Motion to (I) Approve Disclosure Statement, (II) Waive the Notice Requirements Under Local Bankruptcy Rule 3003-

1, (III) Approve Forms of Ballots and A-3 Investor Consent, (IV) Establish Voting Deadline and Procedures For Vote Tabulation, and (V) Approve Form of Notice and Granting Related Relief (the "**Motion to Approve Disclosure Statement**").  On November 13, 2018, a hearing was held on the Motion to Approve Disclosure Statement, at which time the Court approved the Disclosure Statement.

On October 30, 2018, the Debtors filed their Third Amended Plan and Disclosure Statement thereon.  On November 19, 2018, the Debtors filed the Modified Third Amended Plan and Disclosure Statement.

On November 26, 2018, the Court entered an Order approving the Disclosure Statement [Docket No. 381].  On November 7, 2018, the Debtors, through counsel, served the Plan, Disclosure Statement and all related solicitation materials on all creditors and parties in interest. The Debtors, through counsel, also arranged for all solicitation materials to be translated into Chinese.  These translations were served on all of the Debtors' Chinese creditors.  Also, through counsel, the Debtors arranged for advertising in the Washington Post of the auction sale and plan.  Confirmation of the Plan was scheduled for December 21, 2018.  The Debtors requested and were granted a continuance of the confirmation hearing to January 16, 2019, to allow additional time for the Debtors to receive a deposit from GR as the stalking horse bidder. Notwithstanding the additional three week period, GR never posted the deposit.

Shortly before the January 16, 2019 hearing, the Debtors were advised that a group of A-3 and A-4 investors (the "**Investor Group**"), teamed with a private equity concern named Encore were preparing a bid for the purchase of substantially all of the Debtors' assets, including the real property, plant and equipment comprising the Debtors' manufacturing facility, as well as the JSAT Interest.  Because, in the Debtors' estimation, this bid could potentially generate a much better return for creditors than a transfer of the assets to a liquidating trust (which was contemplated under Scenario 2 in the prior Plan), the Debtors, after consulting with certain of their major stakeholders, requested a further continuance of the Plan confirmation hearing, which was scheduled for February 12, 2019.

At the February 12, 2019, hearing on the confirmation of Plan, Debtors' counsel advised the Court of the status of the potential deal with the Investor Group.  Counsel advised the Court that the Debtors and the Investor Group had negotiated a draft asset purchase agreement and had prepared and circulated proposed auction procedures but needed more time to file a motion to approve the auction procedures and the ultimate sale pursuant thereto.

After exhaustive negotiations, the Debtors and the Investor Group prepared the APA. Under the APA, the Purchased Assets, which are more specifically defined in the APA, include: (i) all real and personal property owned by GreenTech, including the Mississippi Parcel, (ii) the JSAT Interest, (iii) litigation claims, if any, that exist, and have not been settled or released, as of the Closing Date (as defined in the APA), excluding avoidance actions pursuant to Chapter 5 of the Bankruptcy Code, (the "**Litigation Claims**"), (iv) all assets of Gulf Coast Funds Management, LLC, a Louisiana limited liability company (the "**GCFM Assets**"), which is a wholly owned subsidiary of WMIC, and (v) all Accounts Receivable, Intellectual Property, Intellectual Property Licenses (all as defined in the APA) and all other tangible or intangible assets of the Debtors (the "**Other Assets**").

20

The consideration for the Purchased Assets is $8,000,000.00, plus a waiver by a number of members of the Investor Group to any distribution under any plan of liquidation or reorganization proposed by any of the Debtors and confirmed by the Bankruptcy Court arising from or related to their respective investments in GreenTech Automotive Partnership A-3, LP or GTA, as applicable (as defined in the APA).

On March 19, 2019, the Court approved the auction procedures and scheduled an auction for April 11, 2019 and a sale hearing for April 16, 2019 [Docket No. 534].

No bidders other than Encore submitted bids and the scheduled Auction was cancelled. On April 16, 2019, the Court approved the Sale of the Purchased Assets to Encore and on April 18, 2019, entered the Sale Order.

### 3.   **THE PLAN**

3.1.   **Purpose of the Plan and General Overview.**   The Plan provides for the substantive consolidation of the Cases, with GTA being the surviving entity. Pursuant to the Plan, the Debtors will effect the distribution of the Debtor's available Cash, which is mostly comprised of the Sale Proceeds. After confirmation of the plan, GTA shall continue its corporate existence for a limited period and for a limited purpose as the Liquidating Debtor. The Liquidating Debtor, through the Plan Administrator, shall make all distributions under the Plan, object to Claims, commence Avoidance Actions, and perform necessary administrative functions, in the sole and absolute discretion of the Plan Administrator, and, if necessary, effectuate a wind-down of the Debtors' remaining business and the businesses of the Debtors' affiliates.

The Plan provides for 11 Classes of Claims and Interests Claims. Classes 4 and 5 are unimpaired Classes under the Plan. Classes 1, 2, 3, 6, 7, 8, 9, 10 and 11 are Impaired Classes under the Plan.

The bar date for filing non-governmental Claims was July 5, 2018. Certain Claimants requested and received one or more extensions of the bar date; all such extensions of the bar date have now expired. The bar date for filing governmental Claims was August 27, 2018. The Debtors are in the process of evaluating all filed proofs of Claim to determine what objections to Claims are necessary and appropriate.

3.2.   **Substantive Consolidation**.   The Plan is predicated upon, and it is a condition precedent to confirmation of the Plan that the Court provides in the Confirmation Order for substantive consolidation of the Cases of the Debtors' estate into a single entity for purposes of this Plan and the distributions hereunder. Pursuant to such Final Order, (i) all Assets and liabilities of the Debtors will be consolidated, (ii) any obligations executed by any Debtor will be deemed to be one obligation of the Debtors, (iii) any Claims filed or to be filed in connection with any such obligation will be deemed one claim against the Debtors, and (iv) each Claim filed in the Case of any Debtor will be deemed filed against the consolidated Assets of the Debtors, in accordance with the substantive consolidation of the Assets and liabilities of the Debtors; however, and notwithstanding the foregoing, such substantive consolidation shall not impair or diminish any valid security interest, lien or encumbrance in any Asset of either Debtor, such

21

security interests, liens and encumbrances, being, and continuing to be, enforceable to the same extent as if there had been no substantive consolidation hereunder. The cases of the jointly administered debtors other than the Debtors shall be dismissed upon entry of the order confirming this Plan. A-3 LP, which is the subject of a stayed bankruptcy case, shall continue to exist after dismissal and be governed by the Amended and Restated A-3 LPA.

3.3. **Classification and Treatment of Claims and Interests under the Plan.** All Allowed Claims and Interests, except the Allowed Unclassified Claims, are placed in the Classes set forth in Article IV of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims have not been classified. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

3.3.1. **Unclassified Claims**. Except for Professional Fee Claims, the treatment of which is described below, the Debtors assert that no amount is due on Administrative Expense Claims, as such Claims have been previously satisfied, shall be satisfied by the Debtors prior to the Effective Date. Each Holder of an Allowed Unclassified Claim that has not been satisfied shall be paid by the Debtors the full amount of such Allowed Unclassified Claim, in Cash on or as soon as reasonably practicable after the Effective Date or on the date on which such Allowed Unclassified Claim becomes due and payable pursuant to the terms thereof, the agreement upon which such Allowed Unclassified Claim is based, or any applicable Order of the Bankruptcy Court. Any Persons that failed to file a proof of Administrative Expense Claim or request for payment thereof on or before the Administrative Bar Date are forever barred from asserting such Claim(s) against any of the Debtors, the Estates, the Liquidating Debtor or their property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Expense Claim.

Each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Liquidating Debtor, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Priority Tax Claim: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the first (1st) Business Day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim or (ii) such other treatment as to which the Liquidating Debtor and such Holder shall have agreed upon in writing.

All Persons seeking an award by the Bankruptcy Court of a Professional Fee Claim incurred through and including the Effective Date shall, unless otherwise ordered by the Bankruptcy Court, file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is no later than forty-five (45) days after the Effective Date. A hearing on final allowance of Professional Fee Claims shall be held as soon as practicable after such applications for Professional Fee Claims are Filed. Professional Fee Claims that are allowed by a Final Order of the Bankruptcy Court shall be paid by the Plan Administrator, acting on behalf of the Liquidating Debtor from available Cash, including the Sale Proceeds.

3.3.2. **Classified Claims.**  As set forth in Article IV of the Plan, Claims classified by the Plan shall be treated and classified as follows:

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|---|---|---|---|---|---|
| 1 | Allowed Tunica County Secured Tax Claim | Impaired, Entitled to Vote | On or as soon as practicable after the Effective Date, in full satisfaction and release of the Allowed Tunica County Secured Tax Claim, Tunica County will receive cash from Sale Proceeds equal to the amount of its Allowed Secured Tax Claim. The Tunica County Secured Tax Claim shall be Allowed in the amount of $465,133.05. | $465,133.05; full payment on the Effective Date | 100% |
| 2 | Allowed Tunica County Secured Claim | Impaired, Entitled to Vote | On or as soon as practicable after the Effective Date, in full satisfaction and release of the Allowed Tunica County Secured Claim, Tunica County will receive Cash equal to the amount of its Allowed Secured Claim in the amount of $394,000.00. | $394,000.00 Secured Claim; full payment on the Effective Date | 100% |
| 3 | Allowed A-3 LP Secured Claim | Impaired, Entitled to Vote | On or as soon as practicable after the Effective Date, in full satisfaction and release of its Claim, A-3 LP will receive Cash from Sales Proceeds equal to the amount of its Allowed Secured Claim in the amount of $6,898,000.00, minus the pro rata portion of the distributions attributable to the Distribution Waiving A-3 Investors. | $4,706,870.59 payment on the Effective Date | 100% |
| 4 | Allowed Priority Non-Tax Claims | Unimpaired, Deemed to Accept | The Debtors assert that no amount is due on account of Class 4 Claims.  To the extent such Claims exist, each Holder of an Allowed Priority Claim that has not been satisfied shall be paid by the Debtors in Cash in the full amount of such Allowed Priority Claim. Distributions on account of Allowed Priority on or as soon as practicable after the Effective Date or on the date on which such Allowed Priority Claim becomes due and payable pursuant to the terms thereof, the agreement upon which such Allowed Priority Claim is based, or any applicable Order of the Bankruptcy Court. | $0; no Sale Proceeds on the Effective Date | 100% |

23

| Class | Type | Status Under Plan | Treatment | Estimated Aggregate Amount in Class ($) | Estimated Recovery of Class (%) |
|---|---|---|---|---|---|
| 5 | Allowed Convenience Class Claims | Unimpaired, Deemed to Accept | This Class is comprised of the Holders of Allowed Unsecured Claims in an amount of less than $10,000.00 for each Claim. On or as soon as practicable after the Effective Date, Holders of Allowed Claims in this Class shall receive full payment on account of their Claims in cash from the Sale Proceeds. The Debtors estimate that the total amount of Convenience Class Claims is in the amount of $62,708.38. | $62,708.38; Paid on Effective Date | 100% |
| 6 | Allowed Unsecured Claims, including the unsecured deficiency claims of the A-3 LP | Impaired, Entitled to Vote | All creditors asserting unsecured claims that are not otherwise classified in the Plan including the unsecured deficiency of the A-3 LP shall receive an aggregate distribution of $1,474,467.71 in Cash, which is a dividend of approximately 5% on account of total Claims in the amount of approximately $30,354,990.31 minus the pro rata distribution allocable to the Distribution Waiving A-3 Investors. Additionally, each non-consenting A-3 Investor shall receive his/her applicable Returned Administrative Fee. | $1,474,467.71 Paid on Effective Date | 5% |
| 7 | Allowed A-4 Investor Claims | Impaired, Deemed to Reject | No recovery under the Plan, other than the return to each non-consenting A-4 Investor his/her applicable Returned Administrative Fee. | $5,585,000.00 | 0% |
| 8 | Allowed Claims of Capital Wealth Holdings, Ltd. and American Theme Park Fund, LLC | Impaired, Deemed to Reject | No recovery under the Plan. | $21 million | 0% |
| 9 | Inter-company Claims | Impaired, Deemed to Accept | Holders of Intercompany Claims will not receive any recovery on account of their Claims. The Debtors, as Plan proponents, shall be deemed to have accepted the Plan. | n/a | 0% |
| 10 | Investor Claims | Impaired, Deemed to Reject | Holders of Investor Claims will not receive any recovery on account of their claims. | $51 million | 0% |
| 11 | WMIC Interests | Impaired, Deemed to Reject | WMIC, as interest holder of 52% of GTA, will retain no ownership interests in the Debtors under the Plan, and such Interests shall be cancelled effective as of the Effective Date. | n/a | 0% |

3.4.   **Acceptance or Rejection of the Plan**.   Classes 1 (Allowed Tunica County Secured Tax Claim), 2 (Allowed Tunica County Secured Claim), 3 (Allowed A-3 LP Secured Claim), and 6 (Allowed Unsecured Claims) are Impaired Classes under the Plan and entitled to Vote.   Class 10 (Intercompany Claims) is an Impaired Class under the Plan but is deemed to have accepted the Plan and is not entitled to vote on the Plan.   Class 7 (Allowed A-4 Investor Claims), Class 8 (Allowed Claims of Capital Wealth Holdings, Ltd. and American Theme Park Fund, LLC), Class 10 (Investor Claims) and Class 11 (WMIC Interests) are also each an Impaired Class under the Plan but are deemed to have rejected the Plan.   Class 4 (Allowed Priority Non-Tax Claims) and Class 5 (Allowed Convenience Class Claims) are each an Unimpaired Class under the Plan and are deemed to have accepted the Plan.   Any Class of Claims that does not consist, as of the date of the Confirmation Hearing, of at least one Allowed Claim, Disputed Claim, or temporarily Allowed Claim under Rule 3018 of the Bankruptcy Rules, shall be deleted from this Plan for Plan confirmation purposes.

The confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied with respect to the Plan.   The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to the Confirmation Hearing upon notice to creditors and other parties in interest.   A determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect the Debtors' ability to modify the Plan to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code.   In the event that the Voting Classes do not vote to accept the Plan, the Debtors shall request the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code.

3.5.   **Implementation and Execution of the Plan.**

3.5.1.   **Effective Date.**   As set forth in Section 6.1 of the Plan, the Plan shall become effective on the date that is the first Business Day on which each condition set forth in Article XII of the Plan has been satisfied or waived as set forth therein.   Upon the occurrence of the Effective Date, the Debtors will file with the Bankruptcy Court a notice of confirmation and occurrence of the Effective Date.   You will not receive further notice of the occurrence of the Effective Date and should monitor the Docket for such notice. If the Effective Date does not occur within the time specified in Section 12.2 of the Plan, the Debtors shall be in default under the terms of this Plan, and all remedies in this Plan and the Plan Documents shall be available and may be exercised.

3.5.2.   **Summary of Means of Implementation and Execution of the Plan.** Article VI of the Plan sets forth the means by which the Plan shall be implemented and executed, the process for Distribution, and the potential role of the Liquidating Trustee.   The Plan will be funded from the Cash from the sale of the Debtor's Assets and from other sources.

3.5.3.   **Sale Proceeds**.   The Purchaser has transferred the Sale Proceeds to the Debtors in the amount of $8,000,000.00 including the Deposit.   The Sale Proceeds in addition to the other available cash shall be distributed in accordance with the Plan Distributions set forth in Article IV hereof.

3.5.3.1 **A-3 LP**.   A-3 LP, which is currently the subject of a stayed bankruptcy case pending in this Court, shall emerge from bankruptcy protection pursuant

25

to the Plan and Confirmation Order and shall be governed by the Amended and Restated A-3 LPA, which shall be approved pursuant to the Confirmation Order.

> 3.5.3.2. **Transfer of Affiliated Entities**.  The Debtors shall cause to be transferred to A-3 LP all equity interests in GCFM.  A-3 LP may elect a new manager to replace GCFM pursuant to the Amended and Restated A-3 LP LPA, shall select one or more new general partners.  Moreover, pursuant to the Plan and the Confirmation Order, the Amended and Restated A-3 LPA shall be approved and shall govern any and all future operations of the A-3 LP, including any distributions received thereby on account of any Claims asserted by A-3 LP against any of the Debtors.

> 3.5.3.3. **Assumption of Contracts and Leases**.   All of the Debtors' executory contracts and unexpired leases that have not been assumed as assigned to the purchaser as of the Confirmation Date shall be deemed rejected.

> 3.5.3.4. **Employees**. To the extent not hired by Encore, the Debtors' employees shall be terminated on or before the Effective Date.

> 3.5.4.  **Implementation of the Plan**.  The Plan will be implemented through the Distribution of the Debtor's Cash, whether from the Sale Proceeds on other cash held by the Debtors.  Liquidating Debtor shall make any required Effective Date payments to Holders of Allowed Class 1 Claims, Allowed Class 2 Claims, Allowed Class 3 Claims, Allowed Class 4 Claims, Allowed Class 5 Claims, and Allowed Class 6 Claims within five (5) business days after the Effective Date.  The Plan Administrator, acting on behalf of the   Liquidating Debtor, shall make any necessary payments after the Effective Date.

> 3.5.6.  **Immigration Matters and EB-5 Investment**.

GTA was funded by a number of EB-5 Investors, including the A-3 Investors and A-4 Investors.  The A-3 Investors advanced $500,000.00 each to the A-3 Limited Partnership, which in turned made a secured loan to GTA in the total amount received from the A-3 Investors.  The A-3 Investors are currently considered limited partners in the A-3 Limited Partnership.  The A-4 Investors even advanced $500,000.00 directly to GTA as securities subject redemption at the option of the A-4 Investors.

Encore will be the purchaser of substantially all of the assets of GTA.  In connection with such acquisition by Encore, the various Investors in Encore, which are comprised of certain A-3 Investors and A-4 Investors, will take certain actions with respect to the disposition of their claims against GTA and potential additional investment that may impact their immigration outcomes as follows:

A.     Certain A-3 and A-4 Investors have determined to accept payments in Cash on account of their claims either from the Debtors or through the Amended and Restated A-3 LPA.  By opting for this outcome, such Investors may have vitiated any opportunity that they may have otherwise had to achieve United States permanent resident status under the EB-5 program.

26

B.      Certain A-3 Investors have opted to have their distributions under the Plan remain in the A-3 LP, which entity will use such proceeds to invest in an entirely separate qualified EB-5 project.  Additionally, some A-3 Investors may infuse new funds into the A-3 LP to invest in such new qualified project.  Pursuit of this option may result in these A-3 Investors achieving permanent resident status under the EB-5 program depending upon the success of the relevant project in creating jobs and upon USCIS interpretations.

C.      Certain A-3 and A-4 Investors have determined to waive their right to distributions under the Plan.  As jobs may be created in GTA after the sale to Encore, such A-3 and A-4 Investors that are also investors in Encore may have a special opportunity to obtain the benefits of the EB-5 program based on their prior investment in GTA.

**THE IMMIGRATION CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE IMMIGRATION CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE LAW AND REGULATIONS.  THERE CAN BE NO ASSURANCE THAT THE FEDERAL GOVERNMENT WILL NOT CHALLENGE ANY OF THE IMMIGRATION CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS/HER OWN IMMIGRATION ADVISOR REGARDING THE IMMIGRATION CONSEQUENCES OF THE PLAN.**

3.7.    **Transfer Taxes**.  Sales, transfers or other dispositions of Assets and property by the Debtors, including any transfers arising from the substantive consolidation of the Debtors under this Plan or the sale of the Purchased Assets pursuant to the APA in contemplation of the Plan, shall be entitled to the tax treatment provided by section 1146(a) of the Bankruptcy Code, and each recording office or other agent of any governmental unit or other taxing authority shall record any such documents of transfer or exchange without any further direction or order from the Bankruptcy Court, and without regard to any law imposing a stamp tax or other similar tax.

3.8.    **Causes of Action**.  All Claims and Causes of Action held by the Debtors other than those conveyed to Encore shall vest in the Liquidating Debtor on the Effective Date and the Liquidating Debtor, through the Plan Administrator, shall have full power and authority to pursue such claims and causes of action for the benefit of the Debtors' creditors.  The proceeds of all Claims and Causes of Action shall be deemed to be the Liquidating Debtor's Cash and shall be administered by the Plan Administrator pursuant to the provisions of this Plan and Causes of Action shall not be subject to approval by the Bankruptcy Court.  All Avoidance Actions (i) shall survive entry of the Confirmation Order, (ii) shall vest in the Liquidating Debtor, and (iii) shall not be barred or limited by estoppel, whether judicial, equitable, or otherwise.  For the avoidance of doubt, any claims or litigation against the Disputed Judgment Creditors and the State of Mississippi, whether in the context of claims objections or Avoidance Actions, shall be the exclusive property of the Debtors, or the Liquidating Debtor, as applicable.

27

3.9.    **Effectuating Documents**.    The Officers and Directors shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

3.10.    **Distributions**.    The Plan Administrator, on behalf of the Liquidating Debtor, shall make all distributions on account of Allowed Unclassified Claims and other Cash payments required on the Effective Date.  Distributions, as applicable, shall be made to Record Holders of any Allowed Claims: (i) at the address set forth on the proof of claim Filed by such Holder, (ii) at the address set forth in any written notices of address change Filed by such Holder, (iii) at the addresses reflected in the Schedules if neither a proof of claim nor a written notice of address change has been Filed, or (iv) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtors' books and records.  The Plan Administrator, on behalf of the Liquidating Debtor, may stop payment on any Distribution check that has not cleared the payer bank within ninety (90) days of the date of Distribution of such check.  No Distribution under the sum of $10.00 is required to be made by the Liquidating Debtor.

3.11.    **Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith, the Plan Administrator, on behalf of the Liquidating Debtor, will comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements.

3.12.    **Executory Contracts and Unexpired Leases.**    All executory contracts and unexpired leases of the Debtors that are not assumed and assigned to Encore, or rejected, prior to the Confirmation Date, shall be deemed rejected.  Any Creditor asserting a claim for monetary damages as a result of the rejection of an executory contract or unexpired lease shall file a proof of claim substantially in the form of Official Form 10 with the clerk of the Bankruptcy Court ("**Rejection Claim**"), and serve it upon Debtors' counsel by overnight mail on or before the Rejection Claim Bar Date.  If no Rejection Claims are filed, such Claims, if any, shall be forever disallowed and barred.  If one or more Rejection Claims are filed the Plan Administrator, on behalf of the Liquidating Debtor, shall have sixty (60) days from the confirmation Date to object thereto.

3.13.    **Procedures for Resolving and Treating Disputed Claims**.

3.13.1. **Objections to and Estimation of Claims and Interests; Prosecution of Disputed Claims and Interests.**    The Debtor, or the Plan Administrator, on behalf of the Liquidating Debtor, as applicable, may file with the Bankruptcy Court an objection to the allowance of any Claim or Interest, or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be litigated to Final Order; *provided, however,* that the Debtor or the Plan Administrator, as applicable, may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to the allowance of such Claims or Interests.  Any objection to the allowance of a Claim not Filed by the Effective Date shall be deemed waived, and the Claim shall be an Allowed Claim in the amount set forth on the proof of claim Filed by the Holder of such Claim. In addition, the

Debtors or the Plan Administrator, as applicable, may, at any time, request that the Bankruptcy Court estimate any Claim under section 502(c) of the Bankruptcy Code, regardless of whether such Claim has been previously objected to or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will be limited to the purposes (such as voting on this Plan) determined by the Bankruptcy Court.  All of the aforementioned provisions with respect to objections to Claims or Interests and the claims estimation and resolution procedures, are cumulative and are not necessarily exclusive of one another.

        3.13.2.  **Distributions on Disputed Claims**.  Notwithstanding any other provision of the Plan to the contrary, no distribution shall be made to the holder of a Disputed Claim or Interest or the holder of a Claim or Interest that is the subject of a proceeding against it by the Debtors or the Plan Administrator, on behalf of the Liquidating Debtor, as applicable, unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest by Final Order.  While disputes regarding Claims or Interests are pending, the Debtors or Liquidating Debtor, as applicable, shall hold for the benefit of each holder of a Disputed Claim or Interest an amount in Cash equal to the distributions that would have been made to the holder of such Disputed Claim or Interest if it were an Allowed Claim or Interest, or, if so determined by the Bankruptcy Court, such amount as estimated by the Bankruptcy Court under section 502(c) of the Bankruptcy Code, until such Claim or Interest becomes an Allowed Claim or Interest.  As soon as practicable after a Disputed Claim or Interest becomes an Allowed Claim or Interest, the holder of such Allowed Claim or Interest shall receive all distributions to which such holder is then entitled under the Plan on account of such Allowed Claim or Interest.  Any Person who holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall receive the appropriate distribution on the Allowed Claim or Interest, although no distribution will be made on the Disputed Claim or Interest until such dispute is resolved by settlement or Final Order.  After resolution of a dispute, any Cash previously reserved for such Disputed Claim or Interest and not paid in connection with the resolution thereof shall be distributed in accordance with the terms of this Plan.

        3.14.  **Modification of the Plan**.  The Debtors reserve the right in accordance with the Bankruptcy Code to amend or modify this Plan prior to the Confirmation Date.  After the Debtors file a modification with the Court, this Plan, as modified, becomes the Plan.  The Debtors or the Plan Administrator, on behalf of the Liquidating Debtor, as applicable, may also modify this Plan at any time after the Confirmation Date regardless of whether this Plan has been substantially consummated within the meaning of sections 1101(2) and 1127(b) of the Bankruptcy Code, if circumstances warrant such modification, if all required disclosure under section 1125 of the Bankruptcy Code has been given, and the Court, after notice and a hearing, confirms the Plan as modified.

        Before or after the Confirmation Date, or in the Confirmation Order, the Debtors or the Liquidating Debtor, through the Plan Administrator, as applicable, may, with the approval of the Court, so long as it does not materially and adversely affect the Interests of Creditors and Interest Holders who have accepted this Plan, remedy any defect or omission, or reconcile any inconsistencies in this Plan or amend this Plan, in such a manner as may be necessary to carry out the purposes and the effect of this Plan without the necessity, if any, of re-soliciting acceptances.

3.15.    **Quarterly Fees**.  Until such time as the Cases are closed, dismissed or converted, the Debtors or Liquidating Debtor, as applicable shall timely pay all quarterly fees due under 28 U.S.C. 1930(a)(6) and file quarterly disbursement reports with the United States Trustee.

3.16.    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**.  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by an impaired Class, if any.  If any class of Claims or Equity Interests entitled to vote on the Plan does not accept the Plan pursuant to section 1126(c), the Debtor reserves the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code and to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

3.17.    **Conditions Precedent to Confirmation of the Plan and the Effective Date**.  Confirmation of the Plan is subject to the following conditions: (i) the Bankruptcy Court having approved the Disclosure Statement by order entered on the docket in the Case of GTA; (ii) the presentment of a Confirmation Order, to the Bankruptcy Court in the Case for entry to confirm the Plan, and (iii) receipt of the Sale Proceeds from Encore.  The Effective Date shall not occur and the Plan shall not be consummated unless and until each of the following conditions has been satisfied (or the Debtors have waived such conditions): (i) the Bankruptcy Court shall have entered the Confirmation Order; (ii) the Confirmation Order shall have become a Final Order, and (iii) the Sales Proceeds shall have been provided by Encore to the Debtors, and (iv) the Effective Date must occur within sixty (60) days of the entry of the Confirmation Order.

4.    **THE EFFECT OF CONFIRMATION**

4.1.    **Binding Effect**.  On and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor or the Liquidating Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

4.2.    **Continuation of Injunctions and Stays**.  Except as otherwise provided in the Plan, Plan Documents, or the Confirmation Order, on and after the Effective Date, and provided that there is no default under the terms of the Plan and Plan Documents, all Persons who have held, currently hold or may hold a debt or Claim against a Debtor or a Liquidating Debtor or the Assets are permanently enjoined from taking any of the following actions on account of any such debt or Claim: (i) commencing or continuing in any manner any action or other proceeding against a Debtor, the Liquidating Debtor or their respective successors or assigns or Assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against a Debtor, the Liquidating Debtor or their respective successors or assigns or Assets; (iii) creating, perfecting or enforcing any lien or encumbrance against a Debtor, the Liquidating Debtor or their respective successors or assigns or Assets; and (iv) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan, the Plan Documents or the Confirmation Order.

4.3.    **Post-Confirmation Governance**.  Zhifa Xu, Jinying Zhang, Peter Huddleston, Trey Agner and Xudong Chai currently sit on the board of directors of GTA (the "**Directors**"). Following the Effective Date, the Directors will serve in their same capacity as Directors of the

Liquidating Debtor until the date of the entry of the Final Decree for the Liquidating Debtor. On the date of the entry of such Final Decree, the Directors of the Liquidating Debtor shall be deemed to have resigned to the extent permissible under applicable law. Nothing herein or in the Confirmation Order, including any releases, shall diminish or impair the enforceability of any policy of insurance that may cover claims against a Debtor or any other Person. Each of the matters provided for under this Plan involving the business structure of the Liquidating Debtor or action to be taken by or required of the Liquidating Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by the members of the Liquidating Debtor. Until dissolution, the Liquidating Debtor may operate under the name of GTA and pursuant to GTA's organizational documents and the laws of the State of Mississippi.

4.4. **Dissolution of the Liquidating Debtor**. On the Effective Date or as soon thereafter as is reasonably practicable, the affairs of the Liquidating Debtor may be wound up and the Liquidating Debtor may be dissolved at any time without the need for any further action or approval; *provided*, *however*, that the entry of the Final Decree as to each Case shall effect such dissolution of the Liquidating Debtor to the extent permissible under applicable law.

## 5. MISCELLANEOUS PROVISIONS

5.1. **Retention of Jurisdiction.** Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction in the Case over the provisions of this Plan including Disputed Claims, Rejection Claims, and Professional Fee Claims, and over all disputes and litigation which may be pending on the Confirmation Date, disputes regarding the APA or the Sale, Causes of Action, including Avoidance Actions, whether or not commenced as of the Effective Date, and any controversies which may arise hereafter which would affect the Debtors' ability to carry out the Plan, until all such disputes and litigation shall be concluded and the Plan shall be fully consummated. Further, the Bankruptcy Court shall retain jurisdiction for the purpose of the Distributions and any related issues which may arise.

5.2. **Governing Law**. Except as mandated by the Bankruptcy Code or Bankruptcy Rules, as applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the Commonwealth of Virginia.

5.3. **Revocation of the Plan**. The Debtors reserve the right to revoke and withdraw the Plan prior to the entry of a Confirmation Order. If the Debtors revoke or withdraw the Plan, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtors.

5.4. **Injunction.** The satisfaction, releases and discharge pursuant to the Plan will also act as an injunction against any person or entity commencing or continuing any action, employment of process or act to collect, offset, secure, recoup or recover any Claim or cause of action satisfied, released or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code.

31

5.5.   <u>**Releases and Exculpations and Limitation of Liability**</u>.

**PLEASE NOTE THAT SECTION 13.9 OF THE PLAN GOVERNS THE RELEASE, EXCULPATION AND LIMITATION OF LIABILITY OF CERTAIN PARTIES WITH RESPECT TO THE CASES.  PLEASE REVIEW THIS PROVISION CAREFULLY.**

5.5.1.   <u>**Release**</u>.   Except as otherwise provided in the Plan or Confirmation Order and except as to obligations arising under the Plan, as of the Effective Date, the Debtors, GCFM, American Immigration Center, LLC, A-3 LP, A-3 GP, and the Plan Administrator, and any of such parties' respective present or former members, officers, directors, employees, advisors, managers, attorneys, representatives, financial advisors, and agents, and any such parties' successors and assigns (collectively, the "**Released Parties**") shall be released by the Debtors' estate from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise (the "**Released Claims**"), that any of them would have been legally entitled to assert or that any holder of a Claim, Interest, or other person or entity would have been legally entitled to assert, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date.  For the avoidance of doubt, the releases contained herein are not intended to, and shall not operate as releases of direct third party claims by any Creditors or Investors.

5.5.2.   <u>**Encore Release**</u>.   Encore has requested that the A-3 and A-4 Investors be provided the opportunity to opt-in to the provision of consensual third-party releases in favor of Encore's respective present or former members, investors, officers, directors, employees, advisors, managers, attorneys, representatives, financial advisors, and agents, and any such parties' successors and assigns (the "**Encore Releasees**") (which releases shall be reciprocal in all respects, subject to the terms below, by the above-referenced in favor of the A-3 and A-4 Investors).  All A-3 Investors and A-4 Investors shall have the option to "opt-in" to such releases by checking a box on the Investor Consent.  The Debtors shall solicit consent to the third-party release in the Investor Consent.  If the Debtors cannot obtain "opt-in" approval from 100% of the A-3 and A-4 Investors but obtain "opt-in" approval from at least 75% of the A-3 and the A-4 Investors submitting ballots, the Debtors reserve the right to request that the Bankruptcy Court approve the third-party release set forth below:

Encore has requested that the A-3 and A-4 Investors be provided the opportunity to opt-in to the provision of consensual third-party releases in favor of Encore's respective present or former members, investors, officers, directors, employees, advisors, managers, attorneys, representatives, financial advisors, and agents, and any such parties' successors and assigns (the "**Encore Releasees**") (which releases shall be reciprocal in all respects, subject to the terms below, by the above-referenced in favor of the A-3 and A-4 Investors).  All A-3 Investors and A-4 Investors shall have the option to "opt-in" to such releases by checking a box on the Investor Consent.  The Debtors shall solicit consent to the third-party release in the Investor Consent.  If the Debtors cannot obtain "opt-in" approval from 100% of the A-3 and A-4 Investors but obtain "opt-in" approval from at least 75% of the A-3 and the A-4 Investors submitting ballots, the

Debtors reserve the right to request that the Bankruptcy Court approve the third-party release set forth below:

*Except as otherwise provided in the Plan or Confirmation Order and except as to obligations arising under the Plan, as of the Effective Date, the Encore Releasees shall be released by the Debtors' estate and all A-3 and A-4 Investors from any and all direct and derivative Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise (the "**Encore Released Claims**"), that any of them would have been legally entitled to assert or that any holder of a direct or derivative Claim, Interest, or other person or entity would have been legally entitled to assert, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date. A-3 and A-4 Investors shall also be released by the foregoing Encore Released Parties from any claim of Encore, to the extent that such A-3 or A-4 Investor opts into the Encore Release.*

5.5.3. **Exculpation.** The Released Parties, including the Encore Releasees (as defined above), and any property of or any professionals retained by the Debtors, shall not have or incur any liability to any person or entity for any act taken or omission, after the Petition Date, in connection with or related to these Cases or the operations of the Debtors' business during the Cases, including but not limited to (i) any actions taken or not taken in connection with the Sale; (ii) formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof); (iii) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; (iv) any Distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Cases, or (v) failure of the Plan or Sale to comply with the requirements of the EB5 program, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan**.**

6. **FEASIBILITY.**

The Bankruptcy Code requires that, in order to confirm a plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan. The Plan provides for the liquidation and distribution of substantially all of the Debtors' Assets in conjunction with the sale of the assets to Encore and certain investors pursuant to the APA for $8 million.

This is a liquidating Plan. The Plan is feasible because all Sale Proceeds and other Sale Proceeds have been deposited with the Debtors and certain Investors have waived their claims.

Alternatively, as set forth above, if the Plan is not confirmed, the Cases will be converted to a case under Chapter 7 and the Chapter 7 Trustee will generate substantial professional fees in administering the Cases, addressing the claims of the Disputed Judgment Creditors and the State of Mississippi (which has already been done), and investing pre and post-petition matters. Indeed, a Chapter 7 liquidation will result in substantial administrative costs in diminution of the

33

funds available to pay Claims under the Plan. The Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

7.      **BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN.**

    7.1.   **Chapter 7 Liquidation.**

        7.1.1.   **Bankruptcy Code Standard.**   Notwithstanding acceptance of a plan by the requisite number of creditors in an impaired class, the Bankruptcy Court must still independently determine that such plan provides each member of each impaired class of claims and interests a recovery that has a value at least equal to the value of the recovery that each such Person would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on the effective date of such plan.

        7.1.2.   **Plan is in the Best Interests of Creditors.**   Notwithstanding acceptance of the Plan by a voting Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class which has not voted to accept the Plan. Accordingly, if an Impaired Class does not vote unanimously to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under Chapter 7.

    The Debtors believe that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a Chapter 7 liquidation.

    In a typical Chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses of the Chapter 7 estate are next to receive payment. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral and payment of administrative expenses, claims entitled to priority are paid next. Creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all creditors with the same priority. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral and payment of administrative expenses and priority claims, holders of general unsecured claims would receive payment. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

    If a Chapter 7 Trustee is appointed, the delay and extra layer of administrative expense will severely diminish the ample funds now available for distribution to Creditors under the Plan. Thus, confirmation of the Plan will be far more beneficial to Creditors than the treatment of Creditors upon a conversion of the Cases to Chapter 7.

7.2.   **Alternative Plan(s).**   The Debtors do not believe that there are any viable alternative plans.  The Debtors believe that the Plan, as described herein, enables holders of Claims to realize the greatest possible value under the circumstances, and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

**8.   RISK FACTORS.**

Holders of Claims who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.

8.1.   **Certain Bankruptcy Considerations.**   Debtors anticipate that the Holders of the various Classes will vote to accept the Plan.  Even if all Impaired Voting Class votes to reject the Plan, and with respect to any Impaired Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Court may nevertheless exercise substantial discretion and may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims or Interests may not be less than the value such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

8.2.   **Claims Estimation.**   There can be no assurance that the estimated amount of Claims set forth in the Plan is correct, and the actual allowed amounts of Claims may differ from the estimates.  Any value given as to the Claims against and the Assets of the Debtors is based upon an estimation of such value.  Additional, there is a genuine possibility that the Debtors may not be successful in their objections to Claims.  If the objections are not successful, the actual distributions to Creditors may vary significantly from the projected distribution.

8.4.   **NO DUTY TO UPDATE DISCLOSURES.**   The debtors have no duty to update the information contained in this disclosure statement as of the date hereof, unless otherwise specified herein, or unless the debtors are required to do so pursuant to an order of the bankruptcy court.  Delivery of the disclosure statement after the date hereof does not imply that the information contained herein has remained unchanged.

8.5.   **Representations Outside this Disclosure Statement**.  This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement (and any related documents) that are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

8.6.   **No Admission**.  The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtor or Holders of Claims and Interests.

9.      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.**

The following discussion summarizes certain U.S. Federal income tax consequences of the Plan to the Debtors and holders of Claims and Interests.  This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below.  Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below.  This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the Federal income tax consequences of the Plan to special categories of taxpayers who are holders of Claims (such as taxpayers who are not U.S. domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each Creditor holds its Claim directly.

The U.S. Federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS/HER/ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

9.1.    **Certain U.S. Federal Income Tax Consequences to the Debtor.**

9.1.1.    **GTA and WMIC Taxable as Corporations**.  GTA and WMIC are taxable as corporations pursuant to subchapter C of the Tax Code.  Upon and information and belief, GTA and WMIC do not file consolidated tax returns.  Upon information and belief, GTA has unused net operating losses in an amount to be determined for tax years ending on or before December 31, 2018.

9.1.2.    **Gain Recognition by Debtor**.  Upon a taxable sale by a Debtor of its property, any recognized gain or loss equal to the difference between the amount realized and the Debtor's adjusted tax basis in the property will be taxable to such Debtor.  The amount realized will include the full proceeds from any sale of property, including the amount of any indebtedness or liabilities assumed by the buyer to which the property is subject, and, therefore,

36

it is possible that any such disposition will produce gain in excess of the cash proceeds of the transaction.

    If the sale of the property results in a gain and such property was used in the Debtor's trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code section 1231 gains and losses of the Debtor. Generally, Tax Code section 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net section 1231 gains must, however, be treated as ordinary income to the extent of net section 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

   9.2.    **Certain U.S. Federal Income Tax Consequences to the Creditors**.

    9.2.1   **Generally**.  The U.S. federal income tax consequences of the Plan to a Creditor will depend upon several factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iii) whether the Creditor has taken a bad debt deduction with respect to its Claim.  In addition, if a Claim is a "security" for tax purposes, different rules may apply.   CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

    9.2.2.   **Cash Payment**.  A Creditor receiving Cash in exchange for its Claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the Allowed Claim.  The amount realized will equal the amount of Cash to the extent that such consideration is not allocable to any portion of the Allowed Claim representing accrued and unpaid interest, as further discussed below.

    The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Creditor, the nature of the Allowed Claim in the Creditor's hands, the purpose and circumstances of its acquisition, the Creditor's holding period of the Allowed Claim, and the extent to which the Creditor previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim.

    A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

    A portion of the consideration received by a Creditor in satisfaction of an Allowed Claim may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest.  If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the Creditor as interest income, except to the extent the Creditor has previously reported such interest as income.

37

Only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the Creditor in respect of the principal amount of the Allowed Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the Creditor with respect to the Allowed Claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

9.2.3. **Federal Income Tax Consequences to Holders of Allowed Claims Receiving No Distributions**. Holders of Allowed Claims receiving no distributions will generally recognize loss in the amount of each such holder's adjusted tax basis in the Allowed Claim.

The character of any recognized loss (i.e., ordinary loss, or short-term or long-term capital loss) will depend upon the status of the Holder, the nature of the Allowed Claim in the Holder's hands, the purpose and circumstances of its acquisition, and the Holder's holding period. The extent to which the Holder had previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim also is relevant in determining the amounts of the loss.

A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

9.2.4. **Net Operating Losses; Cancellation of Indebtedness Income**. Upon information and belief, GTA has incurred substantial net operating losses ("NOLs") for tax years ending on or before December 31, 2018. The unused NOLs may be subject to significant restrictions or limitations on utilization pursuant to Tax Code Section 382. Moreover, the transactions contemplated in the proposed plan of reorganization may create new restrictions or limitations on the utilization of such NOLs, unless the provisions of Tax Code Section 382(l)(5) apply.

To the extent that the proposed plan of reorganization results in the cancellation of indebtedness, the issuer of such indebtedness will recognize income from such cancellation unless an exception to such treatment is available under Tax Code Section 108. The principal exception that might be available to the Debtors is the exception for a discharge of indebtedness in a case filed under Title 11 of the Bankruptcy Code. To the extent that this bankruptcy exception to income recognition is relied upon, the tax attributes of the Debtors would be reduced in the manner prescribed by Tax Code Section 108(b).

9.2.5. **Information Reporting and Backup Withholding**. All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding requirements. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a rate of 24%. Backup withholding generally applies if the Holder fails to provide a taxpayer identification number or fails to otherwise establish an exemption. The amount of any backup withholding will be allowed as a credit against the holder's U.S. federal income tax liability and may entitle

such holder to a refund.  Certain persons, including corporations and financial institutions, are generally exempt from backup withholding.

9.2.6.  **Importance of Obtaining Professional Tax Assistance**.  No Holder of a Claim or Interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional.  The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional.  The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain.  Such consequences may also vary based upon the individual circumstances of each holder of a Claim or Interest.  Accordingly, each Holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, estate, local and foreign tax consequences of the Plan.

10.  **IMMIGRATION AND EB-5 CONSEQUENCES OF THE PLAN**.

The Debtors have not requested an advisory opinion from the United States Customs and Immigration Service ("**USCIS**") on the effect of the Plan on pending Investor applications through the EB-5 Program.  The Debtors and Liquidating Debtor as applicable will continue to work with USCIS in good faith to advance the interests of the Investors with USCIS; however, the Debtors cannot make any assurances with respect to USCIS, the EB-5 Program, or any individual Investor's status with respect thereto.

The Debtors, Liquidating Debtor and/or Encore, as applicable, shall use best reasonable efforts to provide certain supporting documents, records or information, which, in their reasonable discretion, may be necessary for the prosecution of the Form I-526 Petition for Immigrant Investor, or the Form I-829 Petition to Remove Conditional Status filed on behalf of any associated foreign national investors or like parties of interest to the Debtors.  Such documents include (i) accounting records and financial information related to manufacturing and production activities and (ii) staffing records, such as hiring and staffing information, copies of Form I-9 records, tax and wage records, and evidence of immigration status for all full-time employees.

Notwithstanding anything to the contrary in this Disclosure Statement or the Plan, or any amendments, modifications, or supplements thereto: (i) the Debtors, Liquidating Debtor, and Encore have made no representations, warranties or any other statement or inducement to the Investors that the Plan and Sale will comply with the requirements of the EB-5 program, but Borrower has provided true and accurate information as to the scope and nature of the sale as of the date hereof, and (ii) the Investors individually (or with the advice of counsel of their choosing) have the sole responsibility to make his/her own determination as to whether or not the Plan and sale is likely to meet the requirements of the EB-5 program.

## CONCLUSION AND RECOMMENDATIONS.

The Debtors, as the proponents of the Plan, urge all Creditors and Investors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by promptly returning their properly completed ballots to the Balloting Agent, as set forth on the ballots and within the time stated in the notice served with this Disclosure Statement.  The Debtor believes that the Plan maximizes recoveries to all Creditors entitled to receive Distributions on their Allowed Claims and, thus, is in their best interests.  The Plan, among other things, allows Creditors to participate in Distributions in excess of those that would be available if the Assets of the Estates were liquidated under chapter 7 of the Bankruptcy Code, and offers Creditors the potential to receive the full value of their Claims over time.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

IN WITNESS WHEREOF, the Debtors have executed this Disclosure Statement this 24th day of April, 2019.

GREENTECH AUTOMOTIVE, INC.

By:      */s/ Peter Huddleston*
      Name:  Peter Huddleston
      Title:    Chief Financial Officer

WM INDUSTRIES, CORP.

By:      */s/ Peter Huddleston*
      Name:  Peter Huddleston
      Title:    Chief Financial Officer

*/s/ Kristen E. Burgers*
Kristen E. Burgers (VSB No. 67997)
HIRSCHLER FLEISCHER
8270 Greensboro Drive, Suite 700
Tysons, Virginia  22102
Telephone:      (703) 584-8900
Facsimile:      (703) 584-8901
Email:          kburgers@hirschlerlaw.com

*/s/ Mark S. Lichtenstein*
Mark S. Lichtenstein (admitted pro hac vice)
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, New York 10022
Telephone:      (212) 223-4000
Facsimile:      (212) 223-4001
Email:          mlichtenstein@crowell.com

*Co-Counsel to the Debtors*

11157412.3  043227.00001